# EXHIBIT A

1  GEORGE JARVIS AUSTIN
   2107 Montauban Court
2  Stockton, CA, 95210
   209.915.6304
3  georgejarvisaustin@gmail.com; gaustin07@berkeley.edu

4  GEORGE JARVIS AUSTIN, IN PRO PER

5

6              **UNITED STATES DISTRICT COURT**

7              **NORTHERN DISTRICT OF CALIFORNIA**

8  **GEORGE JARVIS AUSTIN**              )  Case No.: ***3:25-cv-07194 (not assigned)***
                                         )
9                   Plaintiff(s),        )  **OPERATIVE COMPLAINT; ALREADY**
                                         )  **FILED IN SF SUPERIOR COURT. 100%**
10          vs.                          )  **CALIFORNIA STATE LAW CLAIMS; 0%**
                                         )  **FEDERAL CLAIMS. There is NO**
11  KEMPER CORPORATION ('KMPR')          )  **FEDERAL JURISDICTION as the claims**
    (2167877; per California Secretary of )  **are 100% California State Claims. This case**
12  State; 55898375 & 60164789;per Illinois )  **100% lacks Federal jurisdiction per statute**
    Secretary of State; Publicly traded as '"KMPR"; )  **and per the 2025 US Supreme Courts Royal**
13  www.kemper.com/,                     )  **Canin U. S. A., Inc. v. Wullschleger, 145 S.**
                                         )  **Ct. 41 (2025), UNANIMOUS interpretation of**
14                                       )  **that statute written by Justice Kagan (*CGC-***
                    Defendant(s).           ***25-627172*)**
15

16

17  _____

18

19

20  **Amended Complaint Claims:** *a. 180+ Unruh violations between 3.1.25-6.23.25 (updated as of*
    *8.18.25) b. Deceit-Fraud c. Unfair Business Practices d. Defamation with Perjury, Malice*
21  *(including to CA state officials) e. Conversion of Settlement Contract Property owed Mr. Austin*
    *by KMPR f. Negligence; Negligence Per Se & Gross Negligence g. KMPR's intentional*
22  *infliction of emotional distress.*

    *Minimum demand between $5.5 - $10.5 million for 3.1.25-6.23.25 claims (updated as of*
23  *8.18.25)*

24

25  DATED: 6.23.25 *(updated 8.18.25)*

                                         *s/ George Jarvis Austin*
26                                       _____
                                            In Pro Per
27

28

                                    -1-
EXHIBIT A
Page 7
         **FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**Introduction Summary**

Mr. George Jarvis Austin, Capital Fellows, Senate Fellows, 2012-2013 Alum, *(with fellowship dual placement as a. Senate Governance and Finance Committee Consultant b. Senator Lois Wolk staffer for select bills through legislative process)*, Self Represented Litigant, Severely Injured Worker at Tesla Motors, Inc. ('TSLA') (*see* <u>CGC-25-627442</u>) notes that the Rules do not expressly provide a word count limit for a complaint, but observes the 8,400 word limit for CA Supreme Court Petition, and 14,000 word limit for CA Appellate Brief, and thus seeks to limit his complaint to less than four times (56,000) the Appellate brief word limit in interest of brevity,  focused language (*while including all requisite precise facts, evidence, & VERY complex context*). See e.g. <u>Slavery Era Insurance Registry</u> ; <u>www.insurance.ca.gov/01-consumers/ 150-other-prog/10-seir/</u> (".. *In August 2000 the California legislature found that "Insurance policies from the slavery era have been discovered in the archives of several insurance companies, documenting .... first evidence of ill-gotten profits from slavery...")* ; <u>www.insurance.ca.gov/01- consumers/150-other-prog/ 10-seir/slavery-era-report.cfm</u> (*"..SB 2199: Slavery Era Insurance Policies ... authored by former Senator Tom Hayden (D-Los Angeles). ... adds sections 13810 through 13813 to the ... (CIC).....(c) ...Commissioner and the Department of Insurance are entitled to seek information from... files of insurers licensed and doing business in this state.....")*

Due to the complexity of shifting legal landscape between the approximately *9 year space* of 1988's <u>*Moradi–Shalal,*</u>  and 1979's <u>*Royal Globe Ins. Co.,*</u> (*where issue of the ability of a private plaintiff to sue an Insurer with the Insurance Code cited directly as the cause of action was debated – {<u>not at issue in this case</u>}*), Mr. Austin dedicates a good amount of space parsing through precisely what 1988's <u>*Moradi–Shalal,*</u> **1.** *did*, and **2.** *did not* say, and **3.** how *both* the majority, and dissent, *100% support this complaint*.  Mr. Austin also takes time to walk through how **a.** <u>*State Farm Mut. Auto. Ins. Co. v. Garamendi*</u>**, b.** <u>*Insurance Code sec. 1861.03,*</u> **c.** <u>*Samson*</u>

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1  *v. Transamerica Ins. Co.*, **d.** *Madrigal v. Allstate Ins. Co.*, **e.** *Koire v. Metro Car Wash,* **f.** *Bell v.*

2  *Maryland,* **g.** *Bailey v. San Francisco District Attorney's Office*, **h.** *White v. Square* **i.** *Munson v.*

3  *Del Taco* **j.** *Greenberg v. Western Turf Asso.* **k..** *Pleasants v. North Beach & Mission R.R* and *a*

4  *host of other 'on point' precedent 100% supports Mr. Austin's complaint*.  For example, Mr.

5  Austin identifies at least **8 forms of KMPR displayed animus** each separately violating Unruh,

6  per **a.-k.** (above), and more (below), while simultaneously identifying at least **25 separately**

7  **violated duties** with an ***ongoing* 99.9% failure rate of duties owed** Mr. Austin.

8  Throughout this *43,612* word complaint Mr. Austin cites heavily to the California & US

9  Supreme Court, including very detailed citations from California Supreme Court's jurisprudence

10  on these precise issues from 3.1.25-6.23.25 (updated as of 8.18.25).  The citations are in context

11  of highlighted plead facts to show in context, and in the flow of precise plead fact-direct

12  evidence, precisely why those facts are important per the Supreme Courts' controlling

13  precedent.  *Mr. Austin will happily reduce, edit, and move more of the information to Exhibits*

14  *Appendix at the Court's request, or order*, for a just, speedy, trial or settlement on the

15  merits.  The *43,612* word initial Opening Complaint is due to the complexity, historical

16  significance, & calculated-strategic animus of issues.       Mr. Austin was harmed by Kemper

17  Corporation (herein "KMPR") from **3.1.25 to 6.23.25** with KMPR's self disclosed-admitted **a.**

18  180+ Unruh Blacklisting & adverse refusals of public accommodation settlement contract

19  violations   **b.** Deceit-Fraud **c.** Unfair Business Practices **d.** Defamation with Perjury & Malice **e.**

20  Conversion of Settlement Contract Property owed Mr. Austin by KMPR  **f.** Negligence;

21  Negligence Per Se & Gross Negligence **g.** KMPR's intentional infliction of emotional

22  distress.  Mr. Austin has a *minimum demand between* **$5.5 million -$10.5 million** *for these*

23  *claims* and harms in this timeframe (3.1.25 - 6.23.25; *updated as of 8.18.25*).  *KMPR's ongoing*

24  *conduct creates both civil, and criminal (felony), liability for KMPR itself*.  Mr. Austin remains

25  open to non-litigious Alternative Dispute Resolution options.

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**PHYSICAL INJURY ADA ACCOMMODATION NEEDS**

Mr. Austin is suffering from two separate very severe injuries creating need for ADA physical injury Accommodation needs.  As mentioned above Mr. Austin was injured while working at TSLA's Fremont Factory, and separately in a Kemper Insurance Covered car accident injuring a different part of the body (described in more depth below).  Both injuries are *ongoing* and make it challenging for Mr. Austin to sit, nor stand, longer than 15-30 minutes without experiencing excruciating pain, and thus will need ADA physical injury accommodation throughout the proceedings (including scheduling, use of virtual-remote options, additional time, and other accommodation).

**EXHIBITS & PRIVACY PROTECTED INFORMATION: REDACTED**

Per *California's* **1.** *Constitution*'s explicit protections of privacy rights (*Article 1, sec. 1*), **2.** *Consumer Privacy Act*, and **3.** *Confidentiality of Medical Information Act (CMIA)*, Mr. Austin proactively redacted exhibits, documents and privacy protected information in accord with current law.

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**TABLE OF CONTENTS**

Page

INTRODUCTION-SUMMARY……………………………………………………..……..... 2

PHYSICAL INJURY ADA NEEDS…………………………………………….…………….….... 4

TABLE OF AUTHORITIES .................................................. 13

FACTS ……………………………………….…................................................ 17

MR. AUSTIN SOUGHT TO MAKE KMPR BODILY INJURY SETTLEMENT
CONTRACTS BETWEEN **3.1.25** TO **6.23.25** (*updated as of 8.18.25*) AND
WAS REFUSED, DEPRIVED, DENIED 180+ INSTANCES

Per the California Supreme Court's:

**A.**      *Bailey v. San Francisco District Attorney's Office*, No. S265223, 2024 WL
3561569 (Cal. July 29, 2024) "*The objective severity of [discrimination] should be
judged from the perspective of a reasonable person in the plaintiff's position… a
single racial epithet can be so offensive it gives rise to a triable issue of actionable
[discrimination]"…. In Boyer-Liberto, for example, …. "two uses of the
'porch monkey' epithet — whether viewed as a single incident or as a pair of
discrete instances of [discrimination] — were severe enough to engender a
[discriminatory] … environment."… the "chosen slur" was .. as odious as the
'[N-word]' "*

**B.**      *Koire v. Metro Car Wash*, "*Courts … repeatedly held … Unruh …
[applies to] unequal treatment [like] when [B]lacks were allowed to enter
business establishments but were restricted to certain portions of the premises ….
[like] [B]lack ticketholders admitted to theatre but restricted to seating in
segregated section [or] …[B]lack ticketholders admitted to racetrack but denied
clubhouse seating.."*

**C.**      *White v. Square* all that's required is an *"exclusionary policy"*… *"on the
basis of the person's membership in a protected category…"*

**D.**      *Moradi–Shalal v. Fireman's Fund Insurance Cos.* reminds Insurers,
California Department of Insurance agents-Commissioners, & CA Judiciary what
the minimum standards are for all California claimants, Regardless of race, and the
available private causes of Actions-Claims per *Moradi-Shalal* like *"fraud, infliction
of emotional distress … Punitive damages may be available in actions … where
fraud, oppression or malice is proved. (See Civ. Code, § 3294.) In addition,
prejudgment interest may be awarded where an insurer has attempted to avoid a*

-5-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*prompt, fair settlement. (See id., § 3291.)"* Insurers are also liable for violations of Unruh liability, by isolating Black claimants like Mr. Austin for derogatory stereotyping, or substandard treatment per the above stated standards as compared to similarly situated Whites whereas per <u>Moradi-Shalal</u> : "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the laws <u>forbidding</u> such practices to the full extent consistent with our opinion....*"

**E.    1.** <u>State Farm Mut. Auto. Ins. Co. v. Garamendi</u> *"As relevant here, Insurance Code section 1861.03, subdivision (a) provides that "[t]he business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust and unfair business practices laws (Parts 2 (commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7 of the Business and Professions Code).".*" & **2.** <u>Samson v. Transamerica Ins. Co.</u> (1981) 30 Cal.3d 220, 243. Which was recently cited to by the Ninth Circuit in <u>Madrigal v. Allstate Ins. Co.</u> whereas the Ninth Circuit upheld a $14 million judgment against Allstate Indemnity Company for its failures of duty to settle with Mr. Madrigal in an Allstate covered car accident causing him severe injury citing <u>Samson</u> " *'the reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury...'"* (with that duty to settle or effectuate settlement contract as part and parcel of CA Insurers *minimum standards* of business operation in CA, as articulated above in <u>State Farm Mut. Auto. Ins. Co. v. Garamendi</u>, *"Insurance Code section 1861.03,"* & <u>Moradi–Shalal v. Fireman's Fund Insurance Cos.,)</u>

**F.    <u>Munson v. Del Taco</u>** reminds that for bodily injury claimants, like Mr. Austin, who are still suffering severe injury causing disability and restriction in major life activity due to KMPR covered car accident, that although he demonstrates intentional discrimination as compared to similarly situated Whites, plaintiffs suing under California's Unruh Civil Rights Act for disability discrimination do not need to prove intentional discrimination to recover statutory damages: *"Although we held in Harris v. Capital Growth Investors XIV (1991) .... that proof of intentional discrimination was necessary to establish a violation of the Unruh Civil Rights Act, the Legislature subsequently added subdivision (f) to Civil Code section 51,2 specifying that ―[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (ADA) ― which does not necessarily require a plaintiff to show intentional discrimination ― ―shall also constitute a violation of this section... The Legislature's intent in adding subdivision (f) was to provide disabled Californians injured by violations of the ADA with the remedies provided by section 52. A plaintiff who establishes a violation of the ADA, therefore, need not prove intentional discrimination*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*in order to obtain damages under section 52...."*

**G.    1.**<u>*Greenberg v. Western Turf Asso. (1903)*</u> & **2.** <u>*Pleasants v. North Beach*</u>
<u>*& Mission R.R (1868),*</u> two early California cases directly addressing the type
of overtly racist KMPR conduct toward Mr. Austin, whereas KMPR expressly
refuses to serve, nor make contracts, or fulfill any of its mandatory statutory
duties per <u>*Moradi–Shalal*</u>, because Mr. Austin is Black, the CA Supreme Court
ruled, and reasserted, the rights Black, 'Colored', or 'Negro,' Californian's have
to public accommodation businesses whereas these <u>rights are taken as a given</u>
<u>in 1903 (& 1868), California</u>: *"In the judgment of the legislature, the public*
*had an interest to prevent race discrimination between citizens on the part of*
*persons maintaining places of public amusement ... The complaint charges a*
*single violation of the statute as having occurred upon the fifth day of December,*
*1899, & plaintiff's demand for damages is based wholly upon this one refusal to*
*admit him..... If the railroad company wrongfully ejects such a [Black, Colored,*
*Negro, or African American] passenger from its train, he is entitled to recoup for*
*the value of his ticket, the expenses to which he is put in reaching his destination,*
*injury to his feelings, and the like...."* The victorious Black or African American
ticket holder, Hyman Greenberg, sued initially in one of the courts of California,
and there was a verdict and judgment against the association, affirming his rights
to a public accommodation, place of amusement whereas he, a. Bought a ticket b.
Presented himself for entry, and c. was initially admitted then ejected, or refused
admission (or denied right to contract, or service).

**What's KMPR's excuse in 2025?** *(122 years after* <u>Greenberg</u> *; 157 years*
*after* <u>Pleasants</u> *)*?

**KMPR DEMONSTRATES RACIAL 'ANIMUS' VIA:**

**1.**    Subjecting Mr. Austin to a *different, and inferior*, bodily injury
settlement contract making process, policy or procedure to exclude, abusively
delay (provided the serious injuries), but never denying Mr. Austin's KMPR
covered accident claim, yet refuse to serve, as *compared to similarly situated*
*Whites (i.e. Whites are typically offered Settlement contract approximately*
*30 ays after submitting required Paperwork as Mr. Austin did).*

**2.**    Excluding, denigrating, and segregating, by per se violations of code-regs,
in the extreme (including *Insurance Code section 1861.03*) as *compared to*
*similarly situated Whites, cruelly while knowing Mr. Austin is severely injured*
*(disability) whereas KMPR's precise violations of law show an explicit Racially*
*derogatory pattern of conduct in violation of 99.9% of specific defined Duties*
*owed Mr. Austin per Insurance Code-Regs*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**3.**     _Per se violations of the absolute minimum standards for any human being claimant_ in California in violation of **a.** _Moradi-Shalal_ instruction "We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the.... courts to continue to enforce the laws _forbidding_ such practices to the full extent consistent with our opinion...." **b.** _Jordan v. Allstate Ins.Co.(2007)_ whereas _"[Plaintiff] was not seeking to recover on a claim based on a violation of Insurance Code section 790.03, subdivision (h). Rather, ..claim was based on a claim of common law bad faith arising from [defendant]'s breach of the implied covenant of good faith and fair dealing which.... is entitled to pursue.[Plaintiff]'s reliance upon the [expert's] declaration for the purpose of [providing evidence supporting .... contention that [defendant] had breached the implied covenant by its actions. This is a proper use of evidence of an insurer's violations of the statute and the corresponding regulations."_ **c.** _CACI No. 2337. Factors to Consider in Evaluating Insurer's Conduct :: California Civil Jury Instructions (CACI) (2025) :: Justia_ "In determining whether [KMPR] acted unreasonably, that is,without proper cause, you may consider whether the defendant did any of the following: ... [(a) Misrepresented to [Mr. Austin] relevant facts ... relating to any coverage at issue.].. [(b) Failed to acknowledge and act reasonably promptly after receiving communications about [Mr. Austin]'s claim arising under the insurance policy.] ... [(c) Failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies.]...[(d) Failed to accept or deny coverage of claims within a reasonable time after [Mr. Austin] completed and Submitted proof -of-loss requirements.]....[(e) Did not attempt in good faith to reach a prompt, fair, and equitable settlement of [Mr. Austin]'s claim after liability had become reasonably clear.]...[(f) Required [Mr. Austin] to file a lawsuit to recover amounts due...]....[(k) Delayed the investigation or payment of the claim by requiring [Mr. Austin].... to submit [unnecessary information...]...[(l) Failed to settle a claim against [Mr. Austin] promptly once [his] liability had become apparent...]....[(m) Failed to promptly provide a reasonable explanation of its reasons for denying the claim or offering a compromise settlement, based on ... applicable law.]...."_ showing extreme animus and malice toward Mr. Austin.

**4.**     Use of, false, derogatory, per se illegal, anti-Black racial stereotypes-slurs _"N*gg*r"_-"_Black Inferior_"-"_Brute_" against Mr. Austin to create stigma plus adverse acts-harms, and attempt to Distract away from KMPR's per se failures of duty owed Mr. Austin(e.g. jimcrowmuseum.ferris.edu/caricature/homepage.htm). This is especially true provided the history of Insurance Industry documented usage of derogatory racist anti-Black stereotypes to **profit from Black Pain and Exploitation** per California's Department of Insurance (CDI) Slavery Era Insurance Registry ; www.insurance.ca.gov/01-consumers/150-other-prog/10-seir/ ("..  _In August 2000 the California legislature found that "Insurance policies from the slavery era have been discovered in the archives of several insurance companies,_

*documenting insurance coverage for slaveholders for damage to or death of their [enslaved Black persons], issued by a predecessor insurance firm. These documents provide the first evidence of ill-gotten profits from slavery, which profits in part capitalized insurers whose successors remain in existence today." SB2199 Sec. 1(a)....") ;* www.insurance.ca.gov/01-consumers/150-other-prog/10-seir/slavery-era-report.cfm *("..SB 2199: Slavery Era Insurance Policies: Legislative Findings..In 2000, the California State Legislature passed SB 2199, authored by former Senator Tom Hayden (D-Los Angeles). The statute is entitled "Slavery Era Insurance Policies" and adds sections 13810 through 13813 to the California Insurance Code (CIC).....(c) The Insurance Commissioner and the Department of Insurance are entitled to seek information from the files of insurers licensed and doing business in this state.....") ;  (Exhibit A-Z)*

**5.**     Complete exclusion from customer contract making process when KMPR's duty is to effectuate or make settlement contract per CA law.

**6.**     Willful violations of KMPR's annual oath, per CA Insurer license, under penalty of perjury as compared to Whites, or any human CA claimant. KMPR **a.** Admits liability to Mr. Austin via its claims agent and insured (immediately accepting 100% responsibility for accident and injuries) **b.** Says that KMPR owes Mr. Austin a written settlement contract offers within approximately 40 days after Mr. Austin submitted signed KMPR paperwork (including medical authorization form) **c.** receives Mr. Austin's successfully submitted forms per KMPR's standards, and KMPR's claims agents confirm receipt of all needed forms for settlement contract offer & effectuation (contract making) **d.** typically offers White claimants offers in 30 days or less **e.** Is required by CA law to make offers in 40 days or less **f.** Promises to make settlement contract offer with Mr. Austin **g.** Instead breaks its word, violates 99.9% of its duties owed per precisely defined Insurance Code, Regs, & annual certification for CA insurer license.

**7.**     Willful felony perjury to state officials, risking criminal violations, completely lying under oath saying that KMPR failed to effectuate contract because Mr. Austin did not submit his medical authorization form while knowing completely false. *(Exhibit A-J)*  KMPR perjures to **a.** discriminate against Mr. Austin, **b.** Embezzle (also a felony) funds both owed and promised to Mr. Austin per KMPR claims agents, (i.e. settlement contract offer), **c.** attempt escaping liability after Mr. Austin reported KMPR's Violations to California Department of Insurance officials in an official investigation-proceeding. *(Exhibit A-J)*

**8.**     Malice & demonstrated Pretext as KMPR knows it perjured itself, knows Mr. Austin not only submitted (and resubmitted) the medical authorization form (and all other documents) multiple times, & received confirmation from KMPR claims agents that they were submitted completely, and correctly. *(Exhibit A-J).*  Two

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

separate witnesses (1. Robert Reisinger, 2. Lisa Seals) verified seeing completed forms, number of medical providers, and other claim file information in writing *(Exhibit A-J)*.  Despite the facts, truth, and KMPR knowing their use of false derogatory stereotypes to exclude is per se illegal,  *(Exhibits A-Z)* they still are subjugating, and excluding Mr. Austin from his right to contract, and ultimately public accommodation per Unruh Act, right to contract, & Civil Rights Act of 1964.

DECLARATION……………………….……….................................................. 60

GUIDING LEGAL STANDARDS  ...................................................................... 141

California Supreme Court's White v. Square clear standards for Public Accommodation, ***prohibition on***: **a.** various iterations of anti-Black animus, **b.** use of derogatory stereotypes **c.** use of outright *"exclusionary policy"*… *"on the basis of the person's membership in a protected category"* whereas **<u>Outright Refusal</u>** is only the *extreme, outer realm* of racial 'Animus', as CA Supreme Court's *<u>Koire v. Metro Car Wash</u>* explains: *"Contrary to defendants' assertions, the scope of the Unruh Act is not narrowly limited to practices which totally exclude classes or individuals from business establishments."*

US Supreme Court's *BELL v. MARYLAND*, 378 U.S. 226 (1964), along with *Students for Fair Admissions, Inc. v. President & Fellows of Harvard* Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023) clear standards for **a.** public accommodation **b.** prohibition on use of derogatory racial stereotypes **c.** prohibition on subjecting one race to one policy-procedure to their disadvantage, and a different race to a different policy-procedure for their *unfair* advantage.

JURISDICTION…………….................................................................... 150

VENUE ..…………………….................................................................. 150

CLAIMS …………………………….……….................................................. 151

**A.**      Unruh Race, and Disability violations: Blacklisting, *180+* adverse refusals of public accommodation service, or contract *from 3.1.25 - 6.23.25 (updated 8.18.25)*.
**B.**      Deceit-Fraud
**C.**      Unfair Business Practices- False Advertising
**D.**      Defamation with Perjury (including to CA state officials; malice).
**E.**      Conversion
**F.**      Negligence, Negligence Per Se, Gross Negligence.
**G.**      Intentional Infliction of Emotional Distress
CONCLUSION .................................................................. 175

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

CERTIFICATE OF COMPLIANCE-SERVICE

EXHIBITS (**A** - **Z**)

**Exhibit A** -Timely Submitted & Re-submitted, KMPR Medical Authorization; State of California verified proof of injury, wages from physical demanding work during time of Injury from KMPR covered accident, etc. - (redacted)

**Exhibit B** - Pristine background checks, and other submitted documentation
**Exhibit C** - SFPD Submitted Report (redacted); Blackletter law Perjury, Embezzlement, Witness Statements, Agency Records showing perjury & Failed duties, etc. (redacted)

**Exhibit D** - KMPR Letter to Mr. Austin before discovering he is Black, Demonstrating KMPR fully understood their duties owed him, *BUT egregiously fails 99.9% of those duties after discovering he's Black.*

**Exhibit E** - CA Supreme Court's a. 1988 _Moradi–Shalal,_ and 9 years earlier in b. 1979 _Royal Globe Ins. Co.,_ highlighted opinions both in 100% support of Mr. Austin's complaint from 3.1.25-6.23.25 (updated as of 8.18.25)

**Exhibit F** - _CACI No. 2337 Factors to Consider in Evaluating Insurer's Conduct :: California Civil Jury Instructions (CACI) (2025)_

**Exhibit G** - KMPR CA License-Company Info, Black Letter law for CA Insurers with precise Duties owed claimants, like Mr. Austin as well as escalated KMPR complaints, inquiries, attempts to make contracts

**Exhibit H** - CDI escalated communications, inquiries, formal Complaints, and documented history of corruption

**Exhibit I** - - Insurance Industries documented history of racial abuse, use of derogatory racist stereotypes, and profiting from Black pain, & exploitation

**Exhibit J** - _White v. Square_ CA Supreme Court highlighted
**Exhibit K** - Wikipedia Stereotypes of African Americans
Stereotypes of African Americans - Wikipedia
**Exhibit L** - Jim Crow Museum:: The Black Brute Caricature - The Brute Caricature - Jim Crow Museum
**Exhibit M** - Wikipedia Criminal Stereotypes of African Americans
Criminal stereotype of African Americans - Wikipedia

**Exhibit N** - Jim Crow Museum: "N\*gg\*r and Caricature"N\*gg\*r and Caricature - Anti-Black Imagery - Jim Crow Museum

**FIRST AMENDED COMPLAINT** - **San Francisco County Superior Court**

1

2 Exhibit <u>O</u> - Department of Justice Black Criminal [Derogatory] Stereotypes and Racial Profiling
www.ojp.gov/ncjrs/virtual-library/ abstracts/Black-criminal-stereotypes-and-racial-profiling

3

4 Exhibit <u>P</u> - *Lynching of African-American Veterans after World War I - Wikipedia*
Exhibit <u>Q</u> - *lynching-in-america-targeting-Black-veterans- web.pdf*)

5 Exhibit <u>R</u> - James K. Vardaman - Wikipedia;

6 Exhibit <u>S</u> - The Black Holocaust …..| The Lynching Sites Project of Memphis
Exhibit <u>T</u> - What is the Black Holocaust? - America's Black Holocaust Museum.

7 Exhibit <u>U</u> - *Oxford Global History of Capitalism* - Mansa Musa of Mali : Gold, Salt, and Story-
-telling in Medieval West Africa globalcapitalism.history.ox.ac.uk/files/ghoc

8 mansamusainmalipdf

9

10 Exhibit <u>V</u> - *Smithsonian Magazine* -  New Exhibition Highlights Story of the Richest Man Who
Ever Lived - Mansa Musa, emperor of Mali, who .. disrupted Egypt's economy just by passing

11 through; www.smithsonianmag.com/smart-news/richest-man-who-ever-lived-180971409/ ;

12 Exhibit <u>W</u> – *Mansa Musa – Wikipedia* - *Mansa Musa - Wikipedia*

13 Exhibit <u>X</u> - *Chicago Tribune* -  The richest man ever was not named Gates or Bezos; he was
king of Mali in the Middle Ages www.chicago tribune.com/2019/01/27/the-richest-man-ever-

14 was-not-named-gates-or-bezos-he-was-king-of-mali-in-the-middle-ages/ ;

15 Exhibit <u>Y</u> - *History*- 14th-Century African Emperor Remains the Richest Person in History
Forget today's tech billionaires… wealth of Mansa Musa of Mali was too vast to be imagined, or

16 equaled www.history.com/articles/who-was-the-richest-man-in-history-mansa-musa

17 Exhibit <u>Z</u> - Good Credit Score and 100% on time Payments

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*BELL v. MARYLAND*,
378 U.S. 226 (1964), ...................................................................................

*Brown v. Board of Education,*
347 U.S. 483, 494 (1954), ...............................................................................

*White v. Square, Inc.*,
7 Cal.5th 1019, 1028 (Cal. 2019)*, ..................................................................*

*Bailey v. San Francisco District Attorney's Office*,
No. S265223, 2024 WL 3561569 (Cal. July 29, 2024) .....................................

*Royal Globe Ins. Co. v. Superior Court,*
23 Cal.3d 880, 153 Cal. Rptr. 842, 592 P.2d 329 (1979) .................................

*Moradi–Shalal v. Fireman's Fund Insurance Cos.,*
46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988) ....................................

*Madrigal v. Allstate Ins. Co.,*
215 F. Supp. 3d 870, 907 (C.D. Cal. 2016), . ....................................................

*Madrigal v. Allstate Indem. Co.,*
697 Fed. App'x 905 (9th Cir. 2017), .................................................................

*Critz v. Farmers Ins. Group,*
230 Cal. App. 2d 788 (1964), ...........................................................................

*Samson v. Transamerica Ins. Co.*
(1981) 30 Cal.3d 220, 243*, ..............................................................................*

*Angelucci v. Century Supper Club* (2007)
41 Cal.4th 160, 167.*, .......................................................................................*

*Bailey v. Binyon*
(N.D.Ill. 1984) 583 F.Supp. 923, 927.*, ............................................................*

*Brown v. U.S. Taekwondo,*
11 Cal.5th 204, 209 (Cal. 2021) ........................................................................

*Candelore v. Tinder, Inc.*
(2018)19 Cal.App.5th 1138, 1143, ....................................................................

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 19

*California Logistics, Inc. v. State of California*

(2008) 161 Cal.App.4th 242, 247, ..................................................................

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*

140 S. Ct. 1009, 1016 (2020), ........................................................................

*Diaz v. Tesla, Inc.,*

3:17-cv-06748, at *1 (N.D. Cal. Apr. 13, 2022) .............................................

*Doe v. City of Los Angeles*

(2007) 42 Cal.4th 531, 550, ...........................................................................

*EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, v. TESLA, INC.,*

Case No. 23-cv-04984-JSC (3.29.24 ORDER), ..............................................

*Fletcher v. Western Life Insurance Co. (1970)*

10 Cal.App.3d 376, 397 [89 Cal. Rptr.78].) ...................................................

*General Bldg. Contractors Assn., Inc. v. Pennsylvania,*

458 U.S. 375 (1982), .......................................................................................

*Greenberg v. Western Turf Asso.*

148 Cal. 126 (Cal. 1905), ...............................................................................

*Greenberg v. Western Turf Asso.,*

140 Cal. 357, 363 (Cal. 1903), .......................................................................

*Hansberry v. Lee,*

311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940), ..............................

*Harris v. Capital Growth Investors XIV (1991)*

52 Cal.3d 1142, 1169, ....................................................................................

*Heckler v. Mathews,*

465 U.S. 728, 739 (1984), ...............................................................................

*Hensley v. San Diego Gas & Electric Co.*

(2017) 7 Cal.App.5th.1337, 1358 [213 Cal.Rptr.3d 803], .............................

*Hughes v. Pair (2009)*

46 Cal.4th 1035,1050-1051 [95 Cal.Rptr.3d 636, 209 P.3d 963, ….............

*Hutson v. Owl Drug Company,*

79 Cal. App.390 (Cal. Ct. App. 1926), ...........................................................

*In re Cox (1970)*

3 Cal.3d 205, 212, .........................................................................................

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 20

*Koire v. Metro Car Wash,*

40 Cal.3d 24, 219 Cal. Rptr. 133, 707 P.2d 195 (Cal. 1985), ..........................................................

*Krupnick v. Hartford Accident & Indemnity Co.*

(1994) 28 Cal.App.4th 185, 199, ..........................................................

*Little v. Stuyvesant Life Insurance Co. (1977)*

67 Cal.App.3d451, 462 [136 Cal.Rptr. 653, ..........................................................

*Lombard v. Louisiana*

373 U.S. 267 (1963), ..........................................................

*McGinest v. GTE Serv. Corp.,*

360 F.3d 1103-16 (9th Cir. 2004), ..........................................................

*Molko v. Holy Spirit Ass'n (1988)*

46 Cal.3d1092, 1122 [252 Cal.Rptr. 122, 762 P.2d 46], ..........................................................

*Monteiro v. the Tempe Union High School Dist,*

158 F.3d 1022-34 (9th Cir. 1998), ..........................................................

*Munson v. Del Taco*

46 Cal.4th 661-664, 94 Cal.Rptr.3d 685, 208 P.3d 623 (2009), ..........................................................

*Pleasants v. North Beach & Mission R.R.,*

34 Cal. 586 (1868), ..........................................................

*Ramirez v. Plough, Inc.,*

863 P.2d 167 (1993), ..........................................................

*Regents of University of California v. Superior Court (2013)*

220 Cal.App.4th 549, 558, ..........................................................

*Rodgers v. Western-Southern Life Ins. Co. (7th Cir. 1993)*

12 F.3d 668, 675, ..........................................................

*Shopoff & Cavallo LLP v. Hyon*

(2008) 167 Cal.App.4th 1489, 1507 [85Cal.Rptr.3d 268], ..........................................................

*State Farm Mut. Auto. Ins. Co. v. Garamendi*

12 Cal.App.4th 206,15 Cal.Rptr.2d 546, ..........................................................

*Students for Fair Admissions, Inc. v. President & Fellows of*

Harvard Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023), ..........................................................

*St. Louis, I.M. & S. Ry. Co. v. McWhirter,*

229 U.S. 265 (1913), ..........................................................

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 21

*Thacker v. New York Life Insurance,*
796 F. Supp. 1338 (E.D. Cal. 1992), ..............................................................................................

*The United States v. the Amistad,*
40 U.S. 518, 521 (1841), ..............................................................................................

*Voris v. Lampert*
(2019) 7 Cal.5th 1141, 1158 [250 Cal.Rptr.3d 779, 446 P.3d 284], ..............................................

*Welco Electronics, Inc. v. Mora*
(2014) 223 Cal.App.4th 202, 209 [166 Cal.Rptr.3d 877], ..............................................

*Western Turf Association v. Greenberg,*
204 U.S. 359 (1907), ..............................................................................................

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**FACTS**

<u>Mr. Austin's plead facts are to be accepted as true: Avoiding Bias</u>

The Court *"assume[s] the truth of the allegations in the complaint"* per *California Logistics, Inc. v. State of California (2008) 161 Cal.App. 4th 242, 247; Doe v. City of Los Angeles (2007) 42 Cal.4th 531, 550.* The Court liberally construes the complaint *"with a view to substantial justice between the parties,"* drawing *"all reasonable inferences in favor of the asserted claims." Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 558; *Candelore v. Tinder, Inc.* (2018)19 Cal.App.5th 1138, 1143. Throughout the complaint Mr. Austin pleads specific facts, with direct evidence, repeatedly demonstrating that KMPR acted **1.** willfully, **2.** knowingly, **3.** intentionally, **4.** deceitfully, **5-6.** to inflict emotional distress, discriminate, and **7.** maliciously, to violate Mr. Austin rights between **3.1.25 - 6.23.25**. Because of the extreme KMPR violations Mr. Austin is experiencing we begin with CACI instructions on avoiding bias:: <u>CACI No. 113. Bias: CA Civil Jury Instructions (2025) :: Justia</u>:

> *"Each one of us has biases about or certain perceptions or stereotypes of other people. Bias is a tendency to favor or disfavor a person or group of people. We may be aware of some of our biases, though we may not reveal them to others. We may not be fully aware of some of our other biases. We refer to biases that we are not fully aware of as "implicit" or "unconscious." They may be based on stereotypes we would reject if they were brought to our attention. Implicit or unconscious biases can affect how we perceive others and how we make decisions, without our being aware of the effect of these biases on those decisions. Our biases often affect how we act, favorably or unfavorably, toward someone. Bias can affect our thoughts, how we remember, what we see and hear, and whom we believe or disbelieve…. You must not be biased … because of .. race … ethnicity, disability, gender.. religion,... socioeconomic status …[or any other protected characteristics]"*

<u>Overview: KMPR refuses public accommodation contract 180+ times</u>

Between 3.1.25 and 6.23.25 *(updated 8.18.25)* Mr. Austin sought to make bodily injury claimant settlement contracts 180+ times with publicly traded Kemper Insurance Corporation "KMPR'. (*Exhibits A-J*) KMPR is CA licensed and obtains 53% of its auto policies revenue from California per KMPR's <u>Securities and Exchange (SEC) reports</u>. It should be noted at the

outset that KMPR claims agents explicitly admit that Mr. Austin is owed a settlement contract offer from KMPR (and was initially owed one within 40 or so days within him submitting his signed medical authorization agreement-contract-form (*and all required paperwork to effectuate settlement contract per KMPR*) .(*Exhibits A-J*)   Per <u>Moradi–Shalal</u> *"prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. (See id., § 3291.)."*  And, each time Mr. Austin sought service or to make settlement-contract between 3.1.25 and 6.23.25 *(updated 8.18.25)* he was denied-refused, as KMPR *"attempted to avoid a prompt, fair settlement,"* but his bodily injury claim was never denied (i.e. 180+ adverse contract refusals). (*Exhibits A-J*)

Per Unruh Act **§ 52***:"((a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is <u>liable for each and every offense</u> for the actual damages, and any amount that may be determined by a jury..."*  For a restaurant an Unruh violation may be in seeking to order food, like similarly situated others, but singled out for one or more protected characteristics and **a.** Denied outright failing to make public accommodation contract, **b.** charged more than similar others for the same food, or **c.** treated in an inferior manner (i.e. segregated seating, or racially derogatory-abusive comments-treatment etc.).  See e.g. <u>Koire v. Metro Car Wash</u>, (holding that the Unruh Act prohibits companies from imposing unreasonable pricing differentials based on protected characteristics like Race, Gender or Disability ).  See also e.g. *<u>Hutson v. Owl Drug Company's</u>* (where White worker yelled  *"What did you serve the n\*gg\*r for?....*[they] c*ould have set there until tomorrow, [& still wouldn't be served]."*) For Insurers, like KMPR, whose statutory duty per CA Supreme Court, Legislature, & Executive Branch, is to make-effectuate settlement contracts with claimants **1.** In a Fair & timely way-manner (*i.e. 40 days or less*) **2.** At a fair price **3.** According to precise standards of care defined by regs-statutes, *regardless of race, sex, nor disability*, an Unruh violation could be **a.** making settlement offers for less than similarly situated Whites, or

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

others, **b.** Inferior treatment of Black claimants (i.e. segregating them with use of different-inferior policies, practices, or procedures than Whites, making wait longer, violating more of precise duties of care, etc.) **c.** Outright exclusion or denial and failure to make a public accommodation settlement contract, at all (even when CA law mandates).

Mr. Austin was denied settlement contract making *outright*, despite CA's law command to effectuate contract (in 40 days or less), more than 180+ separate-distinct occasions from 3.1.25-6.23.25, with KMPR "*liable for each and every offense*." (*Exhibits A-J*)   Per *Krupnick v. Hartford Accident & Indemnity Co.* KMPR's *special relationship emerged with Mr. Austin the moment his claim was filed*, yet after KMPR confirmed receipt of Mr. Austin's *medical authorization, driver-statement, work-photo identifications, etc.* KMPR 1. followed no mandatory legal requirements 2.  violated every mandatory Insurance-Code regulation-operating procedure-deadline, duties-owed  3. *violates 99.9% of duties owed*-standards of care 4. Broke express-explicit verbal-written promises.  *(Exhibits A-Z)*

KMPR's Taekla Baker, and other claim agents-leadership affirm not only that Mr. Austin is owed a bodily injury settlement offer by KMPR, but **1.** Promised the only information needed to make that settlement offer was the signed medical authorization documents (*which Mr. Austin sent in and KMPR confirmed they received*) & **2.** Provided the statutory maximum approximately 40 days, 5 five business days for grace, as the timeframe for when Mr. Austin should expect a bodily injury settlement contract offer from KMPR.  Mr. Austin was not only promised settlement contract, but meets, and surpasses, all KMPR specific bodily injury claimant settlement contract making requirements per KMPR's claims agents, and Unruh. (*Exhibits A-C*)   Mr. Austin: **a.** was in a KMPR covered car accident **b.** Was injured in KMPR covered accident **c.** was immediately told by the other driver, and KMPR, that the other driver was 100% at fault (who is KMPR insured) **d.** is still physically injured as of 6.23.25 from the KMPR covered accident (as this is a bodily injury claim) **e.** Timely, and repeatedly, Submitted

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

paperwork as instructed from KMPR. f. Reported the accident and was informed the claims investigation process began in Summer 2020 (*Exhibit D; 6.16.20 KMPR letter*), but KMPR *never provided any deliverables as required by CA law once discovering Mr. Austin is Black* g. was instructed to submit KMPR forms to be offered a settlement contract in approximately 40 days  by KMPR h. Successfully submitted forms, and KMPR confirmed receipt.  (*Exhibits A-Z*) Mr. Austin timely submitted all requisite forms once he confirmed with KMPR all needed info was included prior to sending, and confirmed KMPR received all documents thereafter with KMPR to effectuate a settlement contract. *(Exhibits A-G)* Mr. Austin re-submitted requisite paperwork over 15+ separate instances after initially submitting, and did so multiple times between 3.1.25-present (*each time requesting for KMPR to make an offer, and also taking initiative to make offers, also*).  (*Exhibits A-C)* Per California law it is KMPR's, not Mr. Austin's duty to effectuate settlement talks, and contracts.

KMPR's typical policy for White similarly situated claimants includes a. providing necessary paperwork to claimants once notice of accident is made to KMPR b. written confirmation of receipt by KMPR (*once authorization form is submitted to KMPR*) c. written 1.settlement offer to claimant in 40 days or less, or 2. notice of additional information needs d. if additional steps needed, then specific detailed written instructions provided by KMPR within 40 days e. If investigation needed to substantiate claim components, KMPR must notify needs in writing (in 40 days) f. If additional time is needed, KMPR must provide written notice every 30 days until info. provided & settlement contract offer made. (*Exhibits A-J)*  Mr. Austin followed KMPR's & CA's, policies.

KMPR concedes, despite 180+ attempts between 3.1.25-6.23.25, KMPR still fails its basic duty owed to make a written settlement offer, or explanation, to Mr. Austin (claimant) in 40 days or less.  KMPR fails 99.9% of duties owed including making a settlement contract offer.  (*Exhibits A-Z*) Per  _Maslo v. Ameriprise Auto & Home Ins._  there is an Insurer failure of

duty to claimant when *"the insurer's failure and refusal to make any offer of settlement was contrary to Insurance Code section 790.03, subdivision (h)(5), which provides that it is an unfair claim settlement practice not to " 'attempt[ ] in good faith to effectuate a prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.' "* Also, similar to *Maslo v. Ameriprise Auto & Home Ins.* KMPR's liability *"was reasonably clear as of the date of the accident, and that the insurer failed to comply with the Insurance Code when it made no offer of settlement."* In fact, KMPR's insured admitted 100% liability immediately, at the scene of the accident, and apologized to Mr. Austin.

KMPR claims agents admit owing Mr. Austin settlement contract, and said all he needed to do was submit medical authorization form (which he successfully did). (*Exhibit A*) KMPR Incurs liability for breaching duties owed as precisely defined in *Ins. Code § 790* (serving as standards of care for CA Insurers) similar to *Maslo v. Ameriprise Auto & Home Ins.* whereas Insurer 1. Failed to respond to claimant demands for payment 2. Failed to adequately investigate claim 3. Ignored facts showing claimant injury 4. Failed to make settlement offer despite clear evidence of Insurer liability 5. Failed to effectuate settlement without forcing adversarial legal action by claimant. Mr. Austin has gone above and beyond to effectuate contract by resending to KMPR a. the signed forms (with updates) at least 10-15 separate instances, b. at least 15-20 specific detailed demands for settlement to make settlement contract (with updates ), & c. over 180+ attempts to make settlement contract, with inquiry, follow up, anything else needed beyond what was already submitted between 3.1.25-6.23.25. (*Exhibits A-J*)

Per CA law it is KMPR's duty to effectuate a settlement contract in a non-adversarial, cooperative, way and alert the claimant, in writing, if any additional information is missing. (*Exhibits A-J*) Mr. Austin's claim was never denied, in writing nor otherwise, nor has KMPR ever made its required settlement contract offer (as CA law requires). (*Exhibits A-J*) Mr. Austin did his part and more proactively ensuring they had all necessary information and forms up front

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1   (*and have attempted to effectuate or make a settlement contract over 180+ since 3.1.25-*

2   *6.23.25*).  KMPR typically follows the precise mandates with a little grace for White, claimants

3   *typically making settlement contract in 30 days, or less vs. maximum statutorily defined 40 days*

4   *for any claimant, regardless of race.*  For all other claimants KMPR typically make settlement

5   contracts, or notifies in writing for need of more information, in 40 days or less.  For Mr. Austin

6   no matter how diligent, how persistent, and how much responsibility he takes (that is really

7   KMPR's duties, not his) they fail even to communicate, let alone the other statutorily defined

8   duties, and have outright refused to make settlement contract, as mandated by CA law, over 180+

9   times between 3.1.25-6.23.25 showing extreme, repeated, ongoing animus in itself.

10

11        Beyond the substandard-inferior treatment, segregated policies, & KMPR violations of

12  Unruh, Mr. Austin was made aware directly by KMPR claims agents words, and subsequent

13  actions, that KMPR engages in use of derogatory racial (anti-Black) stereotypes to deprive Mr.

14  Austin's rights (as pretext).  (*Exhibits A-Z*) Throughout Mr. Austin's fairly thorough multi-year

15  due diligence-research on KMPR (*see below due diligence section*), shortly after KMPR

16  discovered Mr. Austin was Black, a claim agent told  Mr. Austin that being "Black" was

17  somehow unhelpful in KMPR's claims process. (*Exhibits A*)  Per Unruh, the same policies

18  should be applied regardless of race, but here was KMPR making clear that they not only

19  stereotype Black claimants, but utilize different policies, and treat in an inferior manner based

20  upon race (*as the race of the claimant should have been irrelevant to the quality of the claims*

21  *process*). Mr. Austin didn't initially know if he should take those statements seriously, but took a

22  mental note.  KMPR's subsequent conduct *after those derogatory statements* showed that KMPR

23  meant exactly what that KMPR agent said, and have continued to fail over 99.9% of duties owed

24  Mr. Austin once they found out Mr. Austin is a Black male, because Mr. Austin is Black.

25  KMPR's statement and conduct, taken in whole, is even more *pernicious* as they admit using a

26  *"N\*gg\*r"*- *"Black Inferior "*-*"Brute* or *Buck"* slur stereotype epithet. (*Exhibits A-Z).*

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1    KMPR knows, and annually certifies their duties toward claimants, regardless of race, but

2    *felt comfortable* a. falsely labeling Mr. Austin anti-Black racist slurs-stereotypes-epithets :

3    "*N\*gg\*r*"-"*Black Inferior*"-"*Brute* or *Buck*" b. Depriving his rights to make contracts based on

4    that racist trope (outright admitting that they use separate policies for separate races with Black

5    being somehow "inferior" or "unhelpful" when the claimants race shouldn't matter c. "Blacklist

6    [ing]" him in KMPR's system based on that false derogatory stereotype (*evidenced both by 180+*

7    *continued refusals from 3.1.25-6.23.25, and KMPR agents explicitly admitting this while failing*

8    *99.9% of all statutorily defined duties owed Mr. Austin*). (*Exhibits A-J*)   KMPR admits it

9    willfully fails their precise duties (owed Mr. Austin) to make contract over 180+ separate

10   instances because Mr. Austin is a Black man severely injured claimant (*as compared to similarly*

11   *situated non-Black male, or White claimants*).  (*Exhibits A-Z*)

12

13        KMPR's duty, as a CA Insurer, is to effectuate settlement-contracts with CA bodily

14   injury claimants like Mr. Austin, and failure to do so is a breach of Insurer duty owed CA

15   claimants per  1. <u>Critz v. Farmers Ins. Group</u>, a *"failure to settle may occur late or early in the*

16   *game. Sometimes negotiations are held open almost to the time the jury returns with its verdict;*

17   *sometimes the contending sides agree to disagree…"*  and 2. <u>Moradi-Shalal v. Fireman's Fund</u>

18   <u>Ins. Companies</u> "*section 790.03 imposes on the insurer a duty to the public, including the third*

19   *party claimant whose interests are adverse to the interests of the insured.*"  Per the Ninth

20   Circuit's Gibbs v.State Farm Mutual Insurance Co., 544 F.2d 423, 427 (9th Cir.1976) the

21   Insurer's (KMPR's) duty to effectuate settlement with a claimant is so serious that the *"insurer*

22   *may be found to have "neglect[ed] its … dut[ies] when it fails to take … action in settling*

23   *claim."*  Every-time Mr. Austin sought to "make" contracts, or effectuate settlement (i.e. duty to

24   settle) with KMPR between 3.1.25-6.23.25 he was refused contract.  Importantly, Mr. Austin's

25   <u>*KMPR bodily injury claim itself was never denied*</u> by KMPR (*in writing, nor otherwise, as*

26   *required by California law*).

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Mr. Austin's claim is just continually delayed without KMPR explanation, nor any of the other statutorily defined duties required when a settlement takes longer than 40 days to effectuate in California.  See e.g. 10 CCR § 2695.7: Standards for Prompt, Fair and Equitable Settlements *"(a) No insurer shall discriminate in its claims settlement practices based upon the claimant's age, race, gender, income, ... or physical disability, or upon the territory of the property or person insured..... (b) Upon receiving proof of claim, every insurer .... shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim... (c)(1) If more time is required than ... [forty (40) calendar days]... every insurer shall provide the claimant,.... with written notice of the need for additional time. This written notice shall specify any additional information the insurer requires in order to make a determination....written notice shall be provided every thirty (30) calendar days...."*

Per Mr. Austin's multi-year, and multi-modality, active due diligence: KMPR typically, *when serving-making contracts with White claimants*, only takes approximately 30 days or less to effectuate-make the entire KMPR settlement contracts.   CA law mandates Insurer KMPR take no longer than 40 days, as a *minimum standard*, for any Californian regardless of race, unless they provide the claimant with a written explanation as for need of more time. See e.g. 10 CCR § 2695.7  KMPR continues to completely break the law, *in the extreme*, without 1. written explanation, 2. request for more time, 3. nor communication or 4. attempt to effectuate settlement, *at all* (as legally required to do).  See e.g. *CACI No. 2337. Factors to Consider in Evaluating Insurer's Conduct :: California Civil Jury Instructions (CACI) (2025) :: Justia*  Per *State Farm Mut. Auto. Ins. Co. v. Garamendi* *"Insurance Code section 1861.03,"* and Unruh, KMPR, as a public accommodation Insurer-business must not a. Isolate Mr. Austin for substandard treatment b. Treat White claimants better than Black claimants like Mr. Austin or c. Discriminate in timeliness, quality, fairness, or valuation of settlement contract offer, *but does so anyway in violation of the law*.  See also e.g. 10 CCR § 2695.7 (*"No insurer shall*

-24-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*discriminate in its claims settlement practices…"); (Exhibits A-Z)*

KMPR claims agents admitted directly to Mr. Austin that they owe Mr. Austin a settlement-contract-offer.  Per KMPR, and their claims agents, beginning with Taekla Baker, KMPR owes Mr. Austin **1.** a settlement contract offer (*including bodily injury damages, expenses, missed wages, loss of quality of life, etc. compensation*), **2.** multiple detailed requests for additional time with explanations for why the offer has taken so long (*as well as **3.** other statutorily prescribed-defined duties of care for reasonable CA Insurers*), but have failed to make the legally required settlement offer, *at all let alone at a fair price and in a fair manner*, to Mr. Austin to effectuate the settlement contract.(*Exhibits A-J*) ;  KMPR's behavior toward Mr. Austin is similar to Allstate's conduct toward Carlos Madrigal in *Madrigal v. Allstate Ins. Co.* whereas the Ninth Circuit upheld a $14 million judgment against Allstate Indemnity Company for its failures of duty to settle with Mr. Madrigal in an Allstate covered car accident causing severe injury citing the California Supreme Court's *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 243.ʺ *'the reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury.' ʺ*

Although, similar per KMPR's failure of duty to make-effectuate settlement, with an injured claimant, Mr. Austin's case is *even stronger* than *Madrigal v. Allstate Ins. Co.*.  Mr. Austin *commands more liability* from KMPR as Mr. Madrigal was **1.** An Uninsured Motorist whereas both Mr. Austin, and Juan Sanchez (Refugio Simon Sanchez Arche) the other driver were insured by KMPR at the time of the KMPR covered two car accident, **2.** KMPR not only acts in bad faith toward Mr. Austin who is seriously injured like *Madrigal*, but is also racist, overtly discriminatory with outright exclusionary policies because of Mr. Austin's race, and disability (*caused by KMPR covered accident*), malicious, deceitful, and an intentional inflictor of emotional distress with extreme conduct beyond what any reasonable California claimant would expect from a reasonable California Insurer (*after making a claim per California's*

*statutory-regulatory framework*) **3.** Had an accepted-agreed to settlement amount offer on the table, with Allstate thereafter seeking to lowball (accepting then rejecting) the initially agreed to amount, creating reason for $14 million litigation whereas Mr. Austin filled out all paperwork, provided all requested documented (& more) , but KMPR failed to do even the bare minimum first step of that part of the process, failed to effectuate settlement, cut off communication, and Blacklisted Mr. Austin with extreme exclusionary, discriminatory and racist policy in blatant violation of CA law(s).  (*Exhibits A-Z*)

KMPR's continued failures of *'bare minimum'* CA duties, like KMPR's duty to timely effectuate settlement contract, or duty to settle, with Mr. Austin for a fair amount, and in a fair, non-discriminatory way (*as prescribed by statute, including the Unruh Act*), are clear per the California Supreme Court, CACI Jury Instructions, and admitted by KMPR claims agents themselves (*as annually sworn under penalty of perjury for California Department of Insurance licensing requirements*). (*Exhibits A-J*)   Per <u>Moradi-Shalal</u> the *minimum standards* of Insurer conduct are defined by the Insurance Code and forbids KMPR's conduct toward Mr. Austin whereas "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the.... courts to continue to enforce the laws <u>forbidding</u> such practices....*"   Per <u>Jordan v. Allstate Ins.</u> those standards serve as concrete baselines for reasonable insurer, non-discriminatory, conduct and trigger liability when simultaneously violating other statutes, or common law, like Unruh whereas *"[Plaintiff] was not seeking to recover on a claim based on a violation of Insurance Code section 790.03, subdivision (h). Rather, .. claim was based on a claim of common law bad faith arising from [defendant]'s breach of the implied covenant of good faith and fair dealing which.... is entitled to pursue..... This is a proper use of evidence of an insurer's violations of the statute and the corresponding regulations."*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Per *State Farm Mut. Auto. Ins. Co. v. Garamendi* per "Insurance Code section *1861.03*…"[t]he business of insurance shall be subject to the laws of California … including … the Unruh Civil Rights Act (Sections 51 to 53, inclusive..) …." Per Unruh, and non-discriminatory, standards it is important to be mindful of both the baseline standards for 1. *any* Californian, and 2. similarly situated Whites, or non-Blacks, to identify discriminatory animus for reasonable CA Insurers with variations in treatment, particularly derogatory treatment-conduct, by either standard. (*Exhibits A-Z*) Baseline, *non-aspirational, minimum* standards for *any* California claimant includes *CACI No. 2337. Factors to Consider in Evaluating Insurer's Conduct :: California Civil Jury Instructions (CACI) (2025) :: Justia* to determine *"whether [KMPR] acted unreasonably, that is,without proper cause, you may consider whether the defendant did any of the following: … [(a) Misrepresented to [Mr. Austin] relevant facts … relating to any coverage at issue.].. [(b) Failed to acknowledge and act reasonably promptly after receiving communications about [Mr. Austin]'s claim arising under the insurance policy.] … [(c) Failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies.]…[(d) Failed to accept or deny coverage of claims within a reasonable time after [Mr. Austin] completed and Submitted proof-of-loss requirements.]….[(e) Did not attempt in good faith to reach a prompt, fair, and equitable settlement of [Mr. Austin]'s claim after liability had become reasonably clear.]…[(f) Required [Mr. Austin] to file a lawsuit to recover amounts due…]….[(k) Delayed the investigation or payment of the claim by requiring [Mr. Austin]…. to submit [unnecessary information…]….[(l) Failed to settle a claim against [Mr. Austin] promptly once [his] liability had become apparent…]….[(m) Failed to promptly provide a reasonable explanation of its reasons for denying the claim or offering a compromise settlement, based on … applicable law.]…."*

KMPR's conduct toward Mr. Austin not only shows *extreme animus and malice* toward Mr. Austin as compared to **1.** similarly situated Whites, but **2.** *any* Californian claimant per

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1    *minimum standards* of operations for any reasonable California Insurer as they continually

2    violate 99.9% of these standards, *willfully.*  KMPR's conduct is the exact opposite of what CA

3    law commands.  Mr. Austin is a self represented claimant. Per <u>*Madrigal v. Allstate Ins. Co.*</u>

4    KMPR has, an *ongoing* duty to 1. comply with precise standards of care (i.e. above cited duties),

5    and 2. inform (and assist) Mr. Austin, self represented claimant, if any additional information

6    was needed *"to safeguard the public interest,... insurance claims adjusters, when preparing and*

7    *completing documents which affect the legal rights of third party claimants and when advising*

8    *third parties to sign such documents, must comply with the standard of care of a practicing*

9    *attorney" by informing claimants [of] .... legal consequences... disclosing the insurer's potential*

10   *conflict of interest."*  All of these duties owed claimants, especially self represented, factor into

11   KMPR's expected standards for non-discriminatory conduct, and displayed animus toward Mr.

12   Austin. (*Exhibits A-J*)

13

14          Relevant to Unruh, and public accommodation, standards: Mr. Austin **1a.** Is an African

15   American or Black man (protected group) **1b.** Is severely injured from KMPR covered car

16   accident causing ongoing physical disability (protected group) **2.** is qualified to make settlement

17   contract (*suffered physical injury in KMPR car accident, KMPR explicitly told Mr. Austin they*

18   *owed him a settlement offer, and contract, to induce him to submit required documents including*

19   *medical authorization, Mr. Austin submitted all required documents, and additional documents*

20   *proactively, and followed up 180+ thereafter for purpose of making settlement contract owed*

21   *Mr. Austin* ) **3.** suffered adverse actions (*180+ refusal to make an offer, or contract, at all from*

22   *3.1.25 - 6.23.25, Blacklisting, no communication, because of Mr. Austin's race, derogatory*

23   *racial stereotypes, or disability as explicitly admitted to Mr. Austin on the phone via KMPR*

24   *bodily injury claims agent Taekla Baker*) **4.** Continues to provide opportunity for KMPR to make

25   offer, and Mr. Austin alerts of his readiness-openness to good faith non-litigation

26   resolutions.  KMPR is still in the public accommodation CA Insurance business (*with*

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1   *approximately 53% of auto revenue policies coming from California*).  KMPR SEC reports

2   KMPR continues to demonstrate at least *8 forms of demonstrated animus* (see below) whereas

3   White claimants are treated demonstrably better, and Mr. Austin was treated in an extreme-

4   inferior manner.

5          Per <u>White v. Square</u>, all that's required for Unruh standing is encountering *"exclusionary*

6   *policy"... "on the basis of the person's membership in a protected category"* and KMPR takes

7   this very basic requirement to the extreme with malicious, willful, and outright exclusionary

8   policies that are not only per se illegal themselves, but simultaneously violated precisely defined

9   standards of care in several other areas of both civil, and criminal CA law.

10

11  The absurdity of KMPR's conduct is highlighted in the fact that Mr. Austin went out of his way

12  to ensure KMPR had all the information they requested, and more, so they could quickly make

13  the bodily injury settlement offer (*that KMPR themselves said that they owed Mr.*

14  *Austin*).  Despite good faith gestures by Mr. Austin, and 180+ attempts to make contract KMPR

15  **a.** Ignores their own self authenticated direct evidence (i.e. medial authorization, and all other

16  forms) **b.** Didn't ask Mr. Austin any questions, nor request any additional information **c.**

17  presumed a derogatory anti-Black racist stereotype slur-epithet for Blacks and **d.** Used that

18  knowingly false stereotype-slur-epithet *"N*gg*r"*-*"Black Inferior "*-*"Brute or Buck"* as a

19  pretextual basis for subjecting Mr. Austin to inferior treatment, segregated polices-procedures,

20  and denying his public accommodation rights to contract over 180+ times and **e.** Failed to

21  correct, respond, or constructively address Mr. Austin's multiple written complaints, and follow

22  ups, through their channels. (*Exhibits A-Z*)

23

24         KMPR explicitly told Mr. Austin they owe him a settlement contract offer (within 40

25  days as the law mandates), and contract:  Although not required for settlement, Mr Austin **a.** has

26  a pristine, clean & clear background b. Has great-strong character (*eligible for any employment,*

27  *or position*), **c.** takes healthy pride and joy in his African-America or Black heritage **d.** Does not

28

-29-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

degrade himself, nor accept substandard treatment (from anyone) **e.** Is a good person **f.** Has good credit, timely pays his debts in top 1%, above 99.66% of others., per Credit Karma (*Exhibits A-Z*) and **g.** Is a straight A (and A+) student (last 9 semesters).  Yet, still KMPR continues to refuse, deny, or deprive making public accommodation contracts from 3.1.25 - 6.23.25 (updated as of 8.18.25) with use of  *"N*gg*r"*-*"Black Criminal"*-*"Brute* or *Buck"* slurs-epithets.

### *Ongoing Severity of Injury, backstory, As of 6.23.25 (updated 8.18.25)*

Mr. Austin hoped and prayed as soon as this KMPR covered car accident happened that Mr. Austin's injury was not severe.  He was already dealing with a lot of competing priorities and responsibilities.  At the point of impact, he knew this type of severe injury would only further complicate everything he was already working on.  By the next day he felt pain, and stiffness, as soon as he woke up *(signaling severe injury)*.  By the end of the first week, after the accident severe pain, and stiffness reverberated throughout the entire upper body (from lower back to neck-head).  Mr. Austin experienced so much pain that basic tasks like walking at any pace that engages the core, sleeping (*often taking hours each night to find a sleeping position in bed that doesn't cause excruciating pain*), going to the bathroom, turning the steering wheel on a car, even turning his head side to side to ensure the coast is clear (as a safe, defensive, driver) became arduous and untenable.  At the time of accident Mr. Austin's source of income was primarily from physically demanding work roles, and industries that require lifting, pulling, bending, heavy items that utilize full back and neck functionality, and ability to put continuous weighted pressure on those parts of the body.  From the first week of pain, until 6.23.25 (updated 8.18.25), Mr. Austin is suffering from these excruciating pains from KMPR covered car accident. KMPR's subsequent conduct, failings its duties (including provisions of medical care reimbursements as part of bodily injury settlement offer) magnifies Mr. Austin's severe pain. (*Exhibits A-J*)

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Mr. Austin still cannot work in those pre-car-accident physically demanding roles.  KMPR has been continually racist-discriminatory toward Mr. Austin for a long time, illegally delaying while Mr. Austin suffers in pain.  Enough is enough.  In 2020, Mr. Austin was rear ended, at a very high speed, in a KMPR covered car accident. This car accident is the proximate cause of Mr. Austin's severe *ongoing* physical injuries from 3.1.25-6.23.25.  KMPR insured driver, Juan Sanchez (Refugio Simon Sanchez Arche) immediately admitted 100% fault.  He admitted complete responsibility of the accident, on a recorded OnStar line, in the presence of at least four police officers (on the scene; in 2020).  Mr. Austin notified KMPR, & filed KMPR bodily injury insurance claim: **D041556CA20**. KMPR insured both drivers.  Taekla Baker, KMPR claims agent, was assigned claim **D041556CA20**.  Ms. Baker confirmed in writing & on the phone that she was employed-trained by KMPR to process claims.  KMPR is required annually to certify  Ms. Baker 1. provided Mr. Austin, self represented claimant, medical authorization form-agreement (contract) 2.instructed to submit document to process Mr. Austin's claim, and for KMPR to make Mr. Austin a settlement offer.

Mr. Austin sought medical care within a week of the accident (*as pain in injured areas increased, severely; high levels of pain from crown of head to mid-section -primarily back and neck*).  Mr. Austin has now sought, been evaluated, and treated by over 20+ different medical care providers.  All confirmed severity of Mr. Austin's injuries.  Multiple medical professionals certified he could not safely return to work, *at all*, for over a year in their ongoing evaluations (*verified independently by State of California for temporary disability; as returning to physically intensive job type would cause further injury*).  On 9.21.20 per KMPR, Mr. Austin properly completed, signed, and submitted KMPR's medical authorization agreement via all KMPR mediums (fax; physical mail; email).  KMPR confirmed 1. receipt, as well as 2. proper submission, of All required forms, by KMPR triggering duties owed Mr. Austin under *Moradi–*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*Shalal, etc.* Since then Mr. Austin has resent these documents over 15-20 times (and several times from 3.1.25-6.23.25[*updated 8.18.25*]).  (*Exhibits A-J*)

KMPR concedes Mr. Austin proactively included income, selected work history, various forms of identification (Black-African American, temporarily disabled, male), injury journal entries (severe sharp pains, stiffness, whiplash, unable to perform basic household activities due to pain levels), medical treatment contact information, and notes severe injury), beyond what was asked to facilitate a cooperative settlement process.  KMPR explicitly told Mr. Austin no additional information was needed to effectuate a KMPR settlement contract.  When KMPR failed to make settlement offer in 40 days, & 99% of other duties owed.  Mr. Austin was already entitled to KMPR settlement contract offer because he 1. was severely injured in a KMPR covered accident, 2. correctly submitted requisite forms per KMPR & 3. proactively provided an abundance of independently verified proof-documents (and KMPR agents explicitly told him he was owed). Before 1st State of California temporary disability payment was made (*due to KMPR covered car accident injuries*) to Mr. Austin the State independently verified **1.**injury with multiple medical practitioners, **2.**inability to return to previous type of physically demanding work, at all, for a year, or more, **3.**audited wages earned in full-time work at TSLA.  Mr. Austin accumulated thousands of dollars in medical expenses from treatments. Mr. Austin is *still suffering from injuries sustained*. His bodily injury claim was never denied.  These *ongoing physical injuries, throughout this complaints 3.1.25-6.23.25* timeframe, have hampered, & harmed every area of Mr. Austin's life, health, finances, & quality of life.  (*Exhibits A-Z*)

-32-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1

2   **M** Gmail                                                                George J. Austin,

3   **Insurance Follow Up - Claim Number D041556CA20**
    1 message

4   **George Austin** <gaustin07@berkeley.edu>                                 Mon, Sep 21, 2020 at 3:48 PM
    To: Tbaker@kemper.com

5   Good Afternoon, Taekla Baker

    I hope this finds you phenomenally well, and blessed beyond measure (as am I).

6   Attached is the required paperwork which I will also be sending via fax, and perhaps with tracking US Postal Service.

    Can you confirm receipt (and let me know if any additional information is required)?

7   Thank you,

    George J. Austin,

8

9   **3 attachments**
       **Insurance Injury Follow Up TB - 9_21_20 - Google Docs_merged.pdf**
10     2910K
       **504733B8-05D6-423F-AA1F-C5DBD8B1B115_merged_compressed_pages_deleted_merged.pdf**
11     1867K
       **699E3BE1-FE9B-4D07-95D9-1A6BDC88EBF6_merged_compressed.pdf**
       622K

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



-35-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**Section II**

I understand that the information requested is to assist the requesting insurance arrangement to accurately coordinate benefits with Medicare and to meet its mandatory reporting obligation under Medicare law.

Austin George
Claimant Name (please print)

D041556CA20
Claim Number

Name of Person Completing This Form if Claimant is Unable (please print)

Signature of Person Completing This Form

9/20/20
Date

California - For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Medical Authorization**

(Authorization of Release of Medical and Hospital Records and Reports)

Social Security Number:

Date of Birth:

Claim Number: D041556CA20

Patient Name: <Insert Patient Name Here>

Provider Name:

Alliance United Insurance Company insurance is excluded from the definition of "health plan" in the privacy rules developed pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and is not a covered entity. However, this authorization meets the core elements criteria set forth in the HIPAA privacy rule, Section 164.508(c).

Purpose: This authorization is for the purpose of collecting information in connection with a claim for benefits or liability under an insurance policy issued by Alliance United Insurance Company. This will authorize you to give any agent (including ABI Document Support Services, EDCO Group Inc, Blue Ribbon Legal, or other document retrieval companies presenting this form) or claim representative of Alliance United Insurance Company, its subsidiaries and affiliates, its claim associates, and legal representatives (herein after referred to as "Kemper") all information you may have that may relate to the claim regarding my physical condition as revealed by your observation or treatment, past, present and future, including history, findings, x-rays, diagnosis, prognosis, as well as allow Kemper to access to my medical and hospital records and/or medical bills for examination and photocopying.

Authorizes: This authorization extends to any person or entity that has medical information concerning my physical condition, past, present and future that may relate to the claim. The authorization, therefore, specifically includes any doctors or other health care professional who has examined or treated me, and any hospital, clinic or similar facility where I have been examined or treated. It also applies to present and prior employers and any insurance carrier who may have records of my physical condition. A photocopy or facsimile of this authorization shall be as effective as the original.

Confidentiality Note: I understand that my records may contain reference to or result of HIV (AIDS) testing, testing or treatment of communicable diseases, treatment for mental health problems, alcohol history or substance abuse, and I authorize the

**FIRST AMENDED COMPLAINT – San Francisco County Superior Court**

<u>Per Moradi-Shalal, Statute-Regs & annual licensing Oath:  KMPR is bound by minimum standards for All California Claimants but fails duties owed.</u>

Per the California Supreme Court's *Moradi-Shalal* KMPR's mandatory standards of care toward all claimants are precise and objective (*explicitly defined in the Insurance Code-Regs*) in exchange for Insurers' license to do business in the state of California whereas "*section 790.03 imposes on the insurer a duty to the public, including the third party claimant whose interests are adverse to the interests of the insured.*"  The Ninth Circuit's *Yan Fang Du v. Allstate Ins.* makes clear that Insurer's standard of care "***reflect[s] the law after*** the California Supreme Court's decision in ***Moradi–Shalal***" and "*note[s] that* *CACI 2337 is based on California Insurance Code Section 790.03(h) (5)*" and defines the precise factors to consider when California Insurer's breach or fail, their duty of care owed claimants.  KMPR also annually-certifies, under penalty-of-perjury, to precisely follow all insurance code-regs, including fair-claim practices-duties to effectuate settlement-contract in 40 days or less, but fails each duty, *in the extreme.*    KMPR's  *minimum* standard of care can be measured objectively and quantified with Code, Regs, CACI jury instructions, and Supreme Court rulings; When quantified, dividing KMPR's required conduct taken toward Mr. Austin, by all duties owed Mr. Austin, as precisely defined by CA law, KMPR fails 99.9% of these precise, objective, measurable duties owed.

Per California's *CACI No. 2337.*  the factors listed are not only objective guides to determine KMPR's breaches of duty but are useful "*In determining whether [KMPR] acted unreasonably, that is,without proper cause*" and further state that a Plaintiff, and the Court, and Jury (finder of fact) *"may consider whether the defendant did any"* of the "*Factors to Consider in Evaluating Insurer's Conduct*" (*Exhibits A-J*) for express purpose of determining failed duties of care owed claimants.  Per California's Legislature, and Executive (CDI) § 2695.6. Training and Certification. - California Code of Regulations; Fair Claims Settlement Practices Regulations; the above California jury instructions coincide with Insurer mandated duties per

KMPR's annual oath-certification, *under penalty of perjury*, for license to remain active.

Per California's Legislature, and Executive Branch (CDI) § 2695.1. Preamble. - California Code of Regulations the *minimum* Insurer standards of care are partially defined by *"(a) Section 790.03(h) of the California Insurance Code enumerates sixteen claims settlement practices... (1) To delineate certain minimum standards for the settlement of claims.* Per California's Legislature, and Executive Branch (CDI) § 2695.5. Duties upon Receipt of Communications. - California Code of Regulations these duties also include precisely when and how an Insurer must communicate with a claimant, Per California's Legislature, and and Executive Branch (CDI) § 2695.3. File and Record Documentation.- California Code of Regulations these duties also include precise maintenance of specific claim file information for at least five years. Per California's Legislature, and and Executive Branch (CDI) § 2695.7. Standards for Prompt, Fair and Equitable Settlements.- California Code of Regulations the *minimum* Insurer standards of care (in addition to the above jury instructions) include, and are partially defined by *§ 2695.7*. These duties collectively form KMPR's standards of Insurer care, , but repeatedly, and unrepentantly, KMPR fails 99.9% duties owed Mr. Austin, *in the extreme.* (*Exhibits A-J*)

KMPR must train their claims agents in, *and annually certify under penalty of perjury that KMPR follow*s, expressly defined *minimum standards of care* per § 2695.6. Training and Certification. CA statutes, regs, Supreme Court precedent, and Executive Branch prescribe precise *minimum* standards for Insurers, *as industry wide objective standards of care.* In-exchange for certifying to comply with exacting and precise Insurer standards of conduct-care KMPR is granted access to California's huge Insurance market. The majority of KMPR Auto policies, over 50%, are from CA per KMPR's SEC reports. Per certification, CA law, KMPR's duty to claimants is to effectuate (make) settlement contract in a non-adversarial, cooperative, way. Per *Krupnick v. Hartford Accident & Indemnity Co.,* a reason why California law

**FIRST AMENDED COMPLAINT - San Francisco County Superior Court**

mandates a deadline driven written settlement contract offer to claimants in a certain time- frame (*along with other specified duties*) is to prevent 1 Insurer abuse of power and 2. helping facilitate a *"not adversarial" .. "special relationship...of openness, candor and understanding" … "between the claimant and the insurer"* which *begins once "a claim is made." "*

KMPR's *minimum* standard of care is even higher with self-represented claimants.  See e.g. (above cited) <u>*Madrigal v. Allstate Ins. Co.*</u> {whereas Ninth Circuit upheld a $14 million judgment against Allstate Indemnity Company for failed duty to settle}.; (*Exhibits A-J*) When KMPR not only refused to make an offer in the same way as similar Whites (30 days or less), or per minimum standards (40 days or less), *nor at all*, they violated both Mr. Austin's rights 1. to a fair offer, but 2. the legally required fair process to get to a fair offer. (*Exhibits A-Z*)   Although 1988's <u>*Moradi–Shalal*</u> overturned the ability to directly sue under the Insurance Code as provided by the California Supreme Court's 1979 opinion, 9 years prior, in <u>*Royal Globe Ins. Co. v. Superior Court*</u> whereas the California Supreme Court's *Royal Globe* held *"that Insurance Code section 790.03, subdivision (h) (a provision of the Unfair Practices Act, Ins. Code, § 790 et seq.), created a private cause of action against insurers who commit the unfair practices enumerated in that provision,"* <u>it did not overturn the <u>*minimum standards of conduct expected of CA Insurers*</u></u>.

In fact, <u>*Moradi–Shalal*</u> reminds Insurers, CDI agents-Commissioners, & CA Judiciary what the *minimum standards* are for all California claimants, <u>regardless of race</u> *:* "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the laws <u>forbidding</u> such practices to the full extent consistent with our opinion....*"  California Supreme Court's <u>*State Farm Mut. Auto. Ins. Co. v. Garamendi*</u> makes clear Insurer standards of care include *"Insurance Code section 1861.03..... "[t]he business of insurance shall be subject to the laws of California applicable to any other business, including,*

1    *but not limited to, the Unruh CivilRights Act..... the antitrust and unfair business practices laws*

2    *(Parts 2 (commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7*

3    *of the Business and Professions Code).".*"  Despite clear *minimum standards* for KMPR, they

4    continue to fail 99.9% of duties owed.

5

6              <u>Unruh Act requirements are part of CA Insurers Minimum Standards</u>

7         Unruh is part of KMPR's "minimum standards" required of CA Insurers per the 1. CA

8    Supreme Court's <u>*State Farm Mut. Auto. Ins. Co. v. Garamendi*</u> *"...Insurance Code section*

9    *1861.03, subdivision (a) provides that "[t]he business of insurance shall be subject to the laws of*

10   *California ... including.... the Unruh Civil Rights Act....."* and 2. The Ninth Circuit's <u>Chabner v.</u>

11   <u>United of Omaha Life Ins. Co.,</u> who cites to <u>Koire v. Metro Car Wash</u> to affirm the application

12   of *Unruh*'s prohibition to CA Insurers.  (*Exhibits G-J).*

13

14        In process of attempting to make KMPR public accommodation bodily injury settlement

15   contracts Mr. Austin perceives at least *Eight (8)* distinct types of animus violating

16   Unruh.  KMPR **1.** Subjects Mr. Austin to a different-inferior process, policy-procedure as

17   compared to similarly situated Whites  **2.** Excluding, denigrating, and segregating, by per se

18   violations of code-regs, in the extreme, failing 99.9% of duties owed (including *Insurance Code*

19   *section 1861.03*) as *compared to similarly situated Whites, cruelly while knowing Mr. Austin is*

20   *severely injured (disability)*  **3.** <u>*Per se violations of the absolute minimum standards for any*</u>

21   <u>*human being claimant*</u> *in California in violation of* **a.** <u>Moradi-Shalal</u> *&*  **b.** <u>Jordan v. Allstate Ins.</u>

22   <u>Co.(2007)</u> *&*  **c.** <u>*CACI No. 2337. Factors to Consider in Evaluating Insurer's Conduct*</u>  "

23   showing extreme animus and malice toward Mr. Austin. **4.**  Use of, false, derogatory, per se

24   illegal, anti-Black racial stereotypes-slurs *"<u>N*gg*r</u>"*-"<u>*Black Inferior*</u>"-"<u>*Brute*</u>" against Mr.

25   Austin to create stigma plus adverse acts-harms, **5.**   Complete exclusion from claimant

26   settlement contract making process in violation of <u>*White v. Square*</u> when KMPR's duty is to

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

effectuate or make settlement contract per CA law. **6.**          Willful explicit violations of annual

oath per KMPR's CA Insurance license, under penalty of perjury, as compared to Whites, or any

human CA claimant  **7.** Willful felony perjury to state officials, risking criminal violations,

completely lying under oath saying that KMPR failed to effectuate contract because Mr. Austin

did not submit his medical authorization form while knowing completely false to **a.** discriminate

**b.** embezzle contract-funds owed Mr. Austin  **8.** Malice & demonstrated Pretext as KMPR knows

it perjured itself, knows Mr. Austin not only submitted (and resubmitted) the medical

authorization form (and all other documents) multiple times, but moreover knows that they had

the duty to effectuate contract, and ask for any needed documents-information to do so.   Despite

the facts, truth, and KMPR knowinging their use of false derogatory stereotypes to exclude is per

se illegal,  (*Exhibits A-J*) they still are subjugating, and excluding Mr. Austin from his right to

settlement contract, and ultimately public accommodation per Unruh Act, 42 USC 1981, Civil

Rights Act of 1964.

          Mr. Austin diligently attempted to make contracts at least twice daily between 3.1.25-

6.23.25 (updated 8.18.25), on average (*between 180-225 adverse refusals-denials*).  Just to

ensure KMPR was on the same page with Mr. Austin followed up **1.** via email **2.** in the KMPR

internal comments complaint-inquiry portal **3.** Via paper-mail & sent copies to KMPR,

accompanied with formal complaints requesting them to cease, desist, and correct discriminatory

conduct and **4.** Via phone going step by step to alert every senior company decisionmaker

available to be alerted.  KMPR's 180-225 (180+) violations between 3.1.25-6.23.25 multiplied

by 3 for treble damages due to willful, knowing, malicious KMPR conduct at minimum equate to

and toggle between $2,160,000 - $2,700,000 just for Unruh violations (180-225 x $4000 x 3

(treble damages). See **§ 52:***"((a) Whoever denies, aids or incites a denial, or makes any*

*discrimination or distinction contrary to Section 51, 51.5, or 51.6, is* <u>*liable for each and every*</u>

<u>*offense*</u> *for the actual damages, and any amount that may be determined by a jury, or a court*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1    *sitting without a jury, up to a maximum of three times the amount of actual damage but <u>in no*

2    *case less than four thousand dollars ($4,000)." ;* (Exhibits A-Z)

3

4    <u>*Minimum Standards*</u> more important per **1.** Insurer's documented history of profiting from Black
     pain including enslavement **2.** CDI documented corruption **3.** LA fires **4.** *<u>Moradi-Shalal</u>*'s

5    insightful dissent

6    KMPR's-Insurers', *minimum standards* of care have particular significance in this very

7    moment, and *applied to Mr. Austin's precise set of facts*, provided **1.** Insurer's documented

8
     history of profiting from Black enslavement, and exploitation per CDI www.insurance.ca.gov/
9
     01- consumers/150-other-prog/10-seir/ slavery-era-report.cfm ( *"...Legislative Findings..In 2000,*
10
     *the California ... Legislature passed SB 2199, authored by former Senator Tom Hayden (D-Los*
11
     *Angeles). The statute is entitled "Slavery Era Insurance Policies" and adds sections 13810*
12
     *through 13813 to the California Insurance Code (CIC).....(c) The ...Commissioner and*
13
     *...Department of Insurance are entitled to seek information from the files of insurers licensed ...*
14
     *doing business in ... state, including licensed California subsidiaries of international insurance*
15
     *corporations, regarding insurance policies issued to slaveholders by predecessor corporations.*
16
     *The people of California are entitled to significant historical information of this nature....")* **2.**
17
18   Los Angeles Fires causing 250 Billion Dollars (Estimated cost of fire damage balloons to more

19   than $250 billion - Los Angeles Times)  in Damages, Claims, Corruption, Collusion L.A. fire

20   victims sue insurance companies, alleging a 'nefarious conspiracy' - Los Angeles Times; LA

21   homeowners are suing insurance companies for not covering damages from the fires: NPR, **3.**

22   CDI's documented history of corruption *(particularly failures to investigate-enforce)* and **4.**

23   *<u>Moradi-Shalal's</u> insightful dissent* in light of the first two points as well as per Cal. Ins. Code §

24   1871, (with nearly 12%, 1/8th, of the entire United States Insurance market in California), and

25   documented precedent, many Insurers (due to their "bargaining position") are prone to

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

'corruption,' "abuse and illegal activities,"  especially as *" Automobile insurance fraud is the biggest and  fastest growing segment of insurance fraud"*.

As CA's Legislature, and Executive Branch formally recognizes, and explores: Insurers, have a *sordid history* of *financing-insuring Black Enslavement*, and even took enslaved Black People themselves*, to profit directly, from Black pain and exploitation* <u>similar to KMPR's ongoing conduct, tone, and extremely racist attitude toward Mr. Austin.</u>

### *Lloyd's, marine insurance and slavery - Lloyd's*

*"...Marine insurance ... facilitated the 'expansion of Europe', the explosion of European traders, soldiers and colonists into the wider world from the 15th century onwards who established new empires for the major European powers and ultimately founded a global system of capitalism.....*

*... the rise of Lloyd's from the original coffeehouse... to the establishment of New Lloyd's (1771) and the subsequent consolidation of its position as the leading market for marine insurance coincided with the emergence of Britain in the 18th century as the largest slave-trading power and the development of the British transatlantic colonies as a major slave-system....*

*...The slave-economy was one of the major markets for British marine insurance.  ....the premia were higher on long-distance voyages, those to Africa, the East Indies and the Americas, so in financial terms these lines of insurance predominated. The slave-economy was clearly a principal feature in the British financial construct and by extension also significant to its marine insurers.....*

*...Originally, the pattern of organisation for commerce built on slavery was truly a triangular trade, a single ship leaving Britain carrying goods for exchange on the west coast of Africa, carrying the captive Africans purchased there across the Atlantic on the 'Middle Passage', and selling the survivors in the Americas in exchange for slave-grown produce, especially sugar and tobacco but also rum, coffee, indigo, spices and mahogany, which were brought back to Britain to fuel the consumer revolution of the eighteenth century..... But as the system grew, the triangular trade became more of a metaphor.  The slave-ships still fulfilled the first two legs.... an important bilateral trade between Britain and the trans-Atlantic colonies developed, shipping plantation supplies to the colonies and returning with slave-grown produce in custom-built 'West Indiamen', ships .....*

*....It is estimated that slavery-related business overall accounted for between*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*one-third and 40 per cent of premium income in the second half of the 18th century. The insurance of the slave-voyages themselves accounted for an estimated 5-10% of total marine insurance premia. Of more financial importance to the insurance business were the ships sailing directly from Britain to the Caribbean and back, accounting for some 30% of total marine insurance premia paid…..*

*….One index of the overlap of Lloyd's and slavery is the analysis of the list of named subscribers to New Lloyd's in 1771. Of the 77 surviving names, at least eight are known to have invested directly in slave-trading voyages, while a further seven were themselves slave-owners or lenders or annuitants secured on enslaved people ….*

*….The British slave-trade ended in 1807. British colonial slavery itself was abolished only in 1834. Lloyd's entanglement in slavery did not end with Britain's abolition of slavery. Cotton grown by enslaved people in the southern United States became a key driver of Britain's industrialisation from the 1790s onwards, and the insurance of the shipping of raw cotton to Britain and of manufactured cotton products to markers worldwide remained an important part of Lloyd's business, until the abolition of slavery in the United States in 1865 and in South America, with Brazil in 1888. The legacies of slavery in the colonial systems have continued to the present day….*

*….Lloyd's is not alone in beginning only recently to come to terms with its historical connections to slavery. The insurance of slave-ships and, under complex policies, of the captive Africans on board them, however, has an especial resonance and entails a specific responsibility of acknowledgement and repair, of which this fact sheet is one small part….."*

Per BBC's ***The hidden links between slavery and Wall Street*:**

*"**Stacey Toussaint, the boss of Inside Out Tours, which runs the NYC Slavery and Underground Railroad tour, says people are often surprised by how important slavery was to New York City…."They don't realise that enslaved people built the wall after which Wall Street is named," she says….By some estimates, New York received 40% of US cotton revenue through money its financial firms, shipping businesses and insurance companies earned…. Slavery thrived under colonial rule. British and Dutch settlers relied on enslaved people to help establish farms and build the new towns and cities that would eventually become the United States……Enslaved people were brought to work on the cotton, sugar and tobacco plantations. The crops they grew were sent to Europe or to the northern colonies, to be turned into finished products. Those finished goods were used to fund trips to Africa to obtain more slaves who were then trafficked back to America.*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*...This triangular trading route was profitable for investors.....To raise the money to start many future plantation owners turned to capital markets in London .........To balance the risk that came with forcibly bringing humans from Africa to America insurance policies were purchased. These policies protected against the risk of a boat sinking, and the risks of losing individual slaves once they made it to America.*

*...Some of the largest insurance firms in the US - New York Life, AIG and Aetna - sold policies that insured slave owners would be compensated if the slaves they owned were injured or killed...By the mid 19th Century, exports of raw cotton accounted for more than half of US oversees shipments. What wasn't sold abroad was sent to mills in northern states including Massachusetts and Rhode Island to be turned into fabric....The money southern plantation owners earned couldn't be kept under mattresses or behind loose floorboards..... American banks accepted their deposits and counted enslaved people as assets when assessing a person's wealth...."*

Per this set of facts, and KMPR's documented *ongoing* conduct, it prompt an interesting question for the California Supreme Court now, in 2025: Is the majority reasoning, from <u>*Moradi-Shalal,*</u> still the same view of the Court (*provided the gift of hindsight, and express recognition of assumptions the ruling was based upon*)? Since that decision, 9 years after <u>*Royal Globe*</u> , many of <u>*Moradi-Shalal's*</u> dissenting points have come to public fruition: *"The dissent herein expresses some doubt that the Insurance Commissioner will enforce section 790.03 and punish violations thereof; the dissent finds no published appellate cases involving such disciplinary action. But surely we can assume very little from the absence of apposite appellate cases. It is as likely that the commissioner's efforts prevailed without the necessity of an appeal, that any relevant opinions were unpublished, or that administrative enforcement was deemed unnecessary in light of the deterrent effect of an inevitable Royal Globe action...."*

It only took a few years after <u>*Moradi-Shalal*</u> (1988), per mishandling claims during 1994 Northridge earthquake, to test the majority's thesis (*and expressly stated assumptions*), especially in light of public documentation of CDI corruption, and documented failure to enforce Ins. Regs-Codes (sparking public removal of previous Insurance Commissioner(s) within a few years of <u>*Moradi-Shalal*</u> ruling) See e.g. <u>consumer watchdog.org/uncategorized/Low-sworn-state-</u>

-46-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1   *insurance-commissioner/*: (*"At the heart of the Quackenbush scandal was the California*

2   *Research and Assistance Fund, created with about $12 million from insurers accused of*

3   *mishandling claims filed after the 1994 Northridge earthquake. Quackenbush let a half-dozen*

4   *insurers avoid up to $3 billion in potential penalties by giving to the fund...."* ). More recently,

5   CDI had several issues with multi-year, multi- commissioner, publicly documented history of

6   Corruption (*ignoring illegal Insurer conduct; cozy with corruption; non-enforcement of*

7   *violations*) *Per Consumer Watchdog, UpHelp, LA Times, Sac Bee, San Diego Union Tribune*.

8   See e.g. www.latimes.com/business/story/2024-03-01/consumer-watchdog-insurance- industry-

9   harvey-rosenfield ;  Insurance commissioner's financial scandals erode credibility | Sacramento

10  Bee (sacbee.com); Troubling behavior from CA's Insurance Commissioner Ricardo Lara - Los

11  Angeles Times (latimes.com) ; After donation scandal, insurance commissioner resumes

12  campaign, raises $300K – San Diego Union-Tribune (sandiegouniontribune.com) ;More political

13  donations to Insurance Commissioner are linked to companies he regulates – San Diego Union-

14  Tribune (sandiegouniontribune.com) ;

15      Provided the documented history of CDI corruption from the top down (*including recent*

16  *corruption scandals*), it would be interesting to see if the Court still-shares the same 1988 view,

17  especially in light of *Moradi-Shalal's* dissent astutely noting: *"the majority fail to demonstrate*

18  *that such enforcement has ever existed. Since 1959 when sections 790 and following of the*

19  *Insurance Code were adopted, 62 volumes of California Reports and 297 volumes of California*

20  *Appellate Reports have been published. In those 359 volumes there are more than 300,000*

21  *pages. On not one page of one volume is a single case reported in which the Insurance*

22  *Commissioner has taken disciplinary action against a carrier for "unfair and deceptive acts or*

23  *practices in the business of insurance" involving a claimant. Not one case in 29 years.  In the*

24  *absence of demonstrable enforcement by the Insurance Commissioner, it is understandable that*

25  *claimants seek to litigate their own rights rather than to rely on Big Brother. And I am convinced*

-47-

1   *now, as I was when Royal Globe was decided, that the Legislature intended they may do*

2   *so…."*  As noted above the debate in <u>*Moradi-Shalal*</u> centered solely on direct claims (i.e. "*Royal*

3   *Globe actions")* based solely on violations of the Insurance Code.

4           However, per <u>*Moradi-Shalal*</u> the discussion's emphasis (*even by the majority who*

5   *disagreed with direct Royal Globe actions*) made clear that these *'minimum standards'* of Insurer

6   conduct, precisely spelled out by the Legislature, and Executive Branch via regulations, **1.**

7   (including *section 790.03) "imposes on the insurer a duty to the public, including the third party*

8   *claimant"*  **2.** Are enforceable per direct actions like *"fraud, infliction of emotional distress …*

9   *Punitive damages may be available in actions … where fraud, oppression or malice is proved.*

10  *(See Civ. Code, § 3294.) In addition, prejudgment interest may be awarded where an insurer has*

11  *attempted to avoid a prompt, fair settlement. (See id., § 3291.)"* and **3.** Are  *"We caution, … not*

12  *an invitation to the insurance industry to commit the unfair practices proscribed by the*

13  *Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the*

14  *laws <u>forbidding</u> such practices to the full extent consistent with our opinion…."*

15          CDI advertises that *"All of CDI's functions, including overseeing insurer solvency,*

16  *licensing agents and brokers, conducting market conduct reviews, resolving consumer*

17  *complaints, and investigating and prosecuting insurance fraud, <u>are to protect consumers</u>…CDI*

18  <u>*enforces the insurance laws*</u> *of California and has authority over how insurers and licensees*

19  *conduct business in California."*  However, when Mr. Austin tested CDI's advertised capacity-

20  functions, per *Moradi-Shalal's* instructions, and placed a complaint with CDI he was <u>*told by CDI*</u>

21  <u>*that CDI does not do fact-finding*</u> (after KMPR perjured itself in official investigation-

22  proceeding).

23          Based on KMPR's *ongoing* conduct in violation of *'minimum standards'* of care for CA

24  Insurers, and in direct violation of Insurance Code-Regs, Mr. Austin placed a complaint in

25  CDI.  Then 1. CDI assigned Mr. Austin's formal complaint to CDI officials Diane Kaneyuki, and

-48-

Kevork Artinian (*Exhibits A-J*)  2. Ms. Kaneyuki relayed Mr. Austin's complaint to KMPR (*Exhibits A-J*)  3. In response to the complaint KMPR Perjured themselves, in writing (*Exhibits A-J*)  4. KMPR perjured-lied that they never received Mr. Austin's medical authorization forms, and that was the reason that they did not make a settlement offer as promised him (and mandated) (*Exhibits A-J*)  5. Mr. Austin immediately followed up with both CDI, and KMPR, showing in writing that they perjured themselves, and made additional escalated formal complaints about KMPR's perjury  6. Mr. Austin also followed up with additional documentation including two direct evidentiary witness statements from a. Robert Reisinger, b. Lisa Seals from Summer 2022**,** and KMPR's own statement(s) on 9.21. 2020 at 3:48 p.m. PST, confirming that KMPR in fact long ago initially received Mr. Austin's signed, complete, forms (and have since received 15-20 more times), but still fails 99.9% duties owed him. (*Exhibits A-J*)   Mr. Austin escalated his initial, and KMPR perjury-embezzlement complaint up CDI's chain of command to Commissioner Lara, and the only response provided was CDI does not do fact-finding that is only for the Courts.  CDI's conduct-communication toward Mr. Austin points to the <u>*Moradi-Shalal's*</u> dissent's wisdom, and foresight: *"the majority fail to demonstrate that such enforcement has ever existed"* as CDI's own statements (CDI says they don't't do fact-finding, that is up to the Courts) makes the same argument that the dissent did. (*Exhibits A-J*)

Per *Cal. Code Regs. tit. 10 § 2694(a)(b)- (1)(3)(5) & (6), Cal. Evid. Code §410, §668, Cal. Code Regs. tit. 10 §2694, §2695.2, §2695.5, §1871, §1876 , §790, § 2695.7, §2695.6, §2695.7, §2695.3,* CDI advertises specific duties, and requirements to the public, *including investigating formal complaints of Insurer violations*, as it "*investigates more than 37,000 consumer complaints and, as a result, recovers more than $84-130 million a year for consumers. CDI also annually receives and processes tens of thousands of referrals regarding suspected fraud against insurers and others and conducts criminal investigations resulting in thousands of arrests every year.*" About the Department (ca.gov) .  Per *Cal. Ins. Code § 1871* part of the purpose of CDI is

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

investigation, fact finding, detection, discovery, enforcement AND *"intended to permit the full utilization of the expertise of the commissioner and the department so that they may more effectively investigate and discover insurance frauds."*

However, when it came to "investigating" KMPR's perjury (felonies) as it directly relates to laws in CDI's wheelhouse, and the duties <u>*Moradi-Shalal*</u> majority directly assigned to CDI, they did exactly what the <u>*Moradi-Shalal*</u> dissent predicted they would do: nothing, no fact-finding, no investigation, no direct enforcement CDI simply re-directed Mr. Austin back to the Courts. (*Exhibits A-J*)  Mr. Austin escalated the complaint throughout CDI, and even pointed out that they advertise this duty to California claimants, but they just kept repeating that fact-finding is for the Courts. (*Exhibits A-J*)  At present, there is no telling how many claimants, especially the most vulnerable, are being victimized by *greedy, unscrupulous, immoral, & deceitful* Insurers, and provided <u>*no real help from CDI, either*</u>, leaving them high and dry to be *victimized* (as in earlier Eras). e.g. ww.insurance.ca.gov/01- consumers/150-other-prog/10-seir/ slavery-era-report.cfm; (*Exhibits A-J*)

<u>June 2025 San Francisco Police Report because of KMPR's felony perjury to CA officials to embezzle (also felony) Mr. Austin's owed settlement-contract-funds</u>

Mr. Austin reported KMPR's <u>*ongoing* felonies</u> against Mr. Austin (*Perjury per Cal. Pen. Code § 131, § 129, § 127, § 126, § 125, § 123, § 119, &  § 118a; Embezzlement per Pen.Code § 503*) to San Francisco Police Department in June 2025. See e.g. *Insurance Fraud — FBI* ("*...The total cost of insurance fraud... is estimated to be more than $40 billion per year... .[Insurer] Premium diversion is the embezzlement of insurance premiums .. is the most common type of insurance fraud....collecting premiums and <u>then not paying claims</u>....*") (*Exhibits C*)  As described above, *in reference to Mr. Austin's CDI complaint*, KMPR perjured themselves, in writing, to California CDI Regulatory State Officials in Summer 2023, with regard to Mr.

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Austin's claim file contents including submitted medical authorization form, drivers statement, photo identifications, work photo ids-badges, attestation to severity of *ongoing* injury, etc. (*Exhibits A-J*)

KMPR perjured-lied that KMPR never received Mr. Austin's signed Medical authorization contract-form as reason they violated Ins. Code's fair claims practices, and did not effectuate settlement-contract with Mr. Austin (*to transparently avoid legal consequences from direct enforcement of the Insurance code*). (*Exhibits A-J*) KMPR Lied-perjured. KMPR in fact confirmed receipt of Mr. Austin's medical authorization form as early as 2020. (*Exhibits A-J*) Two witnesses 1. Robert Reisinger, 2. Lisa Seals, prove KMPR's perjury, in writing, as they both independently verify-attest receipt of Mr. Austin's medical authorization forms with very specific details (*Exhibits A*)

KMPR perjured to 1. escape legal liability 2. steal or embezzle funds owed Mr. Austin, while entrusted by the State of California, and its claimants, via its CA Insurer license.(*Exhibits A-J*) KMPR is using *trickery, deceit, perjury, discriminatory tactics, racist derogatory stereotypes, malicious, and whatever underhanded tactics* needed to steal what's owed Mr. Austin. KMPR's conduct makes them *liable both civilly, and criminally.* (*Exhibits A-Z*) Perjury is not protected speech, in any context, and incurs both civil (deceit) criminal (perjury) liability and per CA Pen. Code 118 *"Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, ..... is guilty of perjury."* KMPR's lies-perjury to state officials still fails to explain why KMPR did not inform him of additional needs in writing and 99.9% of other duties owed him (Mr. Austin diligently contacted KMPR) after he re-submitted forms at least 15-20 times, made 180+ attempts from 3.1.25-6.23.25 (twice daily) for a settlement contract. KMPR's 6.16 Letter

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

demonstrates it understands it duties owed Mr. Austin (*Exhibits D*) , but chooses to fail them purposefully.  KMPR appears to never have any intent on fulfilling their statutory duties, and are outright frauds, perjurers, and embezzlers.  (*Exhibits A-J*)

Per the FBI this 40 Billion dollar a year Insurer illegal racket has claimants as the primary victims www.fbi.gov/stats-services/publications/ insurance-fraud .  Per *Cal. Ins. Code § 1871*, CA laws, and lawmakers, know, from experience (*with nearly 12%, 1/8th, of the entire United States Insurance market in California*), and documented precedent explaining the reasoning, that many Insurers are prone to *'corruption,' "abuse and illegal activities,"* especially with "*Automobile insurance fraud is the biggest and fastest growing segment of insurance fraud."*  Mr. Austin may have to take additional steps (on the phone or in-person), beyond initial June 2025 police report, with SFPD, for the separate criminal investigation of KMPR's ongoing conduct.  Mr. Austin remains open and willing to do so as KMPR has proven not only an extreme violator of CA Insurer standards, but shows personal animus, hostility, and callousness to Mr. Austin's *ongoing* injuries proximately caused by KMPR's conduct.  There is no telling how many claimants, *particularly Black or vulnerable claimants*, KMPR has violated.

<u>KMPR seeks to hide-destroy evidence plus felony-perjury</u>

After KMPR's perjury to state CDI officials, Mr. Austin began additional due diligence and asked KMPR to send Mr. Austin's claim file (multiple times). (*Exhibits A-J)*  KMPR has thus far failed to send the information. Mr. Austin requested the information, in writing, because the claim file contents serve as the basis of KMPR's <u>*perjury* to CDI state officials in ongoing</u> <u>conspiracy</u>.  It must be maintained by KMPR, at minimum, until October 2025 for the express purpose of investigating Insurer Fraud-Illegal practices See <u>*§ 2695.3 (File-Record*</u> <u>*Documentation)*</u>.  KMPR is *diabolically strategic* and knows they perjured themselves, *felonies*, in writing, in 2023 to CDI State Officials to avoid criminal-civil consequences.  KMPR seeks to

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

lie, perjure, embezzle, and steal, and cover its tracks through hiding-destroying evidence of its wrongs to Mr. Austin. (*Exhibits A-Z*)    Mr. Austin asked for this information 100+ separate instances (along with seeking to make contract), and still not produced to him.

<u>Actionable Legal Claims post *Moradi-Shalal*</u>

Post <u>*Moradi-Shalal*</u>, according to <u>*Moradi-Shalal*</u>, plaintiffs can no longer use Insurance Code provisions (*Royal Globe actions)* as the direct legal-claim.  All of Mr. Austin's complaint's claims from *3.1.25-6.23.25  (A. Unruh B. Deceit-Fraud statutes C. Unfair Business Practices-False Advertising D. Defamation with Perjury, Malice  E. Conversion of owed KMPR settlement contract, per KMPR claims agents F. Negligence, Negligence Per Se, Gross Negligence, G. Intentional Infliction of Emotional Distress*) against KMPR's ongoing conduct <u>are actionable</u> per  <u>*Moradi-Shalal*</u> "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the laws <u>forbidding</u> such practices to the full extent consistent with our opinion....*"

<u>*Moradi-Shalal*</u> removed one item, from the menu of liability, in California's statutory-regulatory regime, while simultaneously reminding that those standards of reasonable CA Insurer conduct are still enforceable via available private causes of Actions-Claims  per <u>*Moradi-Shalal*</u> like *"fraud, infliction of emotional distress … Punitive damages may be available in actions ... where fraud, oppression or malice is proved. (See Civ. Code, § 3294.) In addition, prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. (See id., § 3291.)."*   The California Supreme Court makes clear in <u>State Farm Mut. Auto. Ins. Co. v. Garamendi</u> that 1. Unruh and other violations are also directly actionable:  *"As relevant here, Insurance Code section 1861.03, subdivision (a) provides that "[t]he business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1   *to, the Unruh Civil-Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust*

2   *and unfair business practices laws (Parts 2 (commencing with Section 16600) and 3*

3   *(commencing with Section 17500) of Division 7 of the Business and Professions Code).".*"  Per

4   *Thacker v. New York Life Insurance, opinion by Chief Judge Karlton,*  plaintiffs can also pursue

5   a RICO action against Insurer(s).

6

7        KMPR promises CA *'Minimum Standards'* but delivers ***"relic of slavery"*** policies

8   KMPR holds itself out as a law abiding, CA licensed Insurer, with approximately 53% of its

9   auto revenue from California, who annually certifies under penalty of perjury that its claim

10  agents, and itself as an organization meticulously follows the CA *minimum standards* per CA

11  law. (*Exhibits A-J)* Instead, KMPR treats Blacks like Mr. Austin the exact opposite of the typical

12  open communicative, proactive, 40 day or less deadline for settlement contract offer with 1.

13  outright exclusion via "*relic of slavery*" policy 2. refusal to make contract offers on the same

14  basis as Whites based on anti-Black derogatory assumptions with at least 8 forms of

15  demonstrated animus (*Exhibits A-Z)*

16

17        Mr. Austin has the right to make contracts, and receive non-discriminatory service, in

18  public accommodation settlement contracts per CA legal standards, regardless of race. See CIV §

19  51 (*"All persons within the jurisdiction of this state are free and equal, and no matter what their*

20  *sex, race, color, religion, ancestry, ... disability ... are entitled to the full and equal*

21  *accommodations, advantages, facilities, privileges, or services in all business establishments of*

22  *every kind whatsoever"* ); CIV § 51.5 (*"No business establishment of any kind whatsoever shall*

23  *discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to... any*

24  *person in this state on account of any characteristic listed ...")* ; 42 U.S.C. § 1981: (*"Statement*

25  *of equal rights - All persons within the jurisdiction of the United States shall have the same right*

26  *in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and*

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*to the full and equal benefit of all laws and proceedings for the security of persons and property*

*as is enjoyed by [W]hite citizens.")*  See BELL v. MARYLAND, 378 U.S. 226 (1964):

**"The Black Codes were a substitute for [anti-Black] slavery;**

**Segregation was a substitute for the Black Codes**

**The discrimination in these sit-in cases is a *relic of slavery.***

The Fourteenth Amendment says "No State shall make or enforce any law
which shall abridge the privileges or…  immunities of citizens of the United States."

…makes every person who is born here a citizen;

there is no second or third or (4th) class of citizenship…*Schneider v. Rusk*,

We deal here with incidents of national citizenship…*Slaughter-House
Cases*, …concerning the federal rights resting on the Thirteenth,
Fourteenth, and Fifteenth Amendments:

". . . the one pervading purpose found in them all, lying at the foundation
of each, and without which none of them would have been even suggested;

we mean the freedom of the slave race,

the security and firm establishment of that freedom, …protection of the
newly-made freeman…citizen from the oppressions of those who had
formerly exercised unlimited dominion over him.

It is true that only the fifteenth amendment, in terms, mentions the
[N]egro by speaking of his color and his slavery. But it is just as true that
each of the other articles was addressed to the grievances of that race, and
designed to remedy them as the fifteenth."...

When we deal with Amendments touching the liberation of people from
slavery…

…. we deal with Amendments whose dominant purpose was to guarantee
the freedom of the slave race & establish a regime where national
citizenship has only one class.

The manner in which the right to be served in places of public
accommodations is an incident of national citizenship & of the right to
travel is summarized in H.R. Rep.No. 914, Pt. 2, 88th Cong., 1st Sess.,
pp.7-8 :

"An official of the National Association for the Advancement of Colored
People, testified before the Senate Commerce Subcommittee as follows: "

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

`For millions of Americans this is vacation time. Swarms of families load their automobiles and trek across country. I invite the members of this committee [378 U.S. 226, 251] to imagine themselves darker in color and to plan an auto trip from Norfolk, Va., to the gulf coast of Mississippi, say, to Biloxi. Or one from Terre Haute, Ind., to Charleston, S. C., or from Jacksonville, Fla., to Tyler, Tex.

"`How far do you drive each day?

Where and under what conditions can you and your family eat?

Where can they use a restroom?

Can you stop driving after a reasonable day behind the wheel or must you drive until you reach a city where relatives or friends will accommodate you and yours for the night?

Will your children be denied a soft drink or an ice cream cone because they are not White?'

"In response to Senator Pastore's question as to what the Negro must do, there was the reply:

"`Where you travel through what we might call hostile territory you take your chances.

You drive and you drive and you drive. You don't stop where there is a vacancy sign out at a motel at 4 o'clock in the afternoon and rest yourself; you keep on driving until the next city or the next town where you know somebody or they know somebody who knows somebody who can take care of you.

"`This is the way you plan it. "`Some of them don't go.'

"Daily we permit citizens of our Nation to be humiliated and subjected to hardship and abuse solely because of their color."

As stated in the first part of the same Report, p. 18:
"Today, more than 100 years after their formal emancipation, Negroes, who make up over 10 percent of our population, are by virtue of one or another type of discrimination not accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens." …

When one citizen because of his race, creed, or color is denied the privilege of being treated as any other citizen in places of public accommodation, we have classes of citizenship, one being more degrading than the other. That is at war with the one class of citizenship created by the Thirteenth,

-56-

Fourteenth, & Fifteenth Amendments.        ………..

As stated in *Ex parte Virginia*, 100 U.S. 339, 344 -345, where a federal indictment against a state judge for discriminating against Negroes in the selection of jurors was upheld:

*"One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States.* They were intended to take away all possibility of oppression by law because of race or color……."

As my Brother GOLDBERG says, it is a "civil" right, not a "social" right, with which we deal.

Here it is a restaurant refusing service to a Negro. …But so far as principle and law are concerned it might just as well be a hospital refusing …  admission to a sick or injured Negro …,

or a drugstore refusing antibiotics to a Negro,

or a bus denying transportation to a Negro,

or a telephone company refusing to install a telephone in a Negro's home….."

KMPR promises one thing *"minimum standards"* (at least), but practices the exact opposite with a "***relic of slavery***" policy per the 1964 US Supreme Court's <u>*BELL v. MARYLAND*</u> astute analysis (with KMPR's 180+ refusals-denials between 3.1.25 to 6.23.25).  KMPR admits that it intentionally excludes Mr. Austin. KMPR admits that their reason for blacklisting, or complete exclusion from settlement-contract making process is  because of KMPR's use of derogatory racial, anti-Black male, stereotypes-slurs-epithets (*Exhibits A-Z).*  KMPR continues to operate per this targeted anti-Black segregationist policy, and is willing to perjure themselves to CA officials to segregate, discriminate, and embezzle (*Exhibits A-Z).*

*As a practicing Christian, who loves everyone, and seeks to live my values not just on the Sabbath, but everyday.  I seek to apply the principle of doing unto others as I would have done to me.*  Mr. Austin seeks simply to Love the Lord with all his heart, mind, soul & energy and Love his neighbors (*as he Loves himself).*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

"He who is slow to anger is better than the mighty,
And he who rules his spirit than he who takes a city."
-    **Proverbs 16:32**

"But the fruit of the Spirit is love, joy, peace, forbearance,
kindness, goodness, faithfulness, gentleness, and self-control."
-    **Galatians 5:22-23**

Mr. Austin doesn't worship money, or the things money can buy for all flows from the Most High.  He does not worship things that flow from the *'lust of the flesh, the lust of the eye, or the pride of life'*.  Mr. Austin does not worship power, prestige, position*, the false idols of White Supremacy, Racial Bigotry, or Hate, nor anything man made, temporal, or non-eternal*.  Mr. Austin engaged in good faith with KMPR through his values as an American Citizen, man, human being, a Christian, & Black person; not to have rights violated, disrespected, discriminated against, perjured, embezzled, and deceived.  Although each of KMPR's 180+ discrete adverse discriminatory insults-denials was intended by KMPR to belittle, denigrate, & physically, mentally, economically, and emotionally harm Mr. Austin, through *ongoing* extreme conduct for any law-abiding California licensed Insurer, he kept his peace, patience, and *literally* prayed for KMPR (and their wayward agents). Mr. Austin then 1. took the opportunity  to take concerted action as Abolitionist, Genius, Freedom Fighter, Polyglot, Polymath and Autodidact Fredick Douglass wisely said: *"I prayed for freedom for twenty years but received no answer until I prayed with my legs"*  and 2. took heed of overtly stated wisdom, and admonition, in the Book of James verse 2:26  *"For as the body without the spirit is dead, so faith without works is dead."*

-58-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1       For many being repeatedly called an *"n-word" (by KMPR's words and conduct*) 180+

2 separate instances between 3.1.25-6.23.25 while knowing KMPR is going out of their way to

3 disparage-denigrate them might discourage, or break their Spirit, *but not me.*  I, Mr. George

4 Jarvis Austin subscribe to the philosophy outlined by *The Last Poets* that "*Blessed are those who*

5 *struggle, Oppression is worse than the grave, better to die for a noble cause than to live and die*

6 *[en-slaved],.... And though we have faced insurmountable odds. Yet the will to resist*

7 *[Oppression] remains...."*   The Book of *James*, chapter 1 verse 12 puts it in a slightly different

8 way: "*Blessed is the man who endures trial, because, having been approved, he will receive the*

9 *crown of life..*"  KMPR diabolically seeks to act like segregationists, or their forefather enslavers,

10 through use of derogatory racist stereotypes-slurs to deprive the most basic Constitutional, and

11 California rights that they deceptively hold themselves out as following annually, under penalty

12 of perjury via their license.  Thus, Mr. Austin takes legal, responsible-thoughtful action to correct

13 this *ongoing* per se illegal KMPR conduct (see e.g. *§ 52:* "*((a) Whoever denies, aids or incites a*

14 *denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is <u>liable</u>*

15 <u>*for each and every offense*</u>*),*  heeding Frederick Douglass' wisdom to (take action) *"pray with*

16 *[his] legs."*  See <u>BELL v. MARYLAND</u> *"Th[is] discrimination ... is a relic of slavery."*

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

<u>Signed Declaration under penalty of perjury</u>

I, Mr. George Jarvis Austin, declare-certify, under penalty of perjury of the laws California (and the US), that these *specific, precise facts, cross referenced with filings, documents, exhibits, direct evidence*, are true and correct *(and as I Mr. Austin personally experienced)* per **a.** Cal. Evid. Code § 410 ("Direct evidence") and **b.** CACI No. 202. Direct … Evidence Judicial Council of California Civil Jury Instructions. (*Exhibits A-Z).*  Mr. Austin is Self-Represented, and cites to various forms of <u>*direct evidence*</u> as part of the record *(including direct evidence as Mr. Austin personally saw, felt, touched, heard, spoke, smelled, read, etc.*) under California-Federal law. (*Exhibits A-Z);*  CACI No. 202. Direct...Evidence :: Civil Jury Instructions..(2025): Justia

(*"Evidence can come in many forms. It can be testimony about what someone saw or heard...."*)

<u>Mr. Austin is a high-performing, accomplished, highly sought, student</u>

Mr. Austin is a high achieving, highly recruited, accomplished, high potential, admitted Georgetown (and other elite institutions) student who happens to be a Black man.  Mr. Austin is a person of great character, pristine, clean & clear background, identified as top 5% out of over 20,000 competitive students, admitted to <u>100%</u> of all *top tier* undergraduate schools (including UCLA and Berkeley he applied to), did well at Berkeley, which he selected, and graduated.  [www.forbes.com/sites/ madisonfernandez/2021/09/08/why- berkeley -is-number-one/](www.forbes.com/sites/madisonfernandez/2021/09/08/why-berkeley-is-number-one/); [UC Berkeley No.1 on Forbes' list of America's top colleges - Berkeley News](https://news.berkeley.edu)). See also e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023) : ("*California amended its State Constitution to prohibit race-conscious college admissions in 1996…University of California, Berkeley, a top public university not just in California but also nationally…UC Admits Largest, Most Diverse Class Ever, But It Was Harder To Get Accepted, L. A. Times, July 20, 2021*")

Mr. Austin has straight As, & A+'s the last nine semesters.  Mr. Austin regularly scores in the top 1% of standardized testing for multiple exams, above 99% of test takers, (including the LSAT).  Mr. Austin is highly recruited for both professional and law schools.   Mr. Austin was awarded highest scholarship honors in multiple top tier institutions as incentives for enrollment, as well as free application offers to nearly every T-14 institution, by those institutions, due solely to Mr. Austin's proven, documented, successful academic & professional track record, and accomplishments. Mr. Austin Earned and Won in a top 10 out of 820+ paid Fellowships per Vault and Forbes, in the CA Senate with the most competitive entry *(less than 4% acceptance rate nationwide, my year, for that program)*, as 1 of 18 selected winners (and 1 of 2 *winners* out of that area) …. Mr. Austin declined automatic job offer as part of the elite program selection process as I had already given my word to another commitment.

"The now-25-year-old, along with fellow Stockton native George Austin, is receiving the opportunity to be at the forefront of state politics for 11 months starting in October after being chosen to be among 18 Senate Fellows as part of the state's Capital Fellows Program….. But being chosen for the program is no easy task…..

The Capital Fellows program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing out of 821 internship programs, …"It's a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship, they're also taking graduate courses."...There were more than 1,300 applications for the program each of the past two years. Only 64 people are chosen for the entire program."

- **www.recordnet.com/story/news/2012/09/08/just-one-fellows/49419856007/**

Mr. Austin was accepted into multiple top tier law schools (including T-14), offered highest scholarship award honors from a variety of schools including, previous VP, Kamala Harris' alma mater (in San Francisco), & more recently was chosen as most outstanding student, & top ten business student ever (selected by professor with over 20 years' experience).

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



January ████ 2025

████████████████████████████████████████

Dear George J Austin:

██████████████████████████████████████

The Department has determined that you are entitled to settlement relief for the loans taken out on or after 1/1/2013 associated with your enrollment at Georgetown University ("Relevant Federal Student Loan(s)") based on your allegations regarding the school's misconduct. ███████████████
████ Department of Education will do the following:

- discharge your Relevant Federal Student Loan(s);
- provide a refund for any payments made to the Department of Education on your Relevant Federal Student Loans including Relevant Federal Student Loan debt that you previously paid off; and

████████████████████████████████████████

Sincerely,

U.S. Department of Education
Federal Student Aid

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

830 First Street, NE, Washington, D.C. 20002
StudentAid.gov/borrower-defense

BoR - 1 of 2347

-63-



"What law school in the country is better positioned to deal with the way the profession is going than Georgetown? We have connections to the corporate bar and criminal justice, and we have extensive clinics. We have been oriented to government and politics for decades. Wherever the legal market is going, what law school has more beachheads there than we do? This is a good place to be."

Daniel R. Ernst, Professor of Law

## GEORGETOWN LAW

Combining a world-renowned faculty, a dedication to intellectual stimulation and community, and a location in the heart of the nation's capital, Georgetown is a **unique** place to study law.

### Legal Education in Its Fullest Sense

Georgetown Law seeks not only to impart the tools of the lawyer's trade, but also to foster reflection and inquiry into the nature of law and the role and responsibility of lawyers in a global society. The goal is education in its fullest sense — not only mastery of "black letter law," but a sense of the philosophical, political, social and ethical dimensions of law, the awakening of an abiding curiosity about its nature and purposes, and the instilling of a sense of responsibility for its development and direction.

### A Dynamic Intellectual Community

Georgetown nurtures the very highest standards of scholarly inquiry, intellectual rigor and ethical behavior in a way that respects each student's individuality and fosters his or her particular interests and career goals. The result is a dynamic intellectual community, in which students have an unprecedented range of academic opportunities both inside and outside the classroom.

### An unparalleled Vantage Point

Located in Washington, D.C., within blocks of the U.S. Congress that enacts laws, the Supreme Court that interprets them, and the administrative agencies that enforce them, Georgetown provides an unparalleled vantage point from which its faculty and students explore the dynamic legal processes of our nation and world.

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 70



GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin

CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

-65-



## RULES COMMITTEE

RESOLUTION
By
President pro Tempore of the Senate Darrell Steinberg
RELATIVE TO COMMENDING

# George Austin

**WHEREAS**, George Austin was selected from a highly competitive group of outstanding college and university graduates from California and throughout the nation, and was appointed a 2012-2013 California Senate Fellow; and

**WHEREAS**, George Austin, from Stockton, graduated from the University of California, Berkeley, with a Bachelor of Arts degree in Sociology; and

**WHEREAS**, Through his service in the Senate Committee on Governance and Finance, George Austin had the unique opportunity of acquiring a deeper understanding of the legislative process and public policy formation, while also providing assistance to Senate Members, legislative committees, and their constituencies; and

**WHEREAS**, The California Senate Fellows program, established in 1973 and sponsored jointly by the Senate and California State University, Sacramento, enables 18 individuals to become full-time Senate staff members in the State Capitol for 11 months and receive six units of university graduate credit; and

**WHEREAS**, As a result of his outstanding service as a Senate Fellow, George Austin is better equipped to provide valuable leadership and contributions to educational institutions; local, regional, state, and federal governments; and professional, business, and community endeavors in the State of California and the nation; now, therefore, be it

**RESOLVED BY THE SENATE RULES COMMITTEE**, That George Austin, a 2013-2013 California Senate Fellow, be commended for his exemplary service on behalf of the Members of the Senate, and extended best wishes for every success in his future endeavors.

Senate Rules Committee Resolution No. 24 adopted this 12th day of August, 2013



CHAIR
Senatoris Est Civitatis                    Libertatem Tueri •

EXHIBIT A
Page 72

**FIRST AMENDED COMPLAINT – San Francisco County Superior Court**



-67-



📶 AT&T  LTE                    **10:00 AM**              🔋 ☀ 54% 🔋

🔒 mail-attachment.googleusercontent.com

---

2012–13
## CALIFORNIA SENATE FELLOWS



**About you**
Name: George Austin

Hometown: ▓▓▓▓▓▓

Hobbies/Interests: Basketball, Golf, Boxing, Cooking, Kayaking, Travel

Favorite book(s)/movie(s)/TV show(s)/music: Finding Forester, Goodwill Hunting, Godfather Trilogy, Coming to America, The Golden Child, Batman Begins, Dark Knight, Dark Knight Rises, Hoop Dreams, Above the Rim, Wedding Crashers, Lord of the Rings 1 & 2, Matrix 1 & 2, Ray, Hangover

The West Wing, Doug, Bloomberg Enterprise, Charlie Rose, The Mentor, Bloomberg Game Changers, Cosby Show, The Wire, Martin

Gospel, R & B, Hip-Hop, Country

The Alchemist, Purpose Driven Life, Autobiography of Malcolm X, Developing the Leader Within – John C. Maxwell, How to Win Friends and Influence People Dale Carnegie, Think and Grow Rich Napoleon Hill, 7 Habits of Highly Effective People

Birthday: April 12

**3 strange/unique but interesting facts about you:**
1. Up until I was sixteen my shoes size was always 1 or 2 sizes larger than my age (i.e at twelve years old I wore a size fourteen)
2. In one day I met Oprah Winfrey, Prince, Usher, Anthony Hamilton and Barack Obama
3. I've lived in four states

**Education**
College/University: University of California, Berkeley

Degree: BA

Major: Sociology

Advanced degrees: Georgetown Law School- JD (deferred, begin 2013)

---

2012–13
## CALIFORNIA SENATE FELLOWS

**Goals & Work/Relevant Experience**
Activities or Work Experience after College:
- Riordan MBA Fellows Anderson School of Business (UCLA)
- Chartered Financial Analyst Level 1 Candidate December 2012
- Chartered Financial Analyst Society Scholarship Recipient
- HAAS School of Business, Arts, Science & Engineering Program (Berkeley)

Occupational Goals/Interests: Business/ Law/Entrepreneurship/Finance/Education

Policy Interests: Economy, Finance, Appropriations, Energy, Transportation, Economic Development, Trade (International and Domestic), Tax, Banking, Insurance

---

**FIRST AMENDED COMPLAINT – San Francisco County Superior Court**

EXHIBIT A
Page 74

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIRST AMENDED COMPLAINT – San Francisco County Superior Court**

EXHIBIT A
Page 75

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 77

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 79



**SENATE GOVERNANCE & FINANCE COMMITTEE**
Senator Lois Wolk, Chair

| | |
|---|---|
| **BILL NO:** AB 458 | **HEARING:** 8/14/13 |
| **AUTHOR:** Wieckowski | **FISCAL:** Yes |
| **VERSION:** 2/19/13 | **TAX LEVY:** Yes |
| **CONSULTANT:** Austin | |

*INCOME TAXES: DEDUCTIONS: PUNITIVE DAMAGES*

*Repeals authority to deduct punitive damages on personal and corporate tax filings.*

**Background and Existing Law**

Current law authorizes individuals and corporations to file tax deductions for the payment of monetary damages in legal cases. Under existing law plaintiffs can seek "punitive" or "exemplary" damages in legal cases where the defendant is guilty of "oppression, fraud, or malice." "Malice" means conduct which is intended by the defendant to cause injury or despicable conduct that is carried on with a willful and conscious disregard of the rights or safety of others. "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

California courts hold that punitive damages punish the defendant and deter similar conduct. The goal of deterrence of similar conduct is both for the specific defendant who may repeat or continue offensive behavior and to other potential parties who may commit similar offenses. Punitive damages are not intended to compensate a plaintiff unlike compensatory damages, which are intended for compensation.

The Book of Approved Jury Instructions (BAJI) provides that a jury should consider two factors to determine the amount of punitive damages to award:
- The reprehensibility of the defendant's conduct.
- The amount of punitive damages, which will have a deterrent effect on the defendant in the light of defendant's financial condition.

In addition, a defendant may ask that a jury be instructed to consider that the punitive damages bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff.

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

5046.

**Environmental Quality**—(9)—Hill (Chair), Gaines (Vice Chair), Calderon, Corbett, Fuller, Hancock, Jackson, Leno and Pavley. Chief Consultant: Rachel Machi Wagoner. Consultants: Rebecca Newhouse and Joanne Roy. Assistant: Sue Kumpulainien. Phone: (916)651-4108. Room 2205.

**Governance and Finance**—(7)—Wolk (Chair), Knight (Vice Chair), Beall, DeSaulnier, Emmerson, Hernandez and Liu. Staff Director: Gayle Miller. Consultants: George Austin, Toby Ewing, Colin Grinnell, Samantha Lui and Brian Weinberger. Assistants: Marisa Lanchester and Krimilda McKenzie. Phone: (916) 651-4119. Room 408.

**Governmental Organization**—(11)—Wright (Chair), Vacant (Vice Chair), Berryhill, Calderon, Cannella, Correa, de León, Galgiani, Hernandez, Lieu and Padilla. Staff Director: Arthur Terzakis. Consultant: Paul Donahue. Assistant: Brenda K. Heiser. Phone: (916)651-1530. 1020 N Street, Room 584.

**Health**—(9)—Hernandez (Chair), Anderson (Vice Chair), Beall, de León, DeSaulnier, Monning, Nielsen, Pavley and Wolk. Staff Director: Melanie Moreno. Consultants: Scott Bain, Vincent D. Marchand, Tanya Robinson-Taylor and Katie Trueworthy. Assistants: Dina Lucero and Alex Norring. Phone (916)651-4111. Room 2191.

**Human Services**—(6)—Yee (Chair), Berryhill (Vice Chair), Emmerson, Evans, Liu and Wright. Chief Consultant: Mareva Brown. Consultant: Sara Rogers. Assistant: Mark A. Teemer Jr. Phone: (916)651-1524. 1020 N Street, Room 521.

WEDNESDAY, JUNE 26, 2013

9

## STANDING COMMITTEES OF THE SENATE

**Agriculture**—(5)—Galgiani (Chair), Cannella (Vice Chair), Berryhill, Lieu and Wolk. Consultant: Anne M. Megaro. Assistant: Jone McCarthy. Phone: (916)651-1508. 1020 N Street, Room 583.

**Appropriations**—(7)—de León (Chair), Walters (Vice Chair), Gaines, Hill, Lara, Padilla and Steinberg. Staff Director: Mark McKenzie. Consultants: Robert Ingenito, Marie Liu, Brendan McCarthy, Jolie Onodera, Maureen Ortiz and Jacqueline Wong–Hernandez. Assistants: Jennifer Douglas and Larissa Pitts. Phone: (916)651-4101. Room 2206.

**Banking and Financial Institutions**—(9)—Correa (Chair), Berryhill (Vice Chair), Beall, Calderon, Hill, Hueso, Roth, Torres and Walters. Staff Director: Eileen Newhall. Assistant: Rae Flores. Phone: (916)651-4102. Room 405.

**Budget and Fiscal Review**—(16)—Leno (Chair), Emmerson (Vice Chair), Anderson, Beall, Berryhill, Block, DeSaulnier, Hancock, Jackson, Monning, Nielsen, Price, Roth, Torres, Wright and Wyland. Staff Director: Keely Bosler. Deputy Staff Director: Mark Ibele. Consultants: Michelle Baass, Kim Connor, Catherine Freeman, Jennifer Troia, Joe Stephenshaw and Brady Van Engelen. Assistants: Glenda Higgins and Mary Teabo. Phone: (916)651-4103. Room 5019.

**Business, Professions and Economic Development**—(10)—Lieu (Chair), Emmerson (Vice Chair), Block, Corbett, Galgiani, Hernandez, Hill, Padilla, Wyland and Yee. Chief Consultant: Bill Gage. Consultants: G. V. Ayers, Le Ondra Clark and Sarah Mason. Assistant: Kathleen Sullivan. Phone: (916)651-4104. Room 2053.

**Education**—(9)—Liu (Chair), Wyland (Vice Chair), Block, Correa, Hancock, Hueso, Huff, Monning and Torres. Staff Director: Daniel Alvarez. Principal Consultants: Kathleen Chavira, Lenin Del Castillo and Lynn Lorber. Assistants: Barbara Montero and Vanessa Cisneros. Phone: (916)651-4105. Room 2083.

**Elections and Constitutional Amendments**—(5)—Torres (Chair), Anderson (Vice Chair), Hancock, Padilla and Yee. Chief Consultant: Darren Chesin. Consultant: Frances Tibon–Estoista. Assistant: Maria Lerma. Phone: (916)651-4106. Room 2203.

**Energy, Utilities and Communications**—(11)—Padilla (Chair), Fuller (Vice Chair), Cannella, Corbett, de León, DeSaulnier, Hill, Knight, Pavley, Wolk and Wright. Chief Consultant: Kellie Smith. Principal Consultant: Jacqueline Kinney. Assistant: Melanie Cain. Phone: (916)651-4107. Room 5046.

**Environmental Quality**—(9)—Hill (Chair), Gaines (Vice Chair), Calderon, Corbett, Fuller, Hancock, Jackson, Leno and Pavley. Chief Consultant: Rachel Machi Wagoner. Consultants: Rebecca Newhouse and Joanne Roy. Assistant: Sue Kumpulainen. Phone: (916)651-4108. Room 2205.

**Governance and Finance**—(7)—Wolk (Chair), Knight (Vice Chair), Beall, DeSaulnier, Emmerson, Hernandez and Liu. Staff Director: Gayle Miller. Consultants: George Austin, Toby Ewing, Colin Grinnell, Samantha Lui and Brian Weinberger. Assistants: Marisa Lanchester and Krimilda McKenzie. Phone: (916) 651-4119. Room 408.

...—(11)—...Wright (Chair), Nielsen (Vice Chair), Berryhill, Calderon...

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

9

WEDNESDAY, JUNE 26, 2013

## STANDING COMMITTEES OF THE SENATE

**Agriculture**—(5)—Galgiani (Chair), Cannella (Vice Chair), Berryhill, Leno and Wolk. Consultant: Anne M. Megaro. Assistant: June McCarthy. Phone: (916)651-1508. 1020 N Street, Room 583.

**Appropriations**—(7)—de León (Chair), Walters (Vice Chair), Gaines, Hill, Lara, Padilla and Steinberg. Staff Director: Mark McKenzie. Consultants: Robert Ingenito, Marie Liu, Brendan McCarthy, Julie Ornelas, Maureen Ortiz and Jacqueline Wong-Hernandez. Assistants: Jennifer Douglas and Larissa Pitts. Phone: (916)651-4101. Room 2206.

**Banking and Financial Institutions**—(9)—Correa (Chair), Berryhill (Vice Chair), Beall, Calderon, Hill, Hueso, Roth, Torres and Walters. Staff Director: Eileen Newhall. Assistant: Rae Flores. Phone: (916)651-4102. Room 405.

**Budget and Fiscal Review**—(16)—Leno (Chair), Emmerson (Vice Chair), Anderson, Beall, Berryhill, Block, DeSaulnier, Hancock, Jackson, Manning, Nielsen, Price, Roth, Torres, Wright and Wyland. Staff Director: Keely Bosler. Deputy Staff Director: Mark Ibele. Consultants: Michelle Baass, Kim Connor, Catherine Freeman, Jennifer Troia, Joe Stephenshaw and Brady Van Engelen. Assistants: Glenda Higgins and Mary Teabo. Phone: (916)651-4103. Room 5019.

**Business, Profession and Economic Development**—(9)—Lieu (Chair), Emmerson (Vice Chair), Block, Corbett, Galgiani, Hernandez, Hill, Padilla, Wyland and Yee. Chief Consultant: Bill Gage. Consultant: G.V. Ayers. Le's Oudia Clark and Sarah Mason. Assistant: Kathleen Sullivan. Phone: (916)651-4104. Room 2053.

**Education**—(9)—Liu (Chair), Wyland (Vice Chair), Block, Correa, Hancock, Hueso, Huff, Monning and Torres. Staff Director: Daniel Alvarez. Principal Consultants: Kathleen Chavira, Lenin Del Castillo and Lynn Lorber. Assistants: Barbara Montano and Vanessa Cisneros. Phone: (916)651-4105. Room 2083.

**Elections and Constitutional Amendments**—(5)—Torres (Chair), Anderson (Vice Chair), Hancock, Padilla and Yee. Chief Consultant: Darren Chesin. Consultant: Frances Tibon-Estoista. Assistant: Maria Larrama. Phone: (916)651-4106. Room 2203.

**Energy, Utilities and Communications**—(11)—Padilla (Chair), Fuller (Vice Chair), Cannella, Corbett, León, DeSaulnier, Hill, Knight, Pavley, Wolk and Wright. Chief Consultant: Kellie Smith. Consultant: Jay Dickenson. Principal Consultant: Jacqueline Kinney. Assistant: Melanie Cain. Phone: (916)651-4107. Room 5046.

**Environmental Quality**—(9)—Hill (Chair), Gaines (Vice Chair), Calderon, Corbett, Fuller, Hancock, Jackson, Leno and Pavley. Chief Consultant: Rachel Machi Wagoner. Consultant: Rebecca Newhouse and Joanne Roy. Assistant: Sue Kateley. Phone: (916)651-4108. Room 2205.

**Governance and Finance**—(7)—Wolk (Chair), Knight (Vice Chair), Beall, DeSaulnier, Emmerson, Hernandez and Liu. Staff Director: Colin Grinnell. Consultants: Greg Miller, George Austin, Toby Ewing, Lenny Goldberg, Samantha Lui and Brian Weinberger. Assistants: Marisa Lanchester and Krismida McKenzie. Phone: (916) 651-4119. Room 408.

5046.

CALIFORNIA LEGISLATURE
AT SACRAMENTO

2013–14 REGULAR SESSION

# Senate Daily File

No. 108

SENATOR DARRELL STEINBERG
President pro Tempore

SENATOR ELLEN M. CORBETT
Majority Floor Leader

SENATOR BOB HUFF
Minority Floor Leader

Compiled Under the Direction of

GREGORY SCHMIDT
Secretary of the Senate

By

MARLESSA HERNANDEZ
Daily File Clerk

and

JAMIE TAYLOR
Assistant Daily File Clerk

SENATE CONVENES AT 12 NOON

WEDNESDAY, AUGUST 14, 2013
(FLOOR SESSION)

ONE HUNDRED EIGHTH DAY IN SESSION

Please report any errors or omissions to Daily File Clerk. Phone 651—4171)

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 84



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 85



**Congratulations on Scholarship**

canadag@uchastings.edu
To GAUSTIN07@YAHOO.COM
Apr 11, 2012 at 3:09 PM

Dear George,

Congratulations once again on your admission to the University of California Hastings College of the Law Class of 2015. **It gives me great pleasure to offer you a $15,000 Chancellor's Renewable Scholarship Award**. Based on your outstanding academic record and impressive accomplishments, I believe you are truly deserving of this award, which will amount to **$45,000** during your three years at Hastings.

The Chancellor's Scholarship Award was established to help students of exceptional promise afford their legal education, and is Hastings' largest individual scholarship. While a demonstration of financial need is required for this scholarship, this award is renewable for up to six semesters as long as you continue to demonstrate need.

Please also keep in mind that this scholarship is given in addition to our general need based grants, which will become available beginning mid-March provided you promptly complete your FAFSA and Financial Aid Supplement. We anticipate awarding grants that will range between $7,500 and $11,500 this year.

become available beginning mid-March provided you promptly complete your FAFSA and Financial Aid Supplement. We anticipate awarding grants that will range between $7,500 and $11,500 this year.

I look forward to welcoming you to the Hastings community this fall, and hope this scholarship award will make your years as a student and alum even more rewarding. If you have any questions, please contact me directly canadag@uchastings.edu.

Sincerely,

Greg Canada
Assistant Dean of Admissions

-80-

**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

EXHIBIT A
Page 86

## Austin wants to be sheriff

Look out Tom Tramel, there may be a future sheriff in town.

Five-year-old George Jarvis Austin attends the Kindergarten Center and he wants to be a police officer or a sheriff when he grows up.

Son of Charlotte Hall-Austin, George has begun his school career with a positive attitude. "George is an enthusiastic learner and he is a well-liked and caring person," says one of his teachers.

His interests include T-ball and books, especially the Berenstein Bears series.

According to Principal Earl Watts, "George is a very smart child. He is totally involved in all classroom activities and loves school. With George's ability, I think he can accomplish his goals in life."



## University of California

ON THE NOMINATION OF THE FACULTY OF THE
COLLEGE OF LETTERS AND SCIENCE
HAVE CONFERRED UPON

### GEORGE JARVIS AUSTIN

THE DEGREE OF BACHELOR OF ARTS
WITH A MAJOR IN SOCIOLOGY
WITH ALL THE RIGHTS AND PRIVILEGES THERETO PERTAINING

GIVEN AT BERKELEY
THIS NINETEENTH DAY OF DECEMBER IN THE YEAR
TWO THOUSAND AND NINE

GOVERNOR OF CALIFORNIA AND
PRESIDENT OF THE REGENTS

CHANCELLOR AT BERKELEY

PRESIDENT OF THE UNIVERSITY

ACTING EXECUTIVE DEAN OF THE COLLEGE

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 87

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

EXHIBIT A
Page 88

1

2

3

4

5

6

7

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26





27

28

-83-

**Checkr**                                                    Report completed on Oct 14, 2021 11:15 PM UTC

Consumer Report for          Requestor Company                              Status
**George Jarvis Austin**      **ABC Legal Services**                        Clear
gaustin07@berkeley.edu

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Oct 12, 2021 | Complete |
| Sex Offender Search | Oct 12, 2021 | Clear |
| Global Watchlist Search | Oct 12, 2021 | Clear |
| National Search | Oct 12, 2021 | Complete |
| Federal Search | Oct 12, 2021 | Complete |
| County Searches | Oct 14, 2021 | Clear |

-84-





**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 93



| ıll AT&T 5G E | 8:37 PM | 32% |

🔒 outlook.office.com ↻

× **Microsoft Outlook**
Microsoft Corporation
INSTALLED                    **OPEN**

‹ Inbox (99+)                ∧ ∨

## Paul Allen

Sat 12/28/2019 12:05 PM

**To:** George Austin [C];

Thanks so much George! It was a great pleasure meeting you, sir. Really appreciate your help and willingness to support our team! Seriously, we couldn't do it without you.

Really appreciate the notice, and yes if you're able to support at any time between 9:30 am—8:00 pm on the next four days, please don't hesitate to simply drop-by at any time! Our team is in desperate need of great people such as yourself, and would love the support. J

Thanks again!

-Paul







**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 96

▪▪ AT&T  5G ᴇ          2:24 PM          ⊚ ⏰ 30% ▯



Select an account to sign in with

GA    **George Austin**
      geaustin@tesla.com

⊖⁺    Sign in with another account

🟥🟩 Sign up for free
🟦🟨

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 98

**Payroll Department**
Phone: 510-249-3520
Fax: 650-412-2541
E-mail: payroll@tesla.com

# T E S L A

## Manual Timecard

REQUIRED info below:

Print Employee Name : George J. Austin

Print Manager Name:

Employee Phone: 209 915 6304

Cost Center :

Employee ID :

Use Military Time or enter AM/PM. Ex. 13:00 or 1:00 PM

Reason for Manual TimeSheet(Required)

| 1. FORGOT TO PUNCH | ☐ |
| 2. BADGING ISSUES/ERRORS | ☐ |
| 3. COULD NOT ENTER HOURS | ☑ |
| 4. PTO REQUEST NOT PAID | ☐ |
| 5. HOURLY TO SALARY CONVERSION | ☐ |

| Date (MM/DD/YYYY) | Clock In | Lunch Out | Lunch In | Clock Out | PTO Hours | Total Hours |
|---|---|---|---|---|---|---|
| 12/20/2019 | 9:30 | | | 2:00 | | 4.5 |
| 12/28/2019 | 9:30 | | | 2:00 | | 4.5 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Employee signature          Date  1/11/20

Manager signature          Date

Note: If you need to transfer hours worked to a different cost center/project code, please contact Payroll. **Incomplete time card (required field) will not be processed.**

-93-

**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

**Checkr**

Report completed on Oct 14, 2021 11:15 PM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **George Jarvis Austin** | **ABC Legal Services** | Clear |
| gaustin07@berkeley.edu | | |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Oct 12, 2021 | Complete |
| Sex Offender Search | Oct 12, 2021 | Clear |
| Global Watchlist Search | Oct 12, 2021 | Clear |
| National Search | Oct 12, 2021 | Complete |
| Federal Search | Oct 12, 2021 | Complete |
| County Searches | Oct 14, 2021 | Clear |

-94-

EXHIBIT A
Page 100



**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

EXHIBIT A
Page 101

<u>KMPR won't self-correct from multiple formal complaints</u>

Mr. Austin emailed, formally complained, to KMPR repeatedly, as recently as **6.23.25 (updated 8.18.25; as well as reported to SFPD, and previously CDI)**.  (*Exhibits A-Z*).   KMPR *continues to deprive* his public accommodation rights to make settlement contracts (*Exhibits A-Z*).  Mr. Austin has repeatedly followed up, and even asked if there is anyone else within KMPR to follow up with.  KMPR has yet to self-correct, nor explain.

<u>KMPR's pattern-conduct changed once discovered Mr. Austin is Black.</u>

As soon as KMPR discovered Mr. Austin was a Black man KMPR's pattern, communication, attitude, and conduct changed toward Mr. Austin to a. derogatory, b. insulting, and c. racial stereotype-slur using (*"<u>Black Brutes</u> or <u>Bucks</u>"- "<u>N*gg*r</u>" - "<u>Black Inferior"</u>"* to deprive & demean Mr. Austin on 180+ occasions from *3.1.25 -6.23.25.*  KMPR is failing 99.9% of duties owed to Mr. Austin because he is a severely injured Black male, per their own admission.  <u>*The .01% of duties correctly completed, like the June 16th sent form below, to Mr. Austin was before KMPR discovered he is a Black man.*</u>(*Exhibits D*) This is highly insulting-offensive-racist KMPR conduct: per *Nazir v. United Air Lines, Inc.* (2009) 178 Cal.App.4th 243 discrimination *"is a quintessential question of fact for the jury, which, among other things, "must be assessed from the perspective of a reasonable person belonging to the [plaintiff's] racial or ethnic group."*  Even after KMPR perjured itself to CA state officials, to embezzle funds owed Mr. Austin, *KMPR agents weirdly tried to reverse the scenario and acted as if Mr. Austin exercising his rights to public accommodation per Unruh, and other CA and Federal laws was somehow the issue.*  Even seeming to try and criminalize Mr. Austin when they are committing felonies, in an ongoing manner to embezzle funds owed him.   It seems to actually bother KMPR that Mr. Austin can read, think, and do for himself as a Black man.

The more Mr. Austin meditated on KMPR's initial conduct, strange subsequent and

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

increasingly disrespectful-derogatory conduct toward Mr. Austin (after KMPR realized he was Black), Mr. Austin did not have to look to far in history to recognize this type of anti-literacy, anti-Black, *"relic of slavery"* set of insults, and usage of derogatory slurs-epithets-stereotypes against Mr. Austin.  KMPR's attempts to criminalize Black rights, and Black people's self development, conduct is not only deeply offensive, but runs deep into the American Enslavement Saga per "*Illegal to Read"* | National Museum of African American History & Culture whereas the 1831 North Carolina Legislature, passed the *North Carolina Slave Code, 1831,* (with similar Slave State Legislation in Connecticut, Georgia, Missouri, Mississippi, New York, Ohio, Pennsylvania, South Carolina, & Virginia) making it a crime to teach enslaved Blacks to read: *"Whereas the teaching of slaves to read and write, has a tendency to . . . produce insurrection and rebellion . . . any free person who shall hereafter teach or attempt to teach any slave within this state to read or write . . . shall be liable to indictment...."  (Exhibit A-Z)*

Per Anti-literacy laws in the United States Facts for Kids *"Anti-literacy laws were rules in many parts of the United States that made it illegal to teach enslaved people or even free Black people how to read or write. These laws were common in states where slavery was allowed, both before and during the American Civil War.....Laws Against Learning in the States Between 1740 and 1834, many states passed laws against teaching Black people to read and write. These states included Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia. South Carolina was the first to pass such a law in 1739. It said that teaching enslaved people to read or write could lead to a large fine and time in prison....."* *(Exhibit A-Z)*;  Per Literacy By Any Means Necessary: The History of Anti-Literacy Laws in the U.S – Oakland Literacy Coalition :

> *"Anti-Literacy Laws and Abolitionist Frederick Douglass... ..Confederate states...that passed anti-literacy laws included South Carolina, North Carolina, Georgia, Louisiana, Mississippi, Virginia, and Alabama.....*
>
> *....Due to fear following the Stono Rebellion, the largest slave uprising in South Carolina in 1739, Blacks were prohibited from learning to read. Plantation owners feared that literate*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*slaves could write and use forged documents to gain their freedom. However, many of the enslaved used this method to obtain their freedom…..*

*….Slave owner Hugh Auld describes this fear in this exchange with his wife, Sophia Auld, after he discovered her teaching a young Frederick Douglass how to read:….*

*….."He should know nothing but the will of his master and learn to obey it. As to himself, learning will do him no good, but a great deal of harm, making him disconsolate and unhappy. If you teach him how to read, he'll want to know how to write, and this accomplished, he'll be running away with himself…." (Douglass, 2017, p. 14).*

*..Knowledge acquired by a slave was like a death knell to a slave owner. In order to destroy any semblance of humanity, plantation owners kept enslaved Black people in the dark. The majority of enslaved people didn't even know the year they were born or their lineage. It was a purposeful removal of identity in an effort to perpetuate the slave mentality. Several confederate states jointly imposed literacy restrictions on the enslaved using legislation that went beyond the shackling of bodies and extended into the shackling of minds. In their attempts to shackle our intellect, they failed to factor in the resilience of a people who endured centuries of brutal dehumanization and forced assimilation. A paradigm shift occurs in the thinking processes of enslaved people who gain knowledge. Their thinking moves from a slave mentality to a mentality of liberation, thus making them "unfit to be [enslaved]," as Frederick Douglass stated…."*

Per [Literacy as the path to freedom: How slaveowners purposefully kept enslaved people illiterate - Reading Partners](#) (*"Slavery and illiteracy in the United States….Slavery is "the practice or institution of holding people as chattel involuntarily and under [the] threat of violence."… The institution of antebellum slavery was also facilitated by slave owners using non-physical methods of dehumanization against enslaved people. One of these many methods included maintaining a lack of literacy, or instilling illiteracy, among enslaved people.….*

*Literacy as a threat to slave owners*…..*Slave owners often restricted their slaves' knowledge of the smallest, most inconspicuous information, such as an enslaved person's age, birth parents, or even family origin. White slaveholders did not want their slaves to know anything about or understand their personal identity…..This information was the first step towards literacy, which slaveholders feared would empower enslaved people to recognize the dehumanization and manipulation that they were being subjected to……"*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Per *Slaves Are Prohibited to Read and Write by Law | North Carolina Law (1830-31)* :

> **"...AN ACT TO PREVENT ALL PERSONS FROM TEACHING SLAVES TO READ OR WRITE**, THE USE OF FIGURES EXCEPTED
>
> *Whereas the teaching of slaves to read and write, has a tendency to excite dis-satisfaction in their minds, and to produce insurrection and rebellion, to the manifest injury of the citizens of this State: Therefore, Be it enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the same, That any free person, who shall hereafter teach, or attempt to teach, any slave within the State to read or write, the use of figures excepted, or shall give or sell to such slave or slaves any books or pamphlets, shall be liable to indictment in any court of record in this State having jurisdiction thereof, and upon conviction, shall, at the discretion of the court, if a white man or woman, be fined not less than one hundred dollars, nor more than two hundred dollars, or imprisoned; and if a free person of color, shall be fined, imprisoned, or whipped, at the discretion of the court, not exceeding thirty nine lashes, nor less than twenty lashes.*
>
> *II. Be it further enacted, That if any slave shall hereafter teach, or attempt to teach, any other slave to read or write, the use of figures excepted, he or she may be carried before any justice of the peace, and on conviction thereof, shall be sentenced to receive thirty nine lashes on his or her bare back.*
>
> *III. Be it further enacted*, That the judges of the Superior Courts and the justices of the County Courts shall give this act in charge to the grand juries of their respective counties…."

Per *April 7, 1831: Virginia Literacy Ban Enacted - Zinn Education Project*: *"...Following the publication of David Walker's Appeal in 1829 and numerous uprisings of the enslaved, states across the South began to pass or amend existing anti-literacy laws to prevent future insurrections and thwart the struggle for Black education.....On April 7, 1831, the Virginia General Assembly revised its laws governing slavery in what was called "An Act to amend the act concerning slaves, free negroes and mulattoes." As Encyclopedia Virginia describes, the amended law decreed that "all meetings of free negroes or mulattoes, at any school house, church, meeting-house or other place for teaching them reading or writing, either in the day or night, under whatsoever pretext, shall be considered as an unlawful assembly..... Between 1800 and 1835, the majority of southern states enacted legislation that made it a crime to teach*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*enslaved individuals to read and write.....*"

## Slaves, Free Negroes and Mulattoes.                    107

corporation court, until the case shall be finally disposed of by the superior court to which the writ of error is returnable.

5. All acts and parts of acts coming within the purview of this act shall be and the same are hereby repealed : *Provided always,* That nothing in this act contained shall be construed to repeal any act heretofore made, for so much thereof as may relate to any offence committed or done, or claim which may have accrued, before the commencement of this act. *Repealing clause.*

6. This act shall be in force from and after the first day of May next. *Commencement.*

––––––––––

CHAP. XXXIX.—AN ACT to amend the act concerning slaves, free negroes and mulattoes.

[Passed April 7, 1831.]

1. *Be it enacted by the general assembly,* That all free negroes and mulattoes, who shall be convicted of remaining in this commonwealth contrary to law, and who shall become liable to be sold according to the provisions of former laws and of this act, shall be publicly sold by the sheriff or sergeant, at the front door of the court-house of the county or corporation, on a court-day in pursuance of notice of such sale, posted at such court-house door, at the court held in the preceding month. *Free negroes and mulattoes remaining in state contrary to law, to be sold.* *Notice of sale required.*

2. *Be it further enacted,* That the several superior courts of law, as well as the county and corporation courts, shall have jurisdiction of all prosecutions against free negroes and mulattoes, offending in manner aforesaid, and may try and determine the same according to law. *Jurisdiction in such prosecutions given to superior as well as county courts.*

3. *Be it further enacted,* That it shall be the duty of all commissioners of the public revenue, once in every year, to present to the grand juries of the several courts aforesaid, a list of all free negroes and mulattoes, who, in the opinion of such commissioners, may have remained within the commonwealth, contrary to law, upwards of twelve months from the time of their emancipation. *Commissioners of revenue to present free negroes, &c. so remaining in state.*

4. *Be it further enacted,* That all meetings of free negroes or mulattoes, at any school-house, church, meeting-house or other place for teaching them reading or writing, either in the day or night, under whatsoever pretext, shall be deemed and considered as an unlawful assembly ; and any justice of the county or corporation, wherein such assemblage shall be, either from his own knowledge, or on the information of others, of such unlawful assemblage or meeting, shall issue his warrant, directed to any sworn officer or officers, authorising him or them, to enter the house or houses where such unlawful assemblage or meeting may be, for the purpose of apprehending or dispersing such free negroes or mulattoes, and to inflict corporal punishment on the offender or offenders, at the discretion of any justice of the peace, not exceeding twenty lashes. *Meetings for teaching free negroes, &c. reading or writing, prohibited.* *Justice to issue warrant to apprehend and disperse such persons.* *Punishment.*

5. *Be it further enacted,* That if any white person or persons assemble with free negroes or mulattoes, at any school-house, church, meeting-house, or other place for the purpose of instructing such free negroes or mulattoes to read or write, such person or persons shall, on conviction thereof, be fined in a sum not exceeding fifty dollars, and moreover may be imprisoned at the discretion of a jury, not exceeding two months. *Penalty on white persons for assembling with free negroes to instruct them in reading and writing.*

EXHIBIT A
Page 106

**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

The heart of Black _anti-literacy_ laws in pro-enslaver Southern states was fear that **1.** Black people could read-understand the system that they operated in just as well, *or better than* the White enslavers (competitive advantage) **2.** Black people would read the promises of the country, states, and counties they resided in, *realize that those promises do in fact apply to them, and assert their rights* to the same freedom, rights, and privileges as their White counterparts **3.** Black would gain *self-knowledge, self-mastery, power, economic-technological-political development for themselves*, AND others in an interdependent manner which *forces respect of their rights on equal footing* as Whites, who sought through every mechanism to create an unequal, White Supremacist, corrupt, system to Exploit, and Enslave Black people.  Many of the most pernicious Whites, who promulgated racist propaganda of Blacks *actually knew Black people were just as capable, if not more capable* than the Whites who sought to keep exploiting them for Blacks riches, labor, and various forms of wealth.  They feared Black education because they already knew the only way to keep Exploiting was to keep Black People illiterate, and ignorant of *who Black people really are, what they have already accomplished, and what Black people are capable of doing.*

Mr. Austin is Black, and Free, but KMPR's attitude is that of those White Supremacist who sought to exploit, enslave, and profit on the pain of Black People like Mr. Austin.  KMPR is so racist that even though **1.** Their agents admit they owe Mr. Austin a settlement contract **2.** Mr. Austin read, inquired, followed up (*prior to and after submitting all required info for making settlement contract*) receiving confirmation that all was correctly-successfully submitted to make settlement contract **3.** Mr. Austin **w**as provided the direct contact information to follow up with questions on KMPR letterhead **4.**  Mr. Austin Independently researched, read, and conduct thorough due diligence (far beyond anything required of an injured claimant, and is KMPR's duty to have mastery of their own CA insurer duties) **5.** Mr. Austin dutifully, and diligently follows up (180+ times) as the law commands to do KMPR not only doesn't take responsibility,

but *acts like Black reading comprehension, intelligence, independent thought, and assertion of a Black man's rights per CA Supreme Court, Statutes, Regs, and Law explicit instruction is a criminal legal wrong* by Mr. Austin (similar to enslavers, segregationists, & exploiters of Black pain *Slaves Are Prohibited to Read and Write by Law | North Carolina Law (1830-31)* ; *Lloyd's, marine insurance and slavery - Lloyd's* ; *The hidden links between slavery and Wall Street*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**_Before KMPR discovered Mr. Austin is Black_**, KMPR **1.** openly communicated, **2.** shared details of KMPR's claims-settlement-contract-offer timeline-process, **3.** confirmed receipt-acceptability of all submitted-required documents, **4.** confirmed he was owed KMPR settlement-contract-offer **5.** informed: he will receive an offer in approximately 40 days after signed medical-authorization-contract receipt, **6.** openly welcomed Mr. Austin as prospective bodily injury settlement-contract-offerree. (*Exhibits A-J)* **_After_ KMPR discovered Mr. Austin is Black** *(through uploads self-description, photos-identification, etc.)* KMPR **1.** purposefully obstructed-delayed offer, **2.** refused to effectuate-make contract, nor-effectively-communicate, **3.** deprived contract Rights, but <u>did not deny his claim</u>.

Mr. Austin followed up, asked questions, emailed, called, complained, researched illegal KMPR failures-of-duties.  In the abundance of caution Mr. Austin re-sent all required forms 15-20+ additional times between then and now (several times between 3.1.25-6.23.25).  Aware that KMPR 1. had broken their word (40 days or less for settlement), 2. shifted their conduct after discovering Mr. Austin is Black, and 3. having made derogatory racial comments admitting using epithets-slurs as basis for disparate treatment of Black claimants, Mr. Austin became more diligent.  According to a recent J.D. Power Claims Satisfaction Survey, (for similarly situated non-Black male injured claimants) *"It takes about 30 days … for .. insurer to pay .. claim,"* but KMPR is violating all standards of conduct, 99.9%, and laws mandating they treat Mr. Austin the exact opposite manner they are operating.  Per KMPR, but for Mr. Austin's race he would have received a settlement offer likely in 30 days, but definitely no later approximately 40.  (*Exhibits A-Z)*

KMPR doesn't hide, and readily admits, their repeated animus toward Mr. Austin (*although they should be ashamed*).  Per the California Supreme Court's *Bailey v. San Francisco District Attorney's Office*, No. S265223, 2024 WL 3561569 (Cal. July 29, 2024) "*The objective severity of [discrimination] should be judged from the perspective of a reasonable person in the*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*plaintiff's position"* and thus Mr. Austin began the facts section with key background,

biographical, and contextual information, to show, and make clear, Why KMPR's discriminatory

treatment-conduct is so extremely offensive to Mr. Austin, specifically as a Black man in this

context.  Further, KMPR's conduct would be considered extreme, and insulting, for any

*"reasonable person"* in Mr. Austin's shoes as KMPR repeatedly violates-fails the absolute bare

*'minimum standards'* for any California claimant, let alone the 30 day standards for similarly

situated Whites. *Bailey v. San Francisco District Attorney's Office*, No. S265223, 2024 WL

3561569 (Cal. July 29, 2024):

> "...The objective severity of [discrimination] should be judged from the perspective of a
> reasonable person in the plaintiff's position. (Miller, supra, 36 Cal.4th at p. 462, 30
> Cal.Rptr.3d 797, 115 P.3d 77; Oncale v. Sundowner Offshore Services, Inc. (1998) 523
> U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (Oncale).) We acknowledge, as has the
> Ninth Circuit before us, that "[r]acially motivated comments or actions may appear
> innocent or only mildly offensive to one who is not a member of the targeted group," but
> "intolerably abusive or threatening when understood from the perspective of a plaintiff
> who is a member of the targeted group." (McGinest v. GTE Service Corp. (9th Cir. 2004)
> 360 F.3d 1103, 1116 (McGinest).) We must therefore consider allegations of [racial
> discrimination] "from the perspective of a reasonable person belonging to the racial or
> ethnic group of the plaintiff." (Id. at p. 1115; accord, Nazir v. United Airlines, Inc. (2009)
> 178 Cal.App.4th 243, 264, 100 Cal.Rptr.3d 296 (Nazir).) This allows us to "recognize
> forms of discrimination that are real and hurtful, and yet may be overlooked if considered
> solely from the perspective of an adjudicator belonging to a different group than the
> plaintiff." (McGinest, at p. 1116.).."

 *Bailey v. San Francisco District Attorney's Office,* and a host of other controlling precedent,

makes clear *"a single racial epithet can be so offensive it gives rise to a triable issue of*

*actionable [discrimination]... ..We join the chorus of other courts in acknowledging the odious*

*and injurious nature of the N-word in particular, as well as other unambiguous racial*

*epithets."*  KMPR's conduct is so atrocious-willful the use of, and reliance upon, derogatory

slurs-stereotypes epithets is only the beginning point of KMPR's multifaceted adverse per se

illegal ongoing conduct.  On its face, KMPR's policy is **1.** multi-tiered (one for Blacks, like Mr.

Austin, where they *presume Black Inferiority derogatory stereotypes-epithets and violate 99.9%*

*of California's bare minimum standards*, one for Whites, where they effectuate settlement

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

contracts in 30 days or less, while assiduously following the Insurer standards of conduct, one

for all other Californians where they follow at least the bare minimum CA Insurer standards), **2.**

strange whereas KMPR's settlement-contract making policy or procedure is statutorily defined,

and should be straight forward and easy (especially as Mr. Austin made himself proactively

available), and KMPR already admitting owing Mr. Austin a settlement contract offer. ***KMPR***

***breaks normal, statutorily defined, certified under penalty of perjury, protocol-procedures just***

***to repeatedly, egregiously, and overtly, be racist-discriminatory against Mr. Austin.*** (*Exhibits*

*A-Z*)


<u>Mr. Austin conducted due diligence-research, to discover why KMPR's pattern changed</u>
(<u><i>as he did not initially presume it was due to race</i></u>)

Mr. Austin did not presume race was the reason KMPR refused to serve, or make

contract, over a multi-year process, with Mr. Austin.  Thus, Mr. Austin began his due diligence:

Mr. Austin asked, emailed, complained, researched KMPR's illegal denials-refusals of his rights.

(*Exhibits A-Z*) Mr. began his due diligence very open minded, and gave KMPR the benefit of the

doubt, presuming it was likely some sort of internal KMPR miscommunication, or lack of

information, and attempted to proactively troubleshoot (i.e. resent all requisite paperwork 15-20;

re-attempted to effectuate settlement contract 180+ times between 3.1.25-6.23.25).  Mr. Austin

regularly maintains healthy, positive, proactive business relationships with other Insurers

(*Exhibits A-J*).  KMPR just choose to be a racist outlier.  Mr. Austin's due diligence-research

uncovered KMPR's nefarious, insidious, discriminatory motives for their conduct.

  Mr. Austin's due diligence and research process was fairly extensive on KMPR over a multi-

year process  utilizing a variety of research, investigatory methods, and methodology to ascertain

why they, KMPR, behaved in this way toward Mr. Austin, Black or African American claimant

(prior to filing this action).  Mr. Austin 1. called KMPR over 120 times (*they sometimes have no*

*one in particular offices, i.e. the specific bodily injury claims agent, Taekla Baker, or her*

*supervisors, to timely answer phones so required diligence just to speak with a human*), 2. spoke with over 35+ KMPR agents via phone, email, and internal communication complaints with thorough conversations and KMPR's promise to make a settlement contract coming initially through KMPR decisionmaker Taekla Baker claims agent 3. Called, emailed, and spoke with over 20 California Department of Insurance personnel and utilized CDI embedded assets or resources to obtain a more thorough understanding of both KMPR's and CDI officials exact duties, and responsibilities 4. Read through KMPR's advertisements, policy statements, reports from California Department of Insurance, KMPR's SEC Reports and a variety of state, and national, licensing, agency, and enforcement organizations materials, instructions, as well as the cited to California Supreme Court precedent. *(Exhibits A-J)*

       Mr. Austin's Due diligence shows 1. Typical KMPR settlement-contract making for Whites is approximately ten steps **2.** Each Insurance-Code mandated-step illuminates disparate-derogatory treatment toward Mr. Austin (*failures to effectuate-make Mr. Austin offers in the same way as Whites whereas KMPR a. must effectuate in less than 40 days or periodically alert for more time b. typically effectuates in 30 days or less c. is communicative, openly-facilitates cooperative, timely, settlement d. provides written-communication for all mandated steps e. expedites settlement process while meticulously following statutory-regs requirements-standards f. makes fair settlement-offers, in a fair process, to Whites* <u>whereas they treated Mr. Austin the exact opposite manner because he is Black</u>) **3.** KMPR deprived contract rights 180+ times between 3.1.25-6.23.25, **4.** KMPR's deprivations were intentional, despite confirming receipt of all required-signed-documents  **5.** KMPR's adverse acts were based on Self-admitted derogatory racist stereotypes whereas Black men are presumed 'Black Inferiors' per KMPR's claim-agents.  **6.** Company leadership was actively choosing to *" boycott or blacklist, or refuse to … contract with …."* Mr. Austin per CIV § 51.5 based solely on "*<u>Black Inferior</u>"-"<u>N\*gg\*r</u>"* - *"<u>Black Brute</u> or <u>Buck</u>,"* derogatory stereotypes-slurs-caricatures.  *(Exhibits A-Z)*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

In process of Mr. Austin's due diligence KMPR's animus was shown by **1.** Subjecting Mr. Austin to a different-inferior process, policy-procedure compared to similar Whites  **2.** Excluding, denigrating, and segregating, by extreme per se violations of code-regs failing 99.9% of duties owed compared to Whites  **3.** *Per se violations of the absolute minimum standards for any human being claimant* in California in violation of **a.** *Moradi-Shalal* &  **b.** *Jordan v. Allstate Ins. Co.(2007)* &  **c.** *CACI No. 2337* showing extreme animus-malice **4.** Use of, false, derogatory, per se illegal, anti-Black racial stereotypes-slurs *"N\*gg\*r"*-*"Black Inferior"*-*"Brute"* against Mr. Austin **5.** Complete exclusion from claimant settlement contract making process **6.** Willful explicit violations of KMPR'S annual oath per CA Insurance license compared to Whites, or Californian  **7.** Willful felony perjury to state officials to **a.** discriminate **b.** embezzle funds owed Mr. Austin **8.** Malice & demonstrated Pretext.  *(Exhibits A-J)*

### At least Eight (8) types of KMPR Demonstrated Animus

### 1. Subjecting to a different-inferior process, policy-procedure

KMPR's first demonstrated type of racial animus is subjecting Mr. Austin to a *'different-inferior'*, contract making process-policy-procedure to exclude Mr. Austin as *compared to similarly situated Whites* (180+ separate times).  Per *Koire v. Metro Car Wash, 40 Cal.3d 24, 29 (Cal. 1985),* complete exclusion is not required for liability to ensue, subjecting Black customers to inferior policies-procedures triggers liability whereas *"Courts ... repeatedly held ... Unruh ... [applies to] unequal treatment [like] when [B]lacks were allowed to enter business establishments but were restricted to certain portions of the premises .... [like] [B]lack ticketholders admitted to theatre but restricted to seating in segregated section [or] ...[B]lack ticketholders admitted to racetrack but denied clubhouse seating..."*  Per US Supreme Court's *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media* 140 S. Ct. 1009-16 (2020) , KMPR's repeated failures to make Mr. Austin settlement-contract offers the same way as Whites, or at all, is *"blatant deprivation of ..."* Mr. Austin's *"civil rights where a private offeror..."* KMPR

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*"refuses to extend to an African- American…"* Mr. Austin *"because he is an African- American the same opportunity to enter into contracts he extends to White offerees."* (Exhibits A-J)

KMPR is treating him as an inferior with 180+ discrete adverse actions (refusal to make contract; denials of public accommodation), including Blacklisting, between 3.1.25-6.23.25, when CA law commands the exact opposite KMPR conduct, because he is a Black male (*as compared to the similarly situated Whites, who a. suffer no adverse actions b. Receive offers typically in 30 days or less c. experience Insurer conduct that confirms to CA legal Insurer requirements.* When Mr. Austin a Black or African American bodily injury California claimant, who was injured in a KMPR covered car accident, submitted all required documents and more per KMPR (*to ensure a quick settlement offer- effectuation process so that Mr. Austin could heal quickly and return to full health*), KMPR refused to make Mr. Austin an offer in the same way as they do to Whites because he was African-American or Black

Per Due Diligence A typical KMPR policy-procedure for White California claimants includes settlement contract making is: **1.** Absolutely no later than 40 days or less and periodically alert if more time is needed **2.** Typically in 30 days or less **3.** a communicative, open, timely, and cooperative process (providing written communication for all mandated steps in the process including if more time or information is needed) **4.** Proactive: KMPR reaches out if they have questions **5.** expedited, per CA law's mandate, knowing that for injured persons time is of the essence. **6.** Meticulous, observing the Insurance code's guiding principles, standards of care, with annual certifications to uphold those standards under penalty of perjury **7.** Serious, including their duty to effectuate or make settlement contracts **8.** Thorough, with documentation, due diligence or investigation to make a fair settlement offer **9.** Fair, per KMPR's process, and ultimate contract offer as required per Ca law **10.** Engaged in, and focused on, effectuating- making settlement contract working through negotiations, counter offers, and other claimant needs **11.** Active in negotiations make every effort to make a settlement contract that is fair and

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

compensates for injury, missed wages, lifestyle adjustment needs due to injury, treatment (past & ongoing), pain and suffering, and other related costs per injury-accident (with time of the essence as injuries can worsen and people's livelihoods may be at stake in this critical point in their lives).  *(Exhibits A-J)*

For Black claimants, like Mr. Austin, KMPR is 1. Violating bare minimum 40 days or less settlement offer requirement for *any* California human claimant *(with requirement for periodically alerts if more time-information, is needed)*  2. Refusing to offer like similar Whites in 30 days or less 3. failing to be communicative, open, cooperative, or timely, (*nor provide requisite written communications*) 4. Failing to reach out proactively if KMPR has questions 5. Failing to attempt to expedite the settlement process knowing that for injured persons time is of the essence (as is done with Whites)  6. Failing to meticulously observe the Insurance code's guiding principles- standards of care despite KMPR's annual certifications under penalty of perjury 7. Failing to take their duty to effectuate or make settlement contracts seriously 8. Failing to thoroughly-timely conduct due diligence-investigation to make a fair offer 9. Failing to make a fair offer, or any offer, to the Mr. Austin, the Black  claimant, because he is Black or African American, as required 10. Failing to stay engaged and focused on effectuating or making  settlement contract  11. Failing to actively negotiate or make every effort to make a settlement contract that is fair and compensates for injury, missed wages, lifestyle adjustment needs due to injury, treatment, pain and suffering any other related costs.  *(Exhibits A-Z)* KMPR admits Mr. Austin a. is owed contract-offer, b. did nothing wrong, c. violated no laws, nor failed to submit any required documents.(*Exhibits A-Z)* Yet, KMPR fails every policy outlined above because Mr. Austin is Black. Mr. Austin sought to be treated the same way as typical policy for Whites.  However, KMPR treats Blacks the exact opposite with 1. outright exclusion via "relic of slavery" policy 2. refusal to make contract offers on the same basis as Whites 3. Use of derogatory anti-Black epithets-slurs (*Exhibits A-Z).*  KMPR's first form of

animus shows via KMPR's anti-Black extreme exclusionary policy, and subjecting Mr. Austin to a different policy as compared to similarly situated Whites, as California Supreme Court's *Koire v. Metro Car Wash* explains: *"Contrary to defendants' assertions, the scope of the Unruh Act is not narrowly limited to practices which totally exclude classes or individuals from business establishments."*

### 2. Excluding, Denigrating, Segregating

KMPR's second demonstrated type of racial animus is via excluding, denigrating, and segregating, Mr. Austin along with extreme per se violations of code-regs (including *section 1861.03*) as *compared to similarly situated Whites. KMPR cruelly knows Mr. Austin is severely injured (disability).* (*Exhibits A-Z*) *KMPR's precise violations of law show an explicit Racially derogatory pattern of conduct in violation of 99.9% of specific defined Duties owed Mr. Austin,* but, Mr. Austin's *bodily injury claim was never denied.* (*Exhibits A-Z*) Mr. Austin received no compensation, no settlement offer, nor provision of medical care (or offer of reimbursement for expenses) from KMPR as CA law requires of Insurers.

This part of KMPR's halfway in, halfway out, treatment of Mr. Austin is *akin* to segregated seating for Blacks per *Koire v. Metro Car Wash,* whereas *"Courts ... repeatedly held ... Unruh ... [applies to] unequal treatment [like] when [B]lacks were allowed to enter business establishments but were restricted to certain portions of the premises .... [like] [B]lack ticketholders admitted to theatre but restricted to seating in segregated section..."* Yet, KMPR's outright refusal to make contract (at the same time of the segregated claim treatment) is akin to the most extreme type of racial-discriminatory conduct whereas per White v. Square, all that's required for Unruh standing is encountering *"exclusionary policy"... "on the basis of the person's membership in a protected category."* KMPR outright excludes Mr. Austin: *showing extreme animus.*

**FIRST AMENDED COMPLAINT - San Francisco County Superior Court**

### 3. Per Se violations of absolute minimum standards for any CA human

KMPR's third type of animus, uses a different comparator group whereas the first two (above) highlight similarly situated Whites (i.e. 30 days or less), this type of animus is highlighted with comparisons to *any human California claimant*.  KMPR's *per se violations of the absolute minimum standards for any human being claimant* in California violates **a.** *Moradi-Shalal* " *...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the.... courts to continue to enforce the laws <u>forbidding</u> such practices....*" **b.** <u>Jordan v. Allstate Ins. Co.(2007)</u> *"[Plaintiff] ... seeking to recover ... based on a claim of common law ....which.... is entitled to pursue......This is a proper use of evidence of an insurer's violations of the statute and the corresponding regulations."*  **c.** <u>CACI No. 2337.</u>  *"In determining whether [KMPR] acted unreasonably.... you may consider whether the defendant did any of the following: ... [(a) <u>Misrepresented</u> ... [(b) <u>Failed to acknowledge and act reasonably promptly</u>... about [Mr. Austin]'s claim ... [(c) Failed to ... implement ...<u>standards for the prompt investigation and processing of claims</u> ...[(d) <u>Failed to accept or deny coverage of claims within a reasonable time</u> ....[(e) <u>Did not attempt in good faith to reach a prompt, fair, and equitable settlement</u> ...[(f) <u>Required [Mr. Austin] to file a lawsuit to recover amounts due</u>...]....[(k) <u>Delayed the ...payment of the claim</u> ....[(l) <u>Failed to settle a claim ... promptly</u> ....[(m) <u>Failed to promptly provide a reasonable explanation</u> of [actions or non-actions]....."*  Because these standards are intended as the absolute bare minimums for reasonable CA insurers, KMPR's 99.9% failures of these precise standards show extreme animus and malice toward Mr. Austin. (*Exhibits A-Z*)

### 4. Use of false, derogatory racial stereotypes-slurs

KMPR's fourth demonstrated type of racial animus is evidenced in KMPR's admitted use of false, *but widely recognized*, anti-Black derogatory racial stereotypes-slurs-epithets, *"<u>Black</u>*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*Brute"* - *"N\*gg\*r"* - *"Black Inferior"* and after KMPR got caught perjuring-embezzling began

using a *"Black Criminal"* slur-epithet against Mr. Austin, to shift blame, and deprive his right to

contract public accommodation.  For Insurers, the practice of use derogatory anti-Black, racist

stereotypes is not new.  The US Insurance Industry, from its earliest development, Insuring

enslaved Black People during brutal-torturous voyages, to the most brutal work conditions

*without compensation* under constant surveillance and threat of racial violence, operated from

racist paradigms, derogatory stereotypes, presumptive inferiority of Black people (*not for Black*

*People's benefit, themselves, but to their detriment-exploitation*). See e.g. Slavery Era Insurance

Registry , www.insurance.ca.gov/ 01-consumers/ 150-other-prog/10-seir/ (*Exhibits A-Z*)

    For KMPR it appears *old habits die hard, or not at all*, as segregationists segregate, and

haters hate.  The use of anti-Black derogatory stereotypes in Insurance is well documented

Investopedia: Discrimination in Insurance Underwriting Guidelines (*"....Race and Life*

*Insurance....According to an article by Mary L. Heen in the Northwestern Journal of Law &*

*Social Policy, the life insurance industry has a history of reinforcing racial hierarchies in the*

*United States. After Reconstruction, she writes,…... the insurance industry pointed toward high*

*mortality rates and innate racial differences to justify life insurance that offered emancipated*

*enslaved people only two-thirds of the benefits that were offered to White people.....*

*.....Companies with race premiums tended to ignore any statistics that didn't fit preconceived*

*hierarchies when setting premium rates*, …. *suggesting that the risk involved was not the*

*primary motivating factor in setting premiums....")*  Here, KMPR, via Taekla Baker, went even

further in disparate treatment of Mr. Austin by telling him explicitly that his race is "unhelpful"

or somehow "less worthy" in the KMPR settlement contract making process whereas White

claimants race are not even mentioned, taken as normal, and definitely not seen as in *anyway*

*"unhelpful" or "less worthy"* to Whites.  The process should be the same regardless of race, but

KMPR went out of its way via words, and subsequent conduct to call Mr. Austin *"Black Brute"* -

1  *"N\*gg\*r"*-*"Black Inferior"* See e.g. Bailey v. San Francisco District Attorney's Office, No.

2  S265223, 2024 WL 3561569 (Cal. July 29, 2024):

3      *"…"a single racial epithet can be so offensive it gives rise to a triable issue of actionable*
       *[discrimination]"…*

4

5      *…. In Boyer-Liberto, for example, …. "two uses of the 'porch monkey' epithet — whether*
       *viewed as a single incident or as a pair of discrete instances of [discrimination] — were*

6      *severe enough to engender a [discriminatory] … environment." …. the "chosen slur"*
       *was "about as odious as the use of the '[N-word].' "….. "Far more than a 'mere*

7      *offensive utterance,' the '[N-word]' is pure anathema to African-Americans." …..*

8      *……"It is beyond question that the use of the '[N-word]' is highly offensive and*

9      *demeaning, evoking a history of racial violence, brutality, and subordination."*
       *(McGinest, …. We join the chorus of other courts in acknowledging the odious and*

10     *injurious nature of the N-word in particular, [&] other unambiguous racial epithets. (See*
       *Alcorn… [observing…"particularly abusive.. insulting" nature of N-word]…"*

11

12     During the enslavement period it was illegal for enslaved Black People to **1.** Read **2.** Assert

13   their full humanity, and Constitutional & States rights **3.** Defend oneself, ones family, or one's

14   property from racial abuse by Whites **4.** Vote, **5.** Assert oneself politically, socially, or

15   economically as *all was seen as a threat to the false idol of White Supremacy*. See e.g. Literacy

16   as the path to freedom: How slaveowners purposefully kept enslaved people illiterate - Reading

17   Partners **(***"Slavery and illiteracy in the United States….Slavery is "the practice or institution of*

18   *holding people as chattel involuntarily and under [the] threat of violence."… The institution of*

19   *antebellum slavery was also facilitated by slave owners using non-physical methods of*

20   *dehumanization against enslaved people. One of these many methods included maintaining a*

21   *lack of literacy, or instilling illiteracy, among enslaved people…… Literacy as a threat to slave*

22   *owners…..Slave owners often restricted their slaves' knowledge of the smallest, most*

23   *inconspicuous information, such as an enslaved person's age, birth parents, or even family*

24   *origin. White slaveholders did not want their slaves to know anything about or understand their*

25   *personal identity…..This information was the first step towards literacy, which slaveholders*

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*feared would empower enslaved people to recognize the dehumanization and manipulation that they were being subjected to……"*

KMPR's use of  *"Black Criminal or Inferior"*-*"Black Brute* or *Buck"*-  *"N\*gg\*r"* racial epithets are not only well known, prohibited, derogatory stereotypes-slurs epithets-caricatures, particularly against Black men, but reflect a *White supremacist, enslaver, segregationist,* mindset hell bent on denigrating Blacks, like Mr. Austin. KMPR's use of it to distract from its own *ongoing* criminal conduct is particularly offensive to a reasonable Black male severely injured claimant. (*Exhibits **K-O)*  e.g. jimcrowmuseum.ferris.edu/ caricature/ homepage.htm ; Stereotypes of African Americans - Wikipedia ; Brute Caricature - Jim Crow Museum ; Criminal stereotype of African Americans - Wikipedia ; N\*gg\*r and Caricature - Anti-black Imagery - Jim Crow Museum ; *Department of Justice Black Criminal [Derogatory] Stereotypes and Racial Profiling* (www.ojp.gov/ncjrs/virtual-library/ abstracts/Black-criminal-stereotypes -and-racial-profiling)  KMPR's usage creates instant stigma-harm, especially when combined with deprivations- -refusals of service, customer contracts, and public accommodation. *" 'The use of the "[N-word]" automatically separates the person addressed from every non-black person; this is discrimination per se.' " Rodgers v. Western-Southern Life Ins. Co.* (7th Cir. 1993) 12 F.3d 668, 675, quoting *Bailey v. Binyon* (N.D.Ill. 1984) 583 F.Supp. 923, 927.

Per *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Jun. 30, 2023) *(*[a public Accommodation business'] 1. *"services "[cannot be] refused, withheld from, or denied,"* 2. cannot make *"an individual … unwelcome"*  3. *"may not refuse to serve customers based on race [or derogatory stereotypes], .. [Nor].. hang a sign that says, "No Blacks").*  Per *Lombard v. Louisiana 373 U.S. 267 (1963),* similar to *White v. Square* it is equally illegal to have an invisible "No Blacks" sign or policy to practice a segregationist policy against Black claimants.  Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)*  KMPR's conduct a. treats Blacks as 'inferior' or 'less worthy'

EXHIBIT A
Page 120

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*(presuming derogatory stereotypes-epithets to deprive making a contract)*, b. treats Whites as 'superior' or more worthy *(30 days or less for Whites, while presuming derogatory stereotypes for Blacks to provide slow or no contracts for Blacks)* is doubly offensive to the Constitution of the United States because KMPR's "*systems ... fail to comply with the Equal Protection Clause's [co-existent with 1981's & [Unruh's]) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype....*"  KMPR's *contract making structures "are zero-sum, and a benefit provided to some"* whereas Whites are presumed *'superior' or more worthy  "but not to others necessarily advantages the former at the expense of the latter.  .... Such stereotyping can only "cause[] continued hurt and injury"*

<u>KMPR's conduct & use of slurs caricatures are rooted in "N*gg*r" epithet.</u>

<u>N*gg*r-Caricature-Anti-Black-Imagery-Jim…Crow Museum</u>; (...<u>jimcrowmuseum.ferris.edu/caricature/homepage.htm</u>....)

".....There is a direct and strong link between the word *n*gg*r* and anti-Black caricatures. ...it is usually directed against Black people ....

…The Brute caricature depicts Black men as angry, physically strong, animalistic, and prone to wanton violence [and criminality]....

… *N*gg*r* may be viewed as an umbrella term - a way of saying that Black people have the negative characteristics of the Coon, Buck, Tom, Mammy, Sambo, Picaninny, and other anti-Black caricatures. ***N*gg*r, like the caricatures it encompasses and implies, belittles Black people, and [attempts to] rationaliz[e] their mistreatment….***"

**<u>Stereotypes of African Americans - Wikipedia</u>**
( ....<u>en.wikipedia.org/wiki/Stereotypes_of_African_Americans</u>....)

"...The Mandingo is a stereotype of a sexually insatiable Black man, invented by White [enslavers] to advance the idea that Black people were not civilized but rather "animalistic" by nature…..

…The supposedly inherent physical strength, agility, and breeding abilities of Black men were lauded by white enslavers and auctioneers in order to promote the [en]slave[d persons] they [*entrapped, stole, tortured, and sold*].....

…Since then, the **'Mandingo'-['Brute' - 'Buck'] stereotype** has been used to socially and legally justify spinning instances of interracial affairs between Black men and White women into tales of uncontrollable and largely one-sided lust ….

…This stereotype has also sometimes been conflated with the 'Black brute' or 'Black buck' stereotype, painting the picture of an 'untameable' Black man with voracious, violent sexual urges ….

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

…**The term 'Mandingo' is a corrupted word for the Mandinka peoples of West Africa**, presently populating Mali, Guinea, and the Gambia….

….in recent history, Black men are stereotyped as being deadbeat fathers and dangerous criminals…..There is a frequent stereotype in America that African Americans are frequently stereotyped as being hypersexual, athletic, uncivilized, uneducated and violent.

….Stereotypes of African Americans are misleading beliefs about the culture of people with partial or total ancestry from any Black racial groups of Africa whose ancestors resided in the United States since before 1865. These stereotypes are largely connected to the racism and the
discrimination faced by African Americans. These beliefs date back to the slavery of Black people during the colonial era and they have evolved within American society over time….

….The first significant display of stereotypes of African Americans was in the form of minstrel shows. Minstrel shows boomed at the beginning in the nineteenth century; these shows were theatrical plays that used white actors who performed in blackface and wore torn attire to portray African Americans in order to **lampoon and disparage Black communities**…

Throughout history, more stereotypes became popular to dehumanize African American communities further….

…. nineteenth century stereotypes, such as the sambo, are now considered to be derogatory and racist. The "Mandingo" and "Jezebel" stereotypes portray African-Americans as hypersexual…

…Black brutes or Black bucks are stereotypes for Black men, who are generally depicted as being highly prone to behavior that is violent and inhuman. They are portrayed as hideous, terrifying predators who target helpless victims, especially white women…..

…..In the post-Reconstruction United States, **"Black buck" was a racial slur for Black men** who refused to bend to the law of White [Supremacy] and were seen as irredeemably violent, rude, and lecherous…..”

As an interesting historical aside Mansa Musa, a West African Black man, is the richest person who ever lived (*originating in the region described above of the Mandinka peoples of West Africa, presently populating Mali, Guinea, Gambia, etc.*).  But, beyond Mansa Musa's vast wealth, in the 1300s, his reputation-character is sung about in the history books, *even by his enemies*, for being both generous, and one of the most noble rulers of his time.  At the time he donated-gave so much (gold and valuables) that it disrupted the markets of Europe & Mali's continental direct trading partners. *(Exhibits **O-S**)*

-116-





**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

(23 years ago, in 2002) Nas creatively articulates this tragic, exploitative, murderous, and genocidal experience of Black peoples in *I Can* : *"Be – be–fore we came to this country .... We were kings and queens, never porch monkeys .... There was empires in Africa called Kush; Timbuktu, where every race came to get books ....  To learn from Black teachers, who taught Greeks and Romans; Asians, Arabs, and gave them gold, when Gold was converted to money, it all changed....They heard about the gold, the teachings, and everything sacred; Africa was almost robbed naked; Slavery was money, so they began making slave ships..."*

Who Are the Mandinka?|HISTORY

> "…The Mandinka (also known as the Mandingo and Malinke, among other names) are a West African people spread across parts of Guinea, Ivory Coast, Mali, Senegal, the Gambia and Guinea-Bissau.
>
> ….the Mandinka are the best-known ethnic group of the Mande peoples, all of whom speak different dialects of the Mande language. They are descendants of the great Mali Empire that flourished in West Africa from the 13th through the 16th centuries.
>
> Beginning in the 16th century, …….Mandinka were captured, enslaved and shipped to the Americas. Of the …. Africans who landed in America as a result of the slave trade, historians believe….24 percent…. were Senegambians, from the region of West Africa comprising the Senegal and Gambia Rivers and the land between them; many were Mandinka and Bambara (another Mande ethnic group).
>
> In the 20th century, the author Alex Haley made the Mandinka famous [in the US] when he traced his "Roots" back to the village of Juffure in the Gambia, where his great-great-great-great-grandfather, Kunta Kinte, was captured and sold into slavery in the United States……"

The Black Holocaust …..| The Lynching Sites Project of Memphis

> ""The total number of [enslaved Black People] imported is not known. It is estimated that nearly **900,000** came to America in the 16th Century, **2.75 million** in the 17th Century, **7 million** in the 18th, and over **4 million** in the 19th – perhaps 15 million in total. Probably every [en-slaved person] imported represented, on average, five corpses in Africa or on the high seas. The American slave trade, therefore, meant the elimination of **at least 60 million** Africans from their fatherland."

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

What is the Black Holocaust? - America's Black Holocaust Museum
The four hundred-year history of captured Africans … Holocaust…. include:

- Dehumanization and vilification
- Forced marches and migrations
- Slave (forced, unpaid) labor
- Stolen property
- Mass incarceration
- Torture;    Medical experimentation
- Discrimination in law and custom
- Ethnic cleansing (race riots, pogroms)
- Lynchings and other forms of terrorism
- Mass murder
- Long-lasting psychological effects (Post-Traumatic Stress Disorder) on survivors – and their descendants.

    As *Stereotypes of African Americans - Wikipedia* explained above *"Black Brutes or Bucks"* are targeted-racist-propagandist racial slurs particularly for Black men who have self-respect, and refuse White Supremacy, Black inferiority, and racist abuse.  Although, these racist slurs-caricatures gained prominence during the Reconstruction Era, after the Civil War, and enshrinement of the 13th, 14th, and 15th Amendments, because Black men and women, asserted their rights, in a public fashion, after decades and centuries of De Jure subjugation, and racist abuse, the roots of these epithets emerged during the enslavement period.  The derogatory fear embedded in the *"Black Brute or Buck"* stereotype is carefully crafted racist propaganda which seeks to subvert the very healthy urge in every human being, including Black men (and woman), to stand up for themselves, and what's right, by any means necessary against evil forces seeking to disempower, subjugate, disenfranchise, enslave, racially abuse, or ultimately murder the spirit, or body, of a person.  This propagandist stereotype-caricature-slur is geared primarily at Black men (with variations applied to Black women), who stand up, and take action, against racist abuse.  This slur attempts to justify the abuse itself, and convert strength, self-knowledge, wisdom, and healthy assertiveness-self-defense (*i.e. a lawsuit, political, legal or economic, or other needed actions based on context*), into weakness, fear, self-doubt, docile ignorance, and foolishness by preemptively criminalizing God given rights (*when Black men assert them for their own, and Black people's own, benefit*).

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

"**Cinque** : Ens. : [ Covey translating for Cinque in Mende]  You are a chief.
**President John Quincy Adams** : I was a chief. Yes….

**Cinque** : [in Mende]  Is he going to help? He has far many more questions than answers….

**President John Quincy Adams**: Cinque, look. I'm being honest with you. Anything less would be disrespectful…

**Cinque**: (speaking in Mende / Ens. Covey translating) We won't be going in there alone.
**President John Quincy Adams**: Alone? Indeed not. We have right at our side. We have righteousness at our side. We have Mr Baldwin over there.

**Cinque**: (speaking in Mende / Ens. Covey translating) I meant my ancestors. I will call into the past, far back to the beginning of time….. I will reach back and draw them into me. And they must come, for at this moment, I am the whole reason they have existed at all." https://m.youtube.com/watch?v=y8Jkls3xgvg
- **Cinque (Djimon Hounsou) and President John Quincy Adams (Anthony Hopkins) conversation before winning Supreme Court Argument, and Case:** *The United States v. the Amistad, 40 U.S. 518 (1841), Amistad*, **Movie by Steven Spielberg**

The Sixth US President - John Quincy Adams (*only 1 of 2 non-enslaver early US presidents*) - highlights this very point, in his own way, while arguing before the *pre-Civil War, pre-Reconstruction Amendments*, US Supreme Court in defense of Cinque, and the other captured, tortured, and enslaved Mende (Mandinka) "Africans", who mutinied the *La Amistad* slave ship,  fought back, *as Freedom fighters should do*, when enslavers attempted to put them into American Slavery, and the Enslavement phase of the *Black Holocaust* (*Exhibit Q-T*).  In that context, President Adams, argued that Cinque, and other enslaved Mende people, were free men who had been illegally captured and sold into slavery, and not only were right in taking over the ship, and doing whatever was necessary to do so (provided the context), ultimately freeing themselves, but their actions were aligned, and in the very Spirit of the foundation of the United States *"founded on the great principles of the Revolution, as proclaimed in the Declaration of Independence."* See *The United States v. the Amistad.*

*"...The case was argued for the United States, by Mr. Gilpin, the Attorney General, and by Mr. Baldwin, and Mr. [President John Quincy] Adams...*

*...This case is not only one of deep interest in itself, as affecting the destiny of the unfortunate Africans, whom I represent, but it involves considerations deeply affecting our national character in the eyes of the whole civilized world, as well as questions of power on the part of the government of the United States, which are regarded with anxiety and alarm by a large portion of our citizens.*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*It presents, for the first time, the question whether that government, which was established for the promotion of JUSTICE, which was founded on the great principles of the Revolution, as proclaimed in the Declaration of Independence, can, consistently with the genius of our institutions, become a party to proceedings for the enslavement of human beings cast upon our shores, and found in the condition of freemen within the territorial limits of a FREE AND SOVEREIGN STATE?....*

*The Constitution as it now stands will be searched in vain for an expression recognising human beings as merchandise or legitimate subjects of commerce. In the case of New York v. Miln, 11 Peters, 104. 136, Judge Barbour, in giving the opinion of the Court, expressly declares, in reference to the power "to regulate commerce" conferred on Congress by the Constitution, that "**persons are not the subjects of commerce**."....*

*....The United States, as a nation, is to be regarded as a free state. And all men **being presumptively free**....."*

<u>KMPR's Conduct is akin to Calling Mr. Austin a *"N\*gg\*r"* 180+ times.</u>

COF's per se illegal, extremely harmful, ongoing, targeted anti-Black segregationist (*or its enslaver forefather*),

KMPR's per se illegal, extremely harmful, ongoing, targeted anti-Black segregationist (*or its enslaver forefather*), Klu Klux Klanner, "***relic of slavery***" policy-conduct (per <u>BELL v. MARYLAND</u>)  toward Mr. Austin is *akin* to calling Mr. Austin a "<u>n\*gg\*r</u>" (<u>www.dictionary.com /browse/n\*gg\*r</u>) or '<u>n-word</u>' each time (50+) they utilize derogatory stereotypes-slurs to deprive.   In <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,</u>  it was alleged that student applicants of different races were treated differently, *derogatorily differently*, because of race in the application process whereas the majority opinions emphasized that use of "derogatory" racial stereotypes are prohibited, as per se illegal, under Equal Protection, and 1981, coextensively.  The 2023 US Supreme Court's majority in <u>Students for Fair Admissions, Inc.</u> makes clear utilizing one policy for one race, and another policy for a different race, that treats either as superior or inferior, is prohibited. KMPR, especially as a public accommodation business, operating in the precipice of due process, expressly violates the standards expressed by

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

both the <u>*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*</u>. majority,

and dissenting, opinions.

Similarly, Mr. Austin, meeting all requirements for making contract, receiving service from

public accommodation business, was 1. subjected to an inferior contract making policy (as

compared to Whites) 2. treated derogatorily differently by KMPR 3. mis-treated based on

derogatory *"<u>Black Brutes</u> or <u>Bucks</u>"- "<u>N*gg*r</u>" - "<u>Black Inferior or Criminal</u>"* racial

stereotypes 4. completely excluded in the claimant settlement contract making process because

of those very stereotypes-slurs. In fact, KMPR is so *racist* they are willing to a. Commit Felonies

(Perjuries to State Officials; Embezzlement) b. Risk losing money with *ongoing* per-se-illegal-

conduct c. Violate their annual certification for licensing under penalty of perjury d. Violate-Fail

99.9% of duties owed Mr. Austin, and all claimants e. go out of their way, breaking normal

KMPR-protocol policy-procedure just to call Mr. Austin a *"<u>N*gg*r</u>"*, and deprive his rights,

over 180+ occasions **3.1.25 and 6.23.25 (updated 8.18.25)**. See <u>N*GG*R Definition</u>

(<u>www.dictionary.com/browse/n*gg*r</u>) ; *<u>Monteiro v. the Tempe Union High School Dist</u>*, :

> *"....alleged that her ... daughter and other similarly situated African-American students attended a school where they were called "n*gg*rs" by [W]hite children, ....*
>
> *...It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit .... as ... white counterparts...."*

; <u>*Bailey v. San Francisco District Attorney's Office*</u>,

> *"... we begin in a place of agreement with the Court of Appeal: "a single racial epithet can be so offensive it gives rise to a triable issue of actionable [discrimination]."*
>
> *Identifying the types of isolated incidents that may create a [discriminatory] environment ... courts have recognized that use of "an unambiguous racial epithet such as the 'N-word' " may suffice. (EEOC Compliance Manual, supra, at p. 15–37 & fn. 130, citing Spriggs v. Diamond Auto Glass (4th Cir. 2001) 242 F.3d 179, 185 (Spriggs); see also Woods v. Cantrell (5th Cir. 2022) 29 F.4th 284, 285 (Woods)*
>
> *... "two uses of the 'porch monkey' epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — [is] severe enough to engender a [discriminatory] environment." (Boyer-Liberto, supra, 786 F.3d at p. 280.) ....the "chosen slur" was "about as odious as the use of the '[N-word].' " (Ibid.) "Far more*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*than a 'mere offensive utterance,' the '[N-word]' is pure anathema to African-Americans." (Spriggs, supra, 242 F.3d at p. 185.) "It is beyond question that the use of the '[N-word]' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination." (McGinest, supra, 360 F.3d at p. 1116.)...*

*...We join the chorus of other courts in acknowledging the odious and injurious nature of the N-word in particular, as well as other unambiguous racial epithets. (See Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 498, fn. 4, 86 Cal.Rptr. 88, 468 P.2d 216 [observing the "particularly abusive and insulting" nature of the N-word]; see also Eisenstadt, The N-Word at Work: Contextualizing Language in the Workplace (2012) 33 Berkeley J. Emp. & Lab. L. 299, 316 [the experience of being called the N-word is " 'like receiving a slap in the face' "; the " 'injury is instantaneous' "].)...*

*...The N-word carries with it, not just the stab of present insult, but the stinging barbs of history, which catch and tear at the psyche the way thorns tear at the skin. (See McGinest, supra, 360 F.3d at p. 1116 [the N-word evokes "a history of racial violence, brutality, & subordination"]...*

*....Far from "a mere offensive utterance" (Harris, supra, 510 U.S. at p. 23, 114 S.Ct. 367), this slur may be intrinsically "humiliating"...."*

As California Supreme Court's 1. <u>*Bailey v. San Francisco District Attorney's Office*</u>  & Ninth Circuit's 2. <u>*Monteiro*</u>  3. <u>*McGinest*</u> and separately 4-#. *<u>The Jim Crow museum</u>*, etc. describes those derogatory *"<u>Black Brutes</u> or <u>Bucks</u>"- "<u>N*gg*r</u>" - "<u>Black Inferior</u>"* racial stereotypes-caricatures epithets, slurs, are particularly offensive to any *<u>reasonable</u>* <u>Black man</u>.  The 1. demeaning labeling, & 2. extreme discriminatory exclusionary conduct (<u>outright contract refusal</u>) creates instant *stigma* for the victim *"Because "discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group."*  See <u>White v. Square</u> (*quoting 1984  Supreme Court's <u>Heckler v. Mathews</u>, paying homage to <u>Brown v. Board-of-Education</u>*);  KMPR's *illogical* racially abusive-racist conduct is like smearing feces on a clean person, as part of targeted racial abuse, just to say they stink, as TSLA did to Owen *Diaz*.;.; *<u>Diaz v. Tesla, Inc.,</u>*

"Tesla" discriminated against [Owen Diaz] in violation of …§1981….[which]... prohibits discrimination in the making and enforcement of contracts-…. under California state law, the jury awarded Diaz $6.9 million in compensatory … $130 million in punitive damages. The evidence was disturbing. The jury heard … Tesla factory was saturated with racism…. faced frequent racial abuse, … N-word and other slurs. Other employees harassed him. His supervisors, …. Tesla's broader management structure, did little or nothing to respond…."

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1      For KMPR it is not enough to fail to serve or make contracts with Mr. Austin, as the law

2 requires, because he is Black.  Their extreme-animus requires that they go further by attempting

3 to belittle-label-physically harm him racist derogatory-epithets- slurs used to further his injury-

4 disability.  KMPR's *illogical* racist conduct is like repeatedly calling someone a 'n-word' or its

5 offshoots 180+ separate instances between **3.1.25-6.23.25** in a professional setting knowing HR-

6 leadership doesn't correct, reprimand, or take action on racial abusers (*just to show they can get*

7 *away it*).  KMPR uses *"N\*gg\*r"* - *"Black Brutes* or *Bucks"*- *"Black Criminal"* slurs-

8 derogatory-stereotypes to make other persons be seen as, feel like, "inferiors" or provide false

9 'superiority' complexes for KMPR's racial abusers. See e.g. <u>EQUAL EMPLOYMENT</u>

10 <u>OPPORTUNITY  COMMISSION, Plaintiff, v. TESLA, INC</u>.,

11

12        "….Perhaps no single act can more quickly alter the conditions of
employment and create an abusive working environment than …  [the N

13        word]......" *McGinest*,...; ….The Commission alleges exactly this act. ….

14        Since May 2015, non-Black managers, non-managerial employees, and
temporary workers have *regularly addressed Black current and former*

15        *Tesla employees stationed at Tesla's Fremont Factory individually and*
*collectively by the N-word*, ….. frequently used … racial slurs, epithets,...

16        insults openly in high-traffic work areas …. graffitied swastikas, nooses,
the N-word, death threats …. other abusive language & imagery directed

17        at Black people across desks, elevators, bathrooms, & equipment..

18        *Swinton v. Potomac Corp*…."

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    This stigmatic-harm magnifies for a Black man 1. operating in the Insurance-legal space

18  while seeking to make contracts especially with its documented history of racial abuse, and use

19  of derogatory anti-Black stereotype usage Slavery Era Insurance Registry ;

20  www.insurance.ca.gov/ 2. provided the 13th Amendment's Exception Clause whereas the *"n-*

21  *word"* in its heyday ultimately meant *"Black slave" or "inferior"* whose rights Whites did not

22  have to respect.  KMPR's (180+) targeted uses of "Black Inferior" with a more recent "Black

23  Criminal" tinge once they got caught perjuring-embezzling  for the express purpose violating Mr.

24  Austin's rights to make contracts shows KMPR means the same thing: *"n-word" "Inferior,"*

25  *"Black Slave,"* whose rights Whites like KMPR don't respect (despite the law mandating them to

26  *do so).*

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

<u>Black Criminal stereotype-slur is particularly degrading-dangerous</u>





For Black men the *"Black Brute or Buck"- "N\*gg\*r" - "Black Criminal"* stereotypes-slurs-epithets are perhaps the most dangerous, deadly, and derogatory (even for Black male teenagers, children, like Emmett Till). How Emmett Till's murder catalyzed the U.S. civil rights movement | National Geographic ; Emmett Till's Death Inspired a Movement | National Museum of African American History and Culture ; Emmett Till | Death, Mother, Grave, & Facts | Britannica; For Black men its targeted usage, throughout history, has *literally* meant death of persons, wealth, family, rights, birthrights, and heritage for generations of Black men.

1    The Brute Caricature- Jim Crow Museum This is especially poignant when combined with

2    Slave State's anti-literacy racist strategies to literally criminalize Black people's educational self-

3    development April 7, 1831: Virginia Literacy Ban Enacted -Zinn Education Project

4    (*Exhibits A-Z*).





21    Like the Devil, or as John 10:10 describes *"the Thief"* these slurs diabolical use is *"only to kill,*

22    *steal, and destroy"* not just any Black men, but nefariously the Best, Smartest, Strongest, Most

23    Courageous and Brightest (*who don't accept Black inferiority, nor White Supremacy*).

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**









The dialogue from the White Supremacist-terrorist mob violence scene in the Movie *Rosewood* (from the photos above) helps illustrate the derogatory power of these particular slurs-epithets (*based on a true story [by Legendary John Singleton], in 1923 Rosewood, Florida, of a self sufficient thriving Black town, targeted, burned down, with Black people tortured-executed due to jealousy of surrounding Whites, utilizing false, completely made up story of a "Black Brute or Buck"- "N\*gg\*r" - "Black Criminal" as justification for murder, and destruction).* In the lynching-noose photos-scene above, Vingh Rhames' character *Mr. Mann* is a Black US soldier, World War I Veteran (*highest targets of lynchings in the timeframe, particularly when Black men wore the uniforms domestically: Lynching of African-American Veterans after World War I - Wikipedia; lynching-in-America -targeting-Black-veterans- web.pdf*). *Mr. Mann* is being lynched per usage of "Black Brute or Buck"- "N\*gg\*r" - "Black Criminal" epithets-slurs by White Supremacist mob-terrorists. A White terrorists, in *Rosewood*, explicitly states the subtext, and says the quiet part out loud: *"..Goddamn. That is one strong buck…Why won't he die?.."*

The legendary Denzel Washington, partly in recounting a conversation-advice from the legendary Sidney Portier, explains in his own life how he had to make certain sacrifices to navigate these very dangerous slurs-derogatory-stereotypes in the roles he accepted, when he chose them, and those he had turn down due to stereotypes-slurs destructive power: *"I got a part in a movie in 1986. I call it the "N-word" They Couldn't Kill." [The character] He raped a white woman; they tried to electrocute him but it didn't work and he became a cult hero. Then they tried to hang him…... There were some Jewish people in the audition room who said "it is funny." …. And I said to them "yeah, it's like you bring some Jewish people into a room and they think it is a shower but it is gas………… And they said "right!" And I said "Right! ….That ain't funny!"........ So to me it was not funny to put a rope around my 'MFing' neck and I made a point…….. I called Sidney (Portier) and told him "man they are offering me $600,000 to play the "'N-word' They Couldn't Kill." …. And he told me, "I'm not going to tell you what to do. But I*

-129-

*will tell you this, the first, two, three or four films you do in this business will dictate how you are perceived…"* [Denzel Washington: 'The N\*gg\* They Couldn't Kill' - YouTube](#); [Denzel Washington Turned Down Role Because Of Racism \[derogatory-slurs- stereotypes-epithets\]](#).

The realization of the destructiveness caused by this slur, and the way it shapes perceptions-consciousness, changed the legendary Richard Pryor's paradigm as he explained discussing a life changing trip to a region in Africa (as well as his personal commitment to never again call a Black man the 'N-word'): *"…One thing I got out of it is magic, I'd like to share with you. …. I was sittin' in the hotel and a voice said to me… "Look around, what do you see?" And I said, "I see all colors of people doin' everything." You know, and the voice said, "Do you see any n\*gg\*rs?" …… I said, "No." ……. And it said, "You know why? 'Cause there aren't any."…"* The legendary, writer, orator, genius and freedom fighter in his own right, James Baldwin, highlights not just the destructiveness of these slurs, but the nefarious-deceptive inception of these particular slurs: *"It is entirely up to the American people … to face … and embrace this stranger whom they maligned so long….. What White people have to do is try to find out in their own hearts why it was necessary to have a 'n\*gg\*r' in the first place…… ….Because I am not a 'n\*gg\*r', I am a man! …..But if you think I'm a 'n\*gg\*r', it means you need him……*

*…And the question the White population of this country has got to ask itself….*

*….If I am <u>not</u> the n\*gg\*r here, and you the White people invented the-n\*gg\*r, then you've got to find out <u>why</u>….."*

The question posed by Baldwin is similar to questions underlying this opening complaint with KMPR.  Namely, why was it necessary for KMPR 1. to create a knowingly-false racist-slur-epithet *"Black Brute or Buck"*- *"N\*gg\*r"* - *"Black Inferior or Criminal"*  of Mr. Austin to degrade him (when the law commands the exact opposite behavior), 2. use slurs-epithets as the basis to deprive the most fundamental of rights (when the law prohibits this conduct)?  The animus displayed by KMPR toward Mr. Austin partly answers the questions: haters hate,  segregationists segregate.  A deeper component of the question is partly answered by two Champion Freedom Fighters, and geniuses in their own right: Malcolm & Martin (below).  Similar to  <u>Bailey v. San Francisco District Attorney's Office</u>, "*... we begin in a place of agreement.."* between both brilliant leaders' analysis of how these stereotypes-slurs emerged.


Dr. Martin Luther King, Jr. began:   *"...We don't have anything to be ashamed of...Somebody told a lie one day.... They couched it in language. They made everything Black ugly and evil.... Look in your dictionaries and see the synonyms of the word Black......It's always something degrading and low and sinister (or criminal).......Look at the word White, it's always something pure, high and clean......Well I want to get the language right tonight.......I want to get the language so right that everyone here will cry out: ..'Yes, I'm Black, I'm proud of it. I'm Black & beautiful!'"* www.youtube.com/watch?v=podSc5KA6RA


El Hajj Malik El-Shabazz (*Malcom X; born Malcolm Little, aka Detroit Red*) continued: *"...Who taught you to hate the texture of your hair?  .... Who taught you to hate the color of your skin? ....To such extent you bleach, to get like the [W]hite man...... Who taught you to hate the shape of your nose and the shape of your lips? ......Who taught you to hate yourself from the top of your head to the soles of your feet? ..... Who taught you to hate your own kind? .... Who taught you to hate the race that you belong to so much so that you don't want to be around each*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

other?  ..... No...you should ask yourself who taught you to hate being what God made you?...."

www.youtube.com/watch?v=18Ern-fNEb4

21 years ago, legendary, Jadakiss & Anthony Hamilton creatively articulated the pain, and derogatory power, to Black people (and society at large) of these types of *"N\*gg\*r"* - *"Black Brutes or Bucks"*- *"Jezebel"* - *"Black Criminal"* stereotypes-epithets (even in the fantasy world of Hollywood) in the 2004 song *"Why"* : *"All that I've been given, It's this pain that I've been livin'..... Why they gotta do me like that?...Why Halle [Berry] have to let a white man pop her ['Jezebel Stereotype'] to get a Oscar?.....*

*....Why Denzel [Washington] have to be crooked ["Black Brutes or Bucks"- - "Black Criminal" even while playing a cop] before he took it?....Why they forcin' you to be hard?......Why ain't you a thug by choice?"*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1

2

3

4

5

6

7

8

9





10

11

12

13

14

15

16

17

18





19

20

21

22

23

24

25

26





27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

EXHIBIT A
Page 139

1
2
3
4
5
6
7
8
9




10
11
12
13
14
15
16
17
18
19





20
21
22
23
24
25
26
27
28





FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court

EXHIBIT A
Page 140

Provided the above context, and great harm-danger to Black men, like Mr. Austin, KMPR's usage is not only *per se illegal, but malicious*.  As a recap KMPR **1.** Knows Mr. Austin submitted all required documents **2.** Knows Mr. Austin's background is pristine **3.** Knows its KMPR's duty to effectuate settlement contract with Mr. Austin **4.** Knows Mr. Austin has gone above and beyond repeatedly, including 180+ times between 3.1.25-6.23.25, to attempt to effectuate contract **5.**  By law has to maintain copies of all claim file documents to effectuate settlement **6.** Knew Mr. Austin is seriously-severely injured **7.** Failed 99.9% of duties as soon as they discovered Mr. Austin is Black **8.** Admits using "Black Inferior" "N*gg*r" stereotypes, initially, and expanded to "Black Criminal" or "Black Brute-Buck" stereotype as Mr. Austin asserted his California, Constitutional, and other rights to effectuate contract by formally complaining to CDI, and highlighting KMPR's *ongoing* felonies (embezzlement-perjury) **9.** Continues to deprive Mr. Austin's rights to public accommodation contracts based upon false derogatory slurs-epithets despite repeated complaints-attempts.  KMPR's racist abuse of Mr. Austin via these slurs-epithets is not haphazard, nor accidental, but cut to the core of American racist practices, Black Codes, **"relic of slavery"** polices, & anti-Black laws, which explicitly inspired Nazi Germany's Third Reich (*although some of those US laws were deemed too harsh to implement in Germany by the Nazis*), and are rooted in the most heinous racial abuse in American History.  *(Exhibits A-Z);* See Slavery Era Insurance Registry ; www.insurance.ca.gov/ 01-consumers/ 150-other-prog/10-seir/;  See also www.history.com/news/ how-the-nazis-were-inspired-by-jim-crow ; www.theatlantic.com/magazine/archive/2017/11/what-america-taught-the-nazis/540630/ ; The Biggest Lie in the White Supremacist Propaganda Playbook: Unraveling the Truth About 'Black-on-White Crime' ; www.britannica.com/ topic/The-Birth-of-a-Nation ; www.jta.org/2019/02/06/ny/jews-and- blackface-its-complicated ; www.pbs.org/ independentlens/blog/as-american-as- the-blues-lynching-in-film-and-tv/ ; https://lynchinginamerica.eji.org/report/

1    For Black men, this harm is not some abstract concept, but tangible as Black men, Black

2  People, have long been the highest targets of US hate crimes (with these epithets-slurs often used

3  to motivate the destructive-violent actions of racial-abusers).  Moreover, "*researchers have long*

4  *documented: Black Americans are the most frequent victims of racially motivated [US] hate*

5  *crimes ....*" www.voanews.com/amp/report-african-americans-remain-top-target -of -hate-

6  crimes/7246965.html ; ucr.fbi.gov/hate-crime/2017/topic-pages/ victims ;

7  www.justice.gov/hatecrimes/hate-crimes-case-examples ; www.justice.gov/crs/ highlights/2020-

8  hate-crimes-statistics; publicintegrity.org/politics/ Black-americans-still-are-victims-of-hate-

9  crimes-more-than-any-other-group/ ; www.theroot.com/take-one-guess-whos-the-most-targeted-

10  group-for-hate-cr-1850787981 ; www.pbs.org/newshour/show/fbi-Blacks-most-often-targeted-

11  in- hate-crimes ; time.com/6178301/buffalo-shooting-anti-Black-hate-crime/; www.courier-

12  journal.com/story/opinion/2024/02/07/anti-Black-hate-fbi-report-nobody-cares/72492410007/ ;

13

14    KMPR's use of N*gg*r is so racist it denies Blacks Citizenship rights

15    One does not have to look far in, publicly documented, US History to see exactly the

16  spirit, and mindset, KMPR is operating in when it 1. Creates false derogatory slur-epithet for

17  Blacks, like Mr. Austin 2. Applies it to deprive foundational, California & Constitutional, rights,

18  3. Arrogantly holds itself out, under penalty of perjury, as following California & US law,

19  designed principally to protect Blacks against this type of public Accommodation Insurer

20  treatment, but acts in the exact opposite manner which ultimately deprives Mr. Austin of his

21  rights as a Californian & US Citizen. See e.g. BELL v. MARYLAND, 378 U.S. 226 (1964): ("

22  *When we deal with Amendments touching the liberation of people from slavery ... we deal with*

23  *Amendments whose dominant purpose was to guarantee the freedom of the slave race &*

24  *establish a regime where national citizenship has only one class ....The manner ... the right to be*

25  *served in places of public accommodations ..." )*

'Case in point' Mississippi US  Senator James K. Vardaman, previous Mississippi

Governor, Mississippi House of Representative from 1890 to 1896, elected as its speaker in

1894, (*after having gained control of the legislature by suppressing the Black vote, they passed a*

*new constitution in 1890 with provisions, such as a poll tax, and literacy test, that raised*

*barriers to voter registration and disenfranchised most Blacks),* said out-loud what KMPR is

doing in a more opaque, but same nefarious ways and means: *" … There is no use to equivocate*

*or lie about the matter.... Mississippi's constitutional convention of 1890 was held for no other*

*purpose than to eliminate the 'n\*gg\*r' from politics. Not the 'ignorant and vicious', as some of*

*the apologists would have you believe, but the n\*gg\*r.... Let the world know it just as it is.... In*

*Mississippi we have in our constitution legislated against the racial peculiarities of the Negro....*

*When that device fails, we will resort to something else.....If it is necessary every Negro in the*

*state will be lynched; it will be done to maintain [W]hite supremacy……"* James K. Vardaman -

Wikipedia; See Lynching of African- American veterans after World War I - Wikipedia

([In]…1917, Senator James K. Vardaman of Mississippi spoke of his fear of Black veterans

returning to the South, as he viewed that it would *"inevitably lead to disaster."...* To the

American South, the use of Black soldiers in the military was a threat, not a virtue. *"Impress the*

*Negro with the fact that he is defending the flag, inflate his untutored soul with military airs,*

*teach him that it is his duty to keep the emblem of the Nation flying triumphantly in the air,"* and,

the senator cautioned, *"it is but a* short step to the conclusion that his [Blacks] political rights

must be respected.*"*

Vardaman simply says out loud, what KMPR's conduct, including its use of slurs-

epithets *"N\*gg\*r"* - *"Black Brutes or Bucks"*- *"Jezebel"* - *"Black Inferior or Criminal"*

conflated with targeted deprivation of Mr. Austin's Constitutional, Citizenship, rights, is

actually-intentionally doing in 2025, in an *ongoing per se illegal* manner.  See James K.

Vardaman - Wikipedia ("Vardaman …. called Theodore Roosevelt a *"little, mean, coon-flavored*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*miscegenationist."*  About the education of Black children, he remarked, *"The only effect of Negro education is to spoil a good field hand and make an insolent cook."..."The knowledge of books does not seem to produce any good substantial result with the Negro, but serves to sharpen his cunning, breeds hopes that cannot be fulfilled, creates an inclination to avoid labor, promotes indolence, and in turn leads to crime."*... After… Booker T. Washington, had dined with Roosevelt, Vardaman said that the White House was *"so saturated with the odor of the n\*gg\*r that the rats have taken refuge in the stable."*.... *"I am opposed to the n\*gg\*r's voting, it matters not what his advertised moral and mental qualifications may be. I am just as much opposed to Booker Washington, with all his Anglo-Saxon reenforcement, voting, as I am to voting by the… typical little coon … who blacks my shoes every morning. <u>Neither one is fit to perform the supreme functions of citizenship</u>."*

### 5. Complete Exclusion from settlement contract making process

KMPR's fifth demonstrated type of racial animus is **complete exclusion of Mr. Austin** from KMPR settlement-contract making process. <u>*White v. Square*</u> ***prohibits*** KMPR's **a.** various iterations of anti-Black animus, **b.** use of derogatory stereotypes **c.** use of outright *"exclusionary policy"*… *"on the basis of the person's membership in a protected category"* whereas KMPR's **<u>Outright Refusal</u>** is only the *extreme, outer realm* of racial 'Animus.' <u>*White v. Square*</u> *"observed that the Act must be understood to afford redress to "persons discriminated against on an occasion when there was no one present to receive and answer a demand for equal treatment (for example, persons encountering, as they did in past decades, racially segregated drinking fountains or restroom facilities at an unattended structure)." (Angelucci, at p. 170.)....The Act does not require a Black plaintiff in that situation to make use of the Blacks-only facility (or make use of the Whites-only facility in violation of the segregation policy)...The same rule would apply in the case of a person who visited and intended to patronize an unattended*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*establishment generally open to the public (e.g., a self-serve kiosk) but then encountered a sign prohibiting access on the basis of the person's membership in a protected category. In such circumstances, the person would not need to violate or attempt to violate the stated exclusionary policy before bringing a claim. The high court, adopting a similar rule under title VII of the Civil Rights Act of 1964, explained: "If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs….. (Teamsters v. United States (1977) 431 U.S. 324, 365–366.)*

KMPR completely excludes Mr. Austin, because of race, racial epithets-slurs, showing their overt attempts to 1. stigmatize him, 2. treat him as an inferior, 3. Deprive his *'dignity interests'* and 4. utilize segregationist policy to separate, isolate for inferior treatment to his detriment 50+ times. See *Brown v. Board of Education* ("*the policy of separating the races is usually interpreted as denoting the inferiority of the [N]egro group… [conveying] a sense of inferiority… has a tendency to [retard] the ….. development of [N]egro [people] and to deprive them of some of the benefits they would receive in a racial[ly] integrated [civil society." …, in regard to the [C]olored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them"* ); 303 Creative LLC, v. Elenis et. al., (*"vindicate[s] the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." Heart of Atlanta Motel, Inc."*)

### 6. Willful violations of annual certification (penalty of perjury)

KMPR's sixth demonstrated type of racial animus is demonstrated in KMPR's willful violations of annual-oath, under penalty of perjury, per KMPR's CA Insurance license just to discriminate-embezzle against Mr. Austin as compared to Whites, or any human CA claimant.  KMPR **a.** Admits liability to Mr. Austin via its claims agent and insured (immediately

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

accepting 100% responsibility for accident and injuries) **b.** Says that KMPR owes Mr. Austin a

written settlement contract offer within approximately 40 days after Mr. Austin submitted signed

KMPR paperwork (including medical authorization form) **c.** receives Mr. Austin's successfully

submitted forms per KMPR's standards, and KMPR's claims agents confirm receipt of all

needed forms for settlement contract offer & effectuation (contract making) **d.** typically offers

Whites, or non-Blacks, offers in 30 days or less **e.** Is required by CA law to make offers in 40

days or less **f.** Promises to make settlement contract offer with Mr. Austin **g.** Instead, breaks its

word, violates 99% of its duties owed per precisely defined Insurance Code, Regs, its annual

certification for CA insurance license.  It is one thing to discriminate; it is quite another (more

malicious) to break an oath to do so.

## 7. Willful felony perjury to embezzle and escape liability

KMPR's seventh demonstrated type of racial animus is shown in KMPR's  Willful felony

perjury to state officials, risking criminal violations, completely lying under oath in a state

proceeding-investigation to  **a.** discriminate against Mr. Austin, **b.** embezzle funds both owed

and promised him.  (*Exhibits A-C*)

## 8.Malice & demonstrated Pretext

KMPR's eighth demonstrated type of racial animus is **Malice & demonstrated Pretext**

as KMPR knows it perjured itself, knows Mr. Austin not only submitted (and resubmitted) the

medical authorization form (and all other documents) multiple times, received confirmation from

KMPR claims agents that they were submitted completely, and correctly, and even had two

outside of KMPR witnesses (1. Robert Reisinger, 2. Lisa Seals) who verified seeing completed

forms, number of medical providers, and other claim file information in writing (Exhibit *A-*

*Z*).  Despite the facts, truth, and KMPR knowing their use of false derogatory stereotypes to

exclude is per se illegal,  (*Exhibits A-Z*)) they still are subjugating, and excluding Mr. Austin

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1    from his right to contract, and ultimately public accommodation per Unruh Act, 42 USC 1981,

2    Civil Rights Act of 1964.

3

4                    **SUPREME COURT LEGAL STANDARDS-FRAMEWORK**

5                    KMPR violates Unruh Act per 2019 ***White v. Square***

6          While *highlighting the directly relevant history of examples- manifestations of anti-Black*

7    *animus outside of <u>outright exclusionary-policies</u> based on race, or derogatory racial stereotypes*,

8    California Supreme Court's <u>*White v. Square*</u> ruled in *White's* favor.  Plaintiff White, a

9    bankruptcy attorney, plead a. That he genuinely sought to use *Square's* services for his

10   bankruptcy practice b. encountered *occupationally discriminatory terms* of service which

11   <u>excluded</u> his legal specialty c. did not enter contract, by refusing to click "Continue" in the

12   online agreement for fear that he would be willfully engaging in fraud, d. Filed suit, made formal

13   demand that Square amend its discriminatory terms of service (which excluded his specialty),

14   and e. attempted to form a class of *occupationally* aggrieved persons adversely affected.

15

16         Mr. Austin's case is *stronger* than <u>*White v. Square, Inc.*</u> as **1.** Mr. Austin is being

17   discriminated against *'because of'* race, an *(<u>IMMUTABLE</u>)* protected category, or *"<u>Suspect</u>*

18   *<u>Classification</u>":  'a class of individuals who have been historically subject to*

19   *discrimination.').*  This basis of discrimination triggers <u>*"Strict Scrutiny"*</u> analysis for any type of

20   government action that burdens a fundamental right or involves a <u>suspect classification</u> (unlike

21   Mr. White's legal specialty), meaning Mr. Austin's race, Black, is presumably unchanging (*and*

22   *fundamental to the inception-purpose of Unruh, Federal Anti-Discrimination laws, history of*

23   *racial Caste, US Apartheid, Segregation in America)*. **2.** Mr. Austin provided KMPR 180+

24   opportunities to self correct (*make contracts with Mr. Austin*) from 3.1.25-6.23.25, but is

25   excluded outright, whereas Mr. White was not as he saw discriminatory terms, *had the*

26   *opportunity to enter contract*, but did not enter contract for fear he would be engaging in fraud.

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

**3.** KMPR admits using *"Black Inferior" derogatory stereotypes to <u>deprive OUTRIGHT</u>*, and was even willing to perjure itself to State Officials in an official investigation-action just to deprive Mr. Austin utilizing derogatory stereotypes (while knowingly perjuring itself) **4.** Mr. Austin communicated, sent inquiries, (pre-litigation) formal complaints, and demands for KMPRs business to comply with California, & Federal 'bare minimum' laws <u>*after KMPR admitted using derogatory stereotypes*</u>. (*Exhibits A-Z*)

Like the victorious plaintiffs (*and precedent utilized in their cases*) in a. *Pleasants v. North Beach & Mission R.R.* (1868), b. *Greenberg v. Western Turf Asso.*,(1903), c. *Hutson v. Owl Drug Company* (1926), d. *Koire v. Metro Car Wash* (1985), *White v. Square* (2019), <u>Mr. Austin:</u> 1. Presented himself to get service or make settlement contract 2. Demonstrates he earnestly sought to enter contract-utilize KMPR services as a lawful bodily injury CA claimant  3. broke no laws nor had any issues with KMPR  4. Has positive business relation- - ships with Several other public-accommodation Insurers ( *KMPR is a racist outlier*) 5. Was refused mandatory settlement contract in 40 days or less as CA law mandates because of false derogatory racial-stereotypes-slurs *(Exhibits A-Z).*  KMPR knows they perjured-embezzled, & want to be racist.



KMPR is so racist in *2025, not 1960, or 1925*, that they don't even offer a *"separate but equal"* alternative for service Blacks on the side or in the back (as highlighted in the above

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

photo), they completely exclude Mr. Austin because he is Black, through a targeted anti-Black male segregationist policy, practice, or procedure.  It is important to note how US anti-Black racial segregation worked in practice (*documented fairly well in case law*) to highlight just how racist KMPR's conduct (in per se violation of 99.9% duties owed under CA law) toward Mr. Austin actually is, especially in California who ruled this conduct per se illegal a. 157 years ago in 1868, *Pleasants v. North Beach & Mission R.R.*, b. 122 years ago in 1903, *Greenberg v. Western Turf Asso.*, c. 99 years ago in 1926, *Hutson v. Owl Drug Company*, d. 1985, *Koire v. Metro Car Wash* and re-emphasized most recently in e. 2019 *White v. Square*.

During US De Jure (<u>What Is De Jure Segregation? Definition and Examples</u>)  anti-Black Segregation, or US Apartheid, Rosa Parks was not outright denied admittance to ride segregated buses, but there were instead certain rules to connote 'Black inferiority,' when she refused to go to the back of the bus or segregated portion of the bus it upset the US Apartheid Segregationist system, and the White Supremacists behind it. Her courage sparked the Montgomery bus boycotts.  For example, In <u>*Bell v. Maryland,*</u> as well as in many of the lunch counters, in restaurants, service was not necessarily denied outright in the whole establishment (like the segregated buses), there typically was a "Colored" or "Black" section usually in the back, or on the side, signifying a sense of presumptive inferiority (*that insulted the Black patrons each time they used it*), but the main dining area, or lunch counters front and center were reserved as 'WHITE ONLY.'  See e.g. <u>The Sit-In Movement Takes a Stand – US Civil Rights Trail</u> ;

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**







**FIRST AMENDED COMPLAINT  –  San Francisco County Superior Court**

EXHIBIT A
Page 150







157 years ago in 1868, the CA Supreme Court affirmed it is per se illegal for public

accommodation businesses to refuse service to Black Californians.  In *Pleasants v. North Beach*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

1    *& Mission R.R.* when a Black or *"Colored"* person (Mary E. Pleasants), a. Desired to take

2    passage on a street car in San Francisco b. Presented herself for transport, hailed the conductor,

3    and requested him to take her on board, c. was ready and willing to pay the fare, the Conductor

4    (in violation of California's law in 1868), d. refused to take her on board and said *"We don't take*

5    *colored people in the cars,"* despite there being ample room to accommodate Mary. E. Pleasants,

6    plaintiff. *It is important to note that both parties in the cited arguments before the California*

7    *Supreme Court, take for granted-argue from the premise that this type of anti-Black*

8    *discriminatory conduct, by a public accommodation business (like KMPR), is per se illegal;* the

9    debate before the CA Supreme Court in 1868 was how much a single violation is worth, and if

10   that single violation (in context) exhibited requisite malice to justify the jury award; There was

11   no question from the CA Supreme Court, nor either party, as to whether this was per se illegal

12   anti-Black conduct 157 years ago.              **What's KMPR's excuse in 2025?**

13

14          Similarly, 122 years ago in 1903, per *Greenberg v. Western Turf Asso.* the California

15   Supreme Court ruled, and reasserted, the rights Black, 'Colored', or 'Negro,' Californian's have

16   to public accommodation businesses whereas these rights are taken as a given in 1903,

17   California: *"In the judgment of the legislature, the public had an interest to prevent race*

18   *discrimination between citizens on the part of persons maintaining places of public amusement;*

19   *and the quasi-public use to which the owner of such a place devoted his property gives the*

20   *legislature a right to interfere." The complaint charges a single violation of the statute as having*

21   *occurred upon the fifth day of December, 1899, & plaintiff's demand for damages is based*

22   *wholly upon this one refusal to admit him.".*

23

24          The victorious Black or African American ticket holder, Hyman Greenberg, sued initially

25   in one of the courts of California, and there was a verdict and judgment against the association,

26   affirming his rights to a public accommodation, place of amusement whereas he, a. Bought a

27   ticket b. Presented himself for entry, and c. was initially admitted then ejected, or refused

28

-146-

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

admission (or denied right to contract, or service).  The Court using the analogy of public

accommodation in transportation states clearly *"If the railroad company wrongfully ejects such a*

*[Black, Colored, Negro, or African American] passenger from its train, he is entitled to recoup*

*for the value of his ticket, the expenses to which he is put in reaching his destination, injury to*

*his feelings, and the like."*   In this case, like the <u>Pleasants v. North Beach & Mission R.R,</u> (35 or

so years earlier), the only issue was about what could be included in the damage calculation for

what the court phrased as a single refusal of admission because of the race of the plaintiff.   The

CA Supreme Court affirmed the initial judgment, and again <u>there was no question from CA</u>

<u>Supreme Court, nor either party, whether this was per se illegal anti-Black conduct 122 years</u>

<u>ago.</u>

## What's KMPR's excuse in 2025?

These rights were further affirmed by the US Supreme Court in 1907, even when the

defendant *Western Turf. Asso.* challenged the Constitutionality of the statute itself, in *Western*

*Turf Association v. Greenberg, 204 U.S. 359 (1907).*  The US Supreme Court affirmed the

ruling, and constitutionality of the statute as applying equally to all persons, regardless of race,

saying: *".... the statute [is] constitutional as a valid regulation imposed by the state in its*

*exercise of police power.... the statute is applicable alike to all persons, corporations, or*

*associations conducting places of public amusement or entertainment…"*

99 years ago in 1926, per <u>Hutson v. Owl Drug Company</u>,the victorious plaintiff's, Lela

Hutson's, right to be served, or make contract, at a lunch counter, Soda Shop, in 1920s Los

Angeles, & not be denied service or contract because of race (as a Black, Colored, African

American, or Negro person) was affirmed as a given.  The extremity of racial abuse, derogatory

treatment based on derogatory stereotypes, hatred, and animus as well as the types of extreme

injuries suffered while Lela Hutson sought to be served, or make contract fore-shadowed the

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

abuses suffered by those in Sit-Ins, and other portions of the Civil Rights movements 30, and 40 years later, but what is fundamental here is that the right itself, 99 years ago was taken as a given.  KMPR's conduct is like *Hutson v. Owl Drug Company's* worker who yelled "*What did you serve the n\*gg\*r for?....[they] could have set there until tomorrow, [& still wouldn't be served]*."       **What's KMPR's excuse in 2025?**

In 1985, the California Supreme Court made clear in *Koire v. Metro Car Wash* reiterated the illegality of refusal of equal service or contract (rights, privileges, etc.) because of protected categories, as a male a. Sought service, b. Fully wanted to receive the service c. was not refused service at the higher male price, but d. attempted to be charged the same advertised rates for women (special sale pricing) regardless of gender and e. whereas the defendant refused to provide the service at the same price regardless of a customer's gender. The Court highlights that OUTRIGHT REFUSAL, (per US Apartheid, US enslavement remnants, Segregation type conduct like KMPR's toward Mr. Austin), is only the extreme-obvious iteration of Unruh violations.  The CA Supreme Court then outlined a wide variety of conduct that is considered a violation of a Californians right to public accommodations with a healthy discussion of how use of derogatory stereotypes violates the statute, and examples of precedent based anti-Black disparate treatment violating Unruh.

The above CA Supreme Court cases expressly ban KMPR's anti-Black practices toward Mr. Austin.  This case is simple, and easy to understand, per the facts-controlling law.  On its face this is a textbook example, fact pattern, of public Accommodation anti-Black racial discrimination due to race, or derogatory racial stereotypes.  See White v. Square (*"exclusionary policy"... "on the basis of the person's membership in a protected category"*.) See *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Jun. 30, 2023) (*[a public Accommodation business'] 1.*"services "[cannot be] refused, withheld from, or denied," 2. cannot make *"an individual ... unwelcome"* 3. *"may not refuse to serve customers based on race [or derogatory stereotypes], ..*

*[Nor].. hang a sign that says, "No Blacks")*

## Haters Hate.  Segregationists segregate: *"No Blacks"*

Haters hate.  Segregationists segregate. Racists discriminate, (*on account of race or derogatory racial stereotypes*).  That's why the law is written in a particular way: 1. to incentivize correct behavior and 2. regulate (i.e. $4,000 *minimum* per each Unruh violation).  The Unruh Civil Rights Act's explicit purpose is *"to secure to all persons equal access to public accommodations 'no matter' "* the personal (protected) characteristics (i.e. Race). <u>Harris v. Capital Growth Investors XIV</u>.  *Unruh* is intended to eradicate arbitrary, invidious discrimination in business establishments, and stand *"as a bulwark protecting each person's inherent right to 'full and equal' access to 'all business establishments.' "* <u>Angelucci v. Century Supper Club</u>.  Per the 2023 US Supreme Court's <u>303 Creative LLC v. Elenis</u>: *"Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his [Race]."*

Per *Unruh Act* all persons *"are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."* (§ 51, subd. (b).)  The statute lists 14 types of prohibited discrimination, such as … race.  § 51, Per <u>In re Cox (1970)</u> the list is *"illustrative, rather than restrictive"* (meaning those listed categories like "race" are definitely prohibited from discrimination), AND the statute forbids discrimination *beyond* these enumerated categories.   Per <u>White v. Square, Inc.</u>, Courts liberally construe the Unruh Civil Rights Act to achieve its remedial purpose of deterring discriminatory business practices across the board, but definitely because of race.   Section 51.5 similarly provides *"[n]o business establishment . . . shall discriminate against, boycott or*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in"* the Unruh Civil Rights Act. § 51.5, subd. (a).

KMPR's *ongoing* racist, per se illegal, anti-Black male segregationist policy not only violates the face of the Unruh Act, but also 1. *the 1964 US Supreme Court's* <u>*Bell v. Maryland*</u>, absolute prohibition of this "***relic of slavery.***" Mr. Austin continues to irreparably suffer from KMPR's *"exclusionary policy"* (Blacklisting Mr. Austin) per <u>*White v. Square*</u>. KMPR's <u>per se illegal *reasoning*</u> is based solely on derogatory stereotypes, to presume Blacks, like Mr. Austin, as presumptive <u>*"Black Brutes* or *Bucks"*</u>- <u>*"N\*gg\*r"*</u> - <u>*"Black Inferior"*</u> which violates 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* No. 20-1199, 7 (U.S. Jun. 29, 2023), reminder of the *" twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…."* in compliance with 1. Equal Protection 2. co-existent *1981* (AND Unruh) requirements.

## Jurisdiction

Jurisdiction is proper as Mr. Austin is a resident of California, and US Citizen, and defendant KMPR regularly engages in business in California, advertising directly to California residents *(Exhibit A-H )* KMPR is CA licensed &  obtains approximately 53% auto policies revenue from California per KMPR's <u>(SEC) reports; www.sec.gov/ixviewer/ix.html?doc= /Archives/edgar/data/ 860748/000086074824000046/kmpr-20231231.htm</u>

## Venue

Venue is proper as defendant KMPR's wrongs primarily occurred in,  & while Mr. Austin was working, living, residing, and obtaining medical treatment for severe 1. Lower body workplace injuries at TSLA motors, and 2. Upper body separate car (from lower back to neck) accident injuries in San Francisco, and Alameda Counties.

**Claims**

**A.    KMPR violates Unruh via a. Blacklisting, b. public accommodation service refusals, c. contract making refusals, over 180+ separate adverse refusals between 3.1.25-6.23.25**

KMPR's **1.** Blacklisting **2.** isolation of Mr. Austin for inferior treatment because he is Black, and severely injured (disabled), as compared to similarly situated White bodily injury claimants **3.** Refusal to serve or make public accommodation settlement contracts with Mr. Austin 180+ separate times between 3.1.25-6.23.25 (updated 8.18.25) violates the letter, and spirit of Unruh Act.  Insurance Companies are liable for Unruh violations per *State Farm Mut. Auto. Ins. Co. v. Garamendi* *"section 1861.03 ... provides… insurance shall be subject to …. Unruh Civil-Rights Act."*  Insurers bare 'minimums standards' for *any* CA human claimants are codified in the Insurance Code-Regs, and serve as a baseline comparator for displayed animus per a. <u>Moradi–Shalal</u> *"prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. (See id., § 3291.)"* , b. <u>10 CCR § 2695.7</u>: *"(a) No insurer shall discriminate in its claims settlement practices based upon… race, gender, income, … or physical disability ….. (b) Upon receiving proof of claim, every insurer…. shall…. in no …more than forty (40)... days…. accept or deny the claim… ... with written notice…"* and c. <u>*Samson v. Transamerica Ins. Co.*</u> recently cited to by the Ninth Circuit in <u>*Madrigal v. Allstate Ins. Co.*</u> whereas the Ninth Circuit upheld a $14 million judgment against Allstate Indemnity Company for its failures of duty to settle with Mr. Madrigal in an Allstate covered car accident causing him severe injury citing <u>*Samson*</u> *" 'the reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury…' "* (with duty to effectuate settlement contract as part of CA Insurers '*minimum standards.')*

KMPR's typical 11 step policy-procedure for Whites includes offers in 30 days or less, serves as a separate comparator for displayed animus toward Mr. Austin. (*pp.110-114*). Mr. Austin sought to be treated the same way as typical approximately **11 step policy for Whites**

(*pp.110-114*) and did everything he was supposed do, and more to effectuate settlement contract

(*Exhibits A-Z*).   However, KMPR treats Mr. Austin the exact opposite with 1. outright exclusion

via "relic of slavery" policy 2. refusal to make contract offers on the same basis as Whites 3. Use

of derogatory anti-Black epithets-slurs because he is Black (*Exhibits A-Z; pp.110-150).*

KMPR **1.** promises CA *Minimum Standards* but delivers *"relic of slavery" per* <u>Bell v. Maryland</u>

2. holds itself out as a law abiding, CA licensed Insurer, with approximately 53% of its auto

revenue from California, who annually certifies under penalty of perjury that KMPR & its claim

agents meticulously follows the CA law-regs.  (*Exhibits A-Z).* Instead, KMPR **3.** treats Blacks

like Mr. Austin the exact opposite of the typical (legally mandated) open communicative,

proactive, 40 day or less settlement contract offer process 4. outright excludes from settlement

contract process via "<u>*relic of slavery*</u>" policy 5. refuses to make contract offers on the same 30-

day basis as similar Whites based on anti-Black derogatory stereotypes-slurs, and 6.

Demonstrates at least 8 forms of animus. *Exhibits A-Z).*

Mr. Austin followed up every-way possible inside and outside of their organization, but

KMPR <u>*still strangely fails to correct its ongoing Unruh violations,*</u> *and* <u>refuses to serve or make</u>

<u>settlement contracts</u> with him. (*Exhibits A-Z).* KMPR's conduct toward Mr. Austin violates the

plain text of Cal. Civ §51.5: *"No business ... shall discriminate against, boycott or* <u>*blacklist,*</u> *or*

*refuse to…* <u>*contract with*</u>*… any person in this state on account of any characteristic listed …"*

KMPR's conduct shows racial animus in 8 ways. KMPR **1.** Subjects Mr. Austin to a different-

inferior process, policy-procedure compared to Whites *(pp.110-114)*  **2.** Excluding, denigrating,

and segregating with per se violations of code-regs *(pp.114-115)*  **3.** <u>*99.9% Per se violations of*</u>

<u>*the absolute minimum standards-duties owed  any human being claimant*</u> *in California in*

*violation of* **a.** <u>*Moradi-Shalal*</u> *&*  **b.** <u>*Jordan v. Allstate Ins. Co.(2007)*</u> *&*  **c.** <u>CACI No.</u>

<u>2337. </u> *(pp.115-116)* **4.** Using, false, derogatory racial stereotypes-epithets *"*<u>*N\*gg\*r*</u>*" - "*<u>*Black*</u>

<u>*Inferior or Criminal*</u>*"-"*<u>*Brute*</u> *or* <u>*Buck*</u>*"*  to deprive *(pp.116-147)*  **5.** Complete exclusion from

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

claimant settlement contracts  *(pp.147-149)* . **6.** Willful explicit violations of annual

oath  *(pp.149)*  **7.** Willful felony perjury to state officials  to **a.** discriminate **b.** embezzle

funds  *(pp.149)*   **8.** Malice & demonstrated Pretext as KMPR knows it perjured itself, knows Mr.

Austin not only submitted (and resubmitted) the medical authorization form (and all other

documents) multiple times, but moreover knows that they had the duty to effectuate contract, and

ask for any needed documents-information to do so *(pp.150)*   *(Exhibits A-Z)*

      KMPR displays at least 8 forms of animus.  However, 'animus' is not needed for

KMPR's simultaneous 180+ Unruh disability-ADA violations from 3.1.25-6.23.25. <u>*Munson v.*</u>

<u>*Del Taco*</u> reminds that for bodily injury claimants, like Mr. Austin, who are still suffering severe

injury causing disability and restriction in major life activity due to KMPR covered car accident,

that *"... a violation of the ADA, .... need not prove intentional discrimination in order to obtain*

*damages under section 52....."*   KMPR's Unruh Act violations are textbook violations per <u>*Koire*</u>

<u>*v. Metro Car Wash,*</u> whereas complete exclusion is not required for liability to ensue, subjecting

Black customers to inferior policies-procedures triggers liability whereas *"Courts ... repeatedly*

*held ... Unruh ... [applies to] unequal treatment [like] when [B]lacks were allowed to enter*

*business establishments but were restricted to certain portions of the premises .... [like] [B]lack*

*ticketholders admitted to theatre but restricted to seating in segregated section [or] ...[B]lack*

*ticketholders admitted to racetrack but denied clubhouse seating..."*   Per  <u>White v. Square</u> all

that's required is an *"exclusionary policy"... "on the basis of the person's membership in a*

*protected category,"* but KMPR's violations went further and are extreme-malicious variations

whereas they repeatedly <u>*completely exclude*</u> Mr. Austin.  KMPR's violations are malicious-

willful as they know use racist slurs-epithets stereotypes are per se illegal, for multiple reasons,

*(pp.116-147)* ), but continue to denigrate, defame, and purposefully harm Mr. Austin with use of

them combined with the most extreme form of exclusion (total exclusion) to deprive his rights

180+ separate instances between 3.1.25-6.23.25.  *(Exhibits A-Z)*

Similar to Unruh 1981 requires non-discriminatory contract making.  KMPR's conduct also violates the plain language, explicitly, the Spirit, Intent, and controlling precedent of Unruh as well as *§1981: ("... All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make ... contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by [W]hite citizens"*

On its face, KMPR's policy is **1.** multi-tiered (one for Blacks, like Mr. Austin, where they *presume Black Inferiority derogatory stereotypes-epithets and violate 99.9% of California's bare minimum standards*, one for Whites, where they effectuate settlement contracts in 30 days or less, while assiduously following the Insurer standards of conduct, one for all other Californians where they follow at least the bare minimum CA Insurer standards), **2.** strange whereas KMPR's settlement-contract making policy or procedure is statutorily defined, and should be straight forward and easy (especially as Mr. Austin made himself proactively available), and KMPR already admitting owing Mr. Austin a settlement contract offer.  ***KMPR breaks normal, statutorily defined, certified under penalty of perjury, protocol-procedures just to repeatedly, egregiously, and overtly, be racist-discriminatory against Mr. Austin.*** (*Exhibits A-Z*)

The combination of KMPR's total conduct toward Mr. Austin shows KMPR's actual thought patterns, true intent, toward Mr. Austin, and Blacks like him.  They don't hide it.  As stated earlier*(pp.116-147)* Vardaman simply says out loud, what KMPR's conduct, including its use of slurs-epithets *"N\*gg\*r"* - *"Black Brutes or Bucks"* - *"Black Inferior or Criminal"* conflated with targeted deprivation of Mr. Austin's California, Constitutional, Citizenship, rights, is actually, *intentionally*, doing in 2025, in an *ongoing per se illegal* manner.  See James K. Vardaman - Wikipedia

"Vardaman …. called Theodore Roosevelt a *"little, mean, coon-flavored miscegenationist."*  About the education of Black children, he remarked, *"The only effect of Negro education is to spoil a good field hand and make an insolent cook."..."The*

*knowledge of books does not seem to produce any good substantial result with the Negro, but serves to sharpen his cunning, breeds hopes that cannot be fulfilled, creates an inclination to avoid labor, promotes indolence, and in turn leads to crime."*... After… Booker T. Washington, had dined with Roosevelt, Vardaman said that the White House was *"so saturated with the odor of the n\*gg\*r that the rats have taken refuge in the stable."*.... *"I am opposed to the n\*gg\*r's voting, it matters not what his advertised moral and mental qualifications may be. I am just as much opposed to Booker Washington, with all his Anglo-Saxon reenforcement, voting, as I am to voting by the… typical little coon … who blacks my shoes every morning. <u>Neither one is fit to perform the supreme functions of citizenship.</u>"*

Ironically, Vardaman, emerged from Kemper County Mississippi sharing the namesake of Kemper Insurer, and unfortunately sharing Vardaman's extreme views-conduct toward Blacks, like Mr. Austin.  The US Insurance Industry, from its earliest development, Insuring enslaved Black People during brutal-torturous voyages, to the most brutal work conditions without compensation under constant surveillance and threat of racial violence, operated from racist paradigms, derogatory stereotypes, and presumptive inferiority of Black people not for the benefit of the Black People themselves, but to their detriment. See e.g. <u>Slavery Era Insurance Registry</u> ; <u>www.insurance.ca.gov/01-consumers/150- other-prog/10-seir/</u> ; www.insurance .ca.gov/01-consumers/150-other-prog/ 10-seir/slavery-era-report.cfm (*Exhibits A-Z*)

KMPR typically follows the precise mandates with a little grace for White, claimants *typically making settlement contract in 30 days, or less vs. maximum statutorily defined 40 days for any claimant, regardless of race.*  For all other claimants KMPR typically make settlement contracts, or notifies in writing for need of more information, in 40 days or less.  KMPR went out of its way to show no matter **1.** Mr. Austin's diligence, persistence, **2.** how much responsibility he takes (that is really KMPR's duties, not his) they fail even to communicate, **3.** statutorily defined duties, KMPR has outright refused to make settlement contract, as mandated by CA law, over 180+ times between 3.1.25-6.23.25 showing extreme, repeated, ongoing animus, and they consider Mr. Austin a <u>N\*gg\*r</u>.  KMPR, like <u>Varadaman</u> seems obsessed with

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

opposing Mr. Austin's California & Constitutional rights, full physical health, no matter "*his advertised … qualifications*" KMPR's words, and conduct show they view Mr. Austin as an inferior "*[un]fit to perform the supreme functions of citizenship ….*" With over 180+ failed opportunities to correct from 3.1.25-6.23.25 (updated 8.18) KMPR is just Racist. (*Exhibits A-Z*)

**B.    KMPR Deceives, Mis-states, Omits, and Makes False promises to materially, and economically harm Mr. Austin.**

From 3.1.25 - 6.23.25 (updated 8.18.25), KMPR violates standards for honesty, and non-deceit in business as they **1.** Make misstatements about the nature of their business practices, to  Mr. Austin, and  perjure themselves to CA state officials (*Exhibits A-J*) to discriminate and embezzle funds owed him **2.** Strategically-purposefully omit material information to Mr. Austin's detriment (*just to make his life harder-discriminate*) while purposefully <u>failing 99%</u> duties owed him **3.** Make false promises of *"minimum standards"* as a CA licensed Insurer, under penalty of perjury, annually, that they have no intent of providing Blacks, like Mr. Austin.  Perjury is not protected speech, in any context, and incurs both civil (deceit) criminal (perjury) liability and per <u>CA Pen. Code 118</u> *(pp.56-57)*

Mr. Austin discovered they were lying from KMPR's own admissions, and his fairly extensive due diligence process (pp.108-110)  See CA Civ Code § 1710 ("*.. deceit… is either: 1. The suggestion … of that which is not true, by one who does not believe it to be true; .. 2. The assertion … of that which is not true, by one who has no reasonable ground for believing it to be true; … 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead …; or, … 4. A promise, made without any intention of performing it.*")  Perjury is an extreme, and criminal form of Deceit, and creates simultaneous Civilly-Criminally liability.  Mr. Austin was exposed to KMPR's materially false promises, and subsequent deceit, triggering him to attempt making contracts 180+ times from 3.1.25-6.23.25 via KMPR's websites, initial documents sent to him by KMPR (prior to KMPR discovering Mr.

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Austin is Black; *Exhibits A-J*), Claims agents via phone, email, and fax, its oath via CA Insurer

licensing, and its written perjury to CDI officials.

KMPR promises **1.** that Mr. Austin is owed a written settlement contract offer from

KMPR within 40 or so days of him submitting his signed medical authorization agreement-

contract-form (as CA law requires) **2.** That he is still owed that settlement contract offer, and his

claim has never been denied (in writing or otherwise) **3.** KMPR must effectuate *"a prompt, fair*

*settlement. (...§ 3291.)"* per <u>Moradi–Shalal</u>  **4.** KMPR must abide by Unruh per <u>*State Farm Mut.*</u>

<u>*Auto. Ins. Co. v. Garamendi*</u> per "Insurance Code section <u>*1861.03"*</u> or per  **§ 52***:" is <u>liable for*</u>

<u>*each and every offense* ...*"* </u>**5.** KMPR must not treat Mr. Austin in an inferior manner as

compared to similar White bodily injury claimants (typically settlement offers in 30 days or less)

per  <u>Koire v. Metro Car Wash</u>, and  <u>*Hutson v. Owl Drug Company's*</u> (where White worker

yelled  *"What did you serve the n\*gg\*r for?....*[they] c*ould have set there until tomorrow, [& still*

*wouldn't be served]*."*) **6.** KMPR must make settlement offer to Mr. Austin **a.** In a Fair & timely

way-manner (i.e. 40 days or less per *10 CCR § 2695.7*) **b.** At a fair price **c.** According to precise

standards of care defined by regs-statutes, regardless of race, sex, nor disability,  **7.** *"to*

*safeguard the public interest,... insurance claims adjusters, when preparing and completing*

*documents which affect the legal rights of third party claimants and when advising third parties*

*to sign such documents, must comply with the standard of care of a practicing attorney" by*

*informing claimants [of] .... legal consequences... disclosing the insurer's potential conflict of*

*interest."* <u>Madrigal v. Allstate Ins. Co</u>. **8.** KMPR must not have an *"exclusionary policy"... "on*

*the basis of the person's membership in a protected category"* per <u>White v. Square</u>, **8.** KMPR

began the claims investigation process as early Summer 2020, in writing *Exhibits A-D* and

promised would quickly complete the claims process *before they discovered Mr. Austin was*

*Black*  **9.** KMPR will provide necessary paperwork to claimants (*Exhibits A-Z*)

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

KMPR promises **10.** Written communication of each step of the claims-settlement process **11.** Written notice of additional time to effectuate settlement to Mr. Austin **12.** Written responses to claimant demand for payment, or other needs **13.** to effectuate a settlement contract in a non-adversarial, cooperative, way **14.** To not use derogatory per se illegal derogatory slurs-stereotypes-epithets like *"N\*gg\*r"*-*"Black Inferior "*-*"Brute or Buck"* **15.** Proactively fulfill its duties to the claimant per *Moradi-Shalal* "*section 790.03 imposes on the insurer a duty to ... the third party claimant"* and Gibbs v.State Farm Mutual Insurance Co. *"insurer may be found to have "neglect[ed] its ... dut[ies] when it fails to take ... action in settling claim."* **16.** Not to discriminate per 10 CCR § 2695.7: **17.** To Provide "*written notice ... every thirty (30) calendar days...."* if additional time beyond 40 days is needed to effectuate settlement contract with Mr. Austin **18.** To not do any of the *CACI No. 2337, Factors* **19.** Not to **"***Misrepresent... to [Mr. Austin] relevant facts ... "* per *CACI No. 2337* **20.** to "*acknowledge and act reasonably promptly after receiving communications about [Mr. Austin]'s claim"* per *CACI No. 2337* **21.** to "*adopt and implement reasonable standards for the prompt investigation and processing of claims"* per *CACI No. 2337* **22.** to "*accept or deny coverage of claims within a reasonable time"* (i.e. 40 days or less) per *CACI No. 2337* **23.** Not to "*Require .... lawsuit to recover amounts due..."* per *CACI No. 2337* **24.** Not to "*Delay... investigation or payment of..claim"* per *CACI No. 2337* **25** "*to promptly provide a reasonable explanation of...reasons for denying... claim or offering a compromise settlement based on ... applicable law"*per *CACI No. 2337* (*Exhibits A-Z)*

Despite all its precise, and specific, promises it fails 99.9% of them, and its duties owed to Mr. Austin. (*Exhibits A-Z*) KMPR *still strangely fails to correct its ongoing Unruh violations, and refuses to serve or make public accommodation settlement contracts* with him violating the *bare minimum* of the bare minimum articulated in BELL v. MARYLAND: "*...When we deal with [13th-15th] Amendments touching the liberation of [Black] people from slavery.... we deal with Amendments whose dominant purpose was to guarantee the freedom of*

**FIRST AMENDED COMPLAINT - San Francisco County Superior Court**

*the slave race & establish a regime where national citizenship has only one class ....The manner*

*in which the right to be served in places of public accommodations is an incident of national*

*citizenship ...."*   Each time Mr. Austin sought service-contract between  3.1.25 and 6.23.25 he

was denied refused because he is Black with a ***"relic of slavery"*** policy (i.e. 180+ adverse

denials-refusals). *Exhibits A-Z.*

KMPR's conduct shows its deceit per its own agents, and others, in 8 ways by **1.**

Subjecting Mr. Austin to a different-inferior process, policy-procedure compared to Whites

*(pp.110-114)*  **2.** Excluding, denigrating, and segregating with per se violations of code-regs

*(pp.114-115)*  **3.** <u>*99.9% Per se violations of the absolute minimum standards-duties owed  any*</u>

<u>*human being claimant*</u> in California in violation of **a.** <u>Moradi-Shalal</u> &  **b.** <u>Jordan v. Allstate Ins.</u>

<u>Co.(2007)</u> &  **c.** <u>CACI No. 2337.</u> *(pp.115-116)* **4.** Using, false, derogatory racial stereotypes-

epithets  *"<u>N*gg*r</u>"*-*"<u>Black Inferior or Criminal</u>"*-*"<u>Brute</u>* or <u>Buck</u>"*  to deprive  *(pp.116-147)*   **5.**

Complete exclusion from claimant settlement contracts  *(pp.147-149)* .  **6.** Willful explicit

violations of annual oath  *(pp.149)*  **7.** Willful felony perjury to state officials  to **a.** discriminate

**b.** embezzle funds  *(pp.149)*   **8.** Malice & demonstrated Pretext as KMPR knows it perjured

itself, knows Mr. Austin not only submitted-resubmitted the medical authorization form (and all

other documents) multiple times, but moreover knows that they had the duty to effectuate

contract, and ask for any needed documents-information to do so  *(pp.150)*   *(Exhibits A-Z)*

Mr. Austin's fairly-extensive due diligence with KMPR's agents, reps, and CDI officials

(as well as outside experts) (pp.108-110) helped identify KMPR's deceitful, embezzling,

perjurious conduct harming Mr. Austin.  A truly law-abiding CA Insurer's *"minimum standards"*

including non-discriminatory effectuating settlement contracts that abides by CA law *<u>does not</u>* **1.**

Presume false,  *"<u>N*gg*r</u>"*-*"<u>Black Inferior</u>"*-*"<u>Brute</u> or <u>Buck</u>"*  slurs-stereotypes as a pretext to not

make public accommodation contracts, **2.** harm-embezzle owed property from Black claimants

by violating 99% of duties owed Blacks, like Mr. Austin, to steal from him, **3.** then 'Blacklist'

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

him based on slurs-stereotypes.  Mr. Austin experiences extreme financial, physical, and

emotional harm from these practices as KMPR is actively preventing Mr. Austin from receiving

owed settlement contract offer.  *Exhibits A-Z.*    The harm is magnified because the standards of

care for settlement contract command they must fairly compensates for injury, missed wages,

lifestyle adjustment needs due to injury, treatment (passed and ongoing), pain and suffering any

other related costs per injury accident with time of the essence as injuries can worsen and

people's livelihoods may be at stake in this critical point in their lives.   *Exhibits A-J.  KMPR's*

*deceit* while violating 99.9% of its duties owed Mr. Austin creates civil liability **AND** *crosses the*

*criminal liability threshold with felony perjury. Exhibits A-D*

**C.    KMPR's Unfair-Deceptive Business Practices promising 'minimum standards' but producing "relic of slavery" policies simultaneously violate CA's UCL and CLRA.**

For a Black man, in the United States, (*provided the racialized history of Black*

*enslavement, rape, torture, theft, etc.)*  there is perhaps no greater "unfair", "deceptive",

"untrue," "misleading" "unlawful" or "fraudulent" advertisements or business practices than to

promise the *'minimum standards'* of any CA licensed Insurer, inclusive of promises explicitly

tied to ensuring freedom of Black people (and claimants) like <u>State Farm Mut. Auto. Ins. Co. v.</u>

<u>Garamendi</u>**,** *sec. 1861.03 (Unruh),* <u>10 CCR § 2695.7</u> "*No insurer shall discriminate in its claims*

*settlement practices…"* but deceptively produce ***"relic of slavery"*** policies. See CA's BPC Sec.

17200 (UCL); See also Civ. Code, § 1770; CACI No. 4700. (CLRA).  KMPR's *"relic of*

*slavery"* policies deprive **a.** the very rights, from **b.** precisely the very people, Black and

vulnerable people, like Mr. Austin, those "minimum standards" for public accommodation

Insurers were PRINCIPALLY created for per <u>BELL v. MARYLAND</u>: "*…When we deal with*

*[13th-15th] Amendments touching the liberation of [Black] people from slavery…. we deal with*

*Amendments whose dominant purpose was to guarantee the freedom of the slave race &*

*establish a regime where national citizenship has only one class….The manner in which the right*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*to be served in places of public accommodations…*"  KMPR's promises are *not puffery*, as they provided concrete examples, state filed licenses, and oaths under penalty of perjury that they know, and abide by these minimum standards; Their violations are core to their promises, and material.  *(Exhibits A-Z)*

KMPR makes 'freedom' based Insurer 'minimum standard' promises , but deceives-defrauds with a ***"relic of slavery."***  Each time, 180+ instances, Mr. Austin sought settlement-contract between  3.1.25 and 6.23.25 he was denied refused because he is Black with a ***"relic of slavery"*** policy, which is not only *unfair, deceptive, untrue*, etc. in the broad remedial sense that the UCL intends, but also in precise violation of CLRA's list of approximately 30  specific types of violations for prospective or consummated customers. See also Civ. Code, § 1770; CACI No. 4700. (CLRA). *Exhibits A-Z*  KMPR violates *CLRA* Deceptive Practices # ***5, 7, 9, 10*** and ***14*** from CA Civ Code § 1770: "*(5) Representing that… services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have… (7) Representing that… services are of a particular standard, quality, or grade [and they are not]..... (9) Advertising … services with intent not to sell them as advertised..... (10) Advertising … services with intent not to supply reasonably expectable demand..... (14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have….*"  See also Veera v. BananaRepublic, LLC (2016) 6 Cal.App.5th 907, 916, fn. 3 [211 Cal.Rptr.3d 769]. ( "*[T]he CLRA does not require lost injury or property, but does require damage and causation. 'Under Civil Code section 1780*"*);  Hansen v. Newegg.com Americas, Inc. (2018) 25 Cal.App.5th 714, 724 [236 Cal.Rptr.3d 61]. ("*under the CLRA, a plaintiff must have"suffer[ed] any damage as a result of the . . . practice declared to be unlawful." ' Our Supreme Court has interpreted the CLRA's 'any damage' requirement broadly, .... the consumer must merely 'experience some [kind of] damage,' or 'some type of increased costs' as a result of the unlawful practice.*")

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

Mr. Austin sent at least three detailed written notices to KMPR headquarters over 30+ days ago informing them of their CLRA violating conduct, and requesting-demanding them to self correct.  Mr. Austin also sent a reminder letter alerting them that their 30 day notice deadline has passed. (*Exhibit G*) KMPR's conduct shows its fraud-deceit to its own agents, and others, as well as violations of CLRA, UCL, in 8 ways by **1.** Subjecting Mr. Austin to a different-inferior process, policy-procedure compared to Whites *(pp.110-114)*  **2.** Excluding, denigrating, and segregating with per se violations of code-regs *(pp.114-115)*  **3.** _99.9% Per se violations of the absolute minimum standards-duties owed  any human being claimant_ in California in violation of **a.** _Moradi-Shalal_ &  **b.** _Jordan v. Allstate Ins. Co.(2007)_ &  **c.** _CACI No. 2337._  *(pp.115-116)*  **4.** Using, false, derogatory racial stereotypes-epithets _"N*gg*r"_ - _"Black Inferior or Criminal"_- _"Brute_ or _Buck"_  to deprive *(pp.116-147)*  **5.** Complete exclusion from claimant settlement contracts  *(pp.147-149)* . **6.** Willful explicit violations of annual oath  *(pp.149)*  **7.** Willful felony perjury to state officials  to **a.** discriminate **b.** embezzle funds  *(pp.149)*  **8.** Malice & demonstrated Pretext as KMPR knows it perjured itself, knows Mr. Austin not only submitted (and resubmitted) the medical authorization form (and all other documents) multiple times, but moreover knows that they had the duty to effectuate contract, and ask for any needed documents-information to do so *(pp.150)*   (*Exhibits A-Z*)

KMPR promises (under penalty of perjury) a. Ease of use b. Reliability when triggering events occur c. promises to timely, effectively, pay-effectuate settlement contract with injured claimants, d. To thoroughly understand, and follow the Insurance and other laws with integrity, e. To anticipate claimant needs, per the states particular requirements, for each and every claimant, but lied to, and falsely advertised to Mr. Austin as KMPR's conduct is the exact opposite with regard to hi*m. (Report a Claim - Auto ; Personal Car Insurance | Kemper ;Affordable Auto and Life Insurance | Kemper; Quick Facts about Kemper | Auto Insurance | Life Insurance Kemper ;Kemper Corporation Annual 10K (12 months ending*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*12/31/2023)*.  Every single one of these advertised offerings were not just false, but maliciously

defrauded because of Mr. Austin's race.  *Exhibit A-Z*.  KMPR falsely  advertises points a-e above

that it is open to all, but in practice discriminates against Black men like Mr. Austin.  Mr. Austin

both purchased KMPR insurance for himself based on the false advertisements, and engaged in

the settlement contract making process with the other drivers KMPR insurance (as they were at

fault) in good faith based on their advertised promises for bodily injury claimants.  Their

promises proved to be *"false.*

All of these different components are advertised as material parts of KMPRs value

offering to customers, and were false with respect to Mr. Austin from 3.1.25-6.23.25 when their

a. services were Extremely difficult, if not impossible to make contract for, based on KMPR's

conduct toward Mr. Austin b. Settlement Offers were non-existent (as Mr. Austin appears

blacklisted and discriminated against) c. execution to get to a finalized settlement agreement was

extraordinarily challenging as communication was deceptive and dishonest including KMPR's

felony perjury d. Anticipation of claimant needs was non-existent, and even insulting with

refusal to both communicate effectively or make offer (despite 180+ attempts) e. Communication

was extremely poor, and non-responsive and f. They violate Mr. Austin's Unruh, and Civil

rights.

**D.      Defamation with Perjury to several individuals (including state officials).**

Per *CACI 3610 Jury Instructions* KMPR is liable for Defamation, Malicious Perjury, and

Defamation Per Se.  Perjury is not protected speech, in any context, and incurs both civil (deceit)

criminal (perjury) liability and per CA Pen. Code 118 *(pp.56-57).*   Mr. Austin's reputation and

character are extremely important to him as it directly affects every aspect of his life. (*Exhibit A-*

*K)*  When KMPR outright perjured themselves to attempt to escape liability for what they knew

was per se illegal conduct, and attempting to steal-embezzle Mr. Austin' owed settlement they

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

turned to defamatory lies, and perjury to state officials to try and get them out of the situation they themselves created by breaking the law.  Mr. Austin alerted 1. He timely turned in medical authorization form, signed and completed with all requested information from KMPR's agents 2. KMPR's agents received the authorization in addition to supporting documents, exhibits, etc. for verification purposes. 3. KMPR's agents confirmed receipt (several KMPR agents independently verified that they received) 4. KMPR promised it would make owed settlement in approximately 40 days or less from when the documents were submitted 5. KMPR never made settlement offer, never followed any of the statutorily defined duties of care thereafter (*violating 99% of precisely defined duties of care owed Mr. Austin*) and 6. Mr. Austin diligently followed up, resent all documents multiple times, proactively kept KMPR in the loop, sought to find out what the hold up was over, and over again, with KMPR continuing to fail their owed duties.  KMPR simply ignored Mr. Austin despite the statutory requirement to do the exact opposite.

However, when Mr. Austin filed a complaint-inquiry with the State of California's Department of Insurance they knew they could independently be held accountable both civilly, and criminally, and thus began to lie, perjure themselves under oath (via annual licensing), and during investigation, defame, Mr. Austin as they not only lied about not receiving the documents which they themselves repeatedly confirmed receipt of, but defamed Mr. Austin as they 1. Expressly, and covertly, gave the false impression, and made false statements that Mr. Austin was a Black Criminal felon as their statements accused him of a. lying b. lying to state official as part investigation.  In follow up conversations KMPR made knowingly false statements outright that someone Mr. Austin was engaging in fraud as if his claim of injury from the car was not real or serious, yet they never sent Mr. Austin any follow up as required per CA insurance code and regs.  KMPR also made clear that they have openly, and apparently, routinely published false statements about Mr. Austin in conjunction with depriving his rights.  KMPR's *ongoing* published false statements to over at least 25 separate persons, combined with KMPR's usage of

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

racist epithets *"N\*gg\*r"*-*"Black Criminal or Inferior"*-*"Brute or Buck,"* and subsequent "Blacklisting" per Unruh conduct are extraordinarily damaging and malicious.

KMPR's knowingly false statements are so inherently damaging (*i.e. directly falsely accusing Mr. Austin of criminal conduct, being a criminal as a way to attempt to avoid self inflicted liability, and then taking ongoing "blacklist" adverse actions based on that false accusation*) that those statements-conduct constitute defamation (per se) per *Civ. Code § 45* and per Professor Witkin's observations-guidance, TSLA's false *"charge of commission of some kind of crime is obviously libel per se."* 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 542, p. 795. Despite the fact that Mr. Austin went out of his way to follow California Insurance Code, and Regs, and go above and beyond to ensure everything that was needed from KMPR was provided, by him (and received verification) they not only tried to cheat him, deceive him, and rob-steal-embezzle funds owed him, but sought to steal from his good name, and defame through knowingly false, malicious information seeking to discredit, distract, denigrate, disenfranchise, and defame. KMPR knows, and admits, it owes Mr. Austin a settlement offer*, but lied* to cover up their nefarious scheme to discriminate, embezzle, and defame.

Mr. Austin was defamed to likely over 25+ individuals, or more. The number of persons KMPR defamed Mr. Austin to is likely much higher both inside, and outside, of their organization just from reviewing Mr. Austin's notes, communications, documents, persons spoken with, their respective responses, joined communications with multiple persons on the same email, and what they disclosed to me later about what was said about me.

KMPR's derogatory conduct is so offensive it is defamation per se. *Knievel v. ESPN* highlights the magnitude of damage whereas TSLA literally *"was ... accusing .. of ... criminal activity"* [as a way to distract from their per se illegal, and criminal conduct] plus ongoing adverse-denials (*unlike* what the majority labeled as *"loose, figurative, slang language"* in *Knievel).* KMPR is breaking its normal protocol, blacklisting based upon knowing false

-165-

derogatory slurs-epithets, just to be racist.  This defamatory (per-se) type of harm reverberates in all life's areas: economic, emotional, etc. whereas per Knievel v. ESPN "*with considerable less lilt than Iago, but … same desire to poison the mind not of a Moor — but of millions — defendant"* attempts to harm Mr. Austin's good name, and …*"Good name in man … Is the immediate jewel of their souls…. he that filches from me my good name Robs me… And makes …poor indeed… Othello… (1604)"*)

Per US Dominion, Inc. v. Fox News Network, and the $787 million Dollar Settlement it produced, Defamation, and Defamation Per Se are serious, and expensive, offenses-violations of persons' reputational interest.  Mr. Austin provided KMPR more than fair warning that the basis of their conduct is not only completely false, and provably so, but per se illegal conduct violating Mr. Austin's rights.  KMPR's published usage of *"N\*gg\*r"*-*"Black Inferior or Criminal"*-*"Brute* or *Buck"* slurs-epithets, encouraged Mr. Austin to urge KMPR to not only follow the California law, Standards of care per Insurance Code-Regs, but also to immediately cease and desist Defamatory, Deceitful, Discriminatory, statements-conduct.  Per *US Dominion, Inc. v. Fox News Network, LLC, C. A. "..Fox made the challenged statements with knowledge of their falsity or with reckless disregard of their truth…..'Actual malice' means that defendants published the false information about plaintiff 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"……"a speaker cannot "purposefully avoid[]" the truth and then claim ignorance. If the plaintiff offers "some direct evidence" that the statement "was probably false," the Court can infer that the defendant "inten[ded] to avoid the truth..."*   KMPR knows what they are doing is per se illegal, and wrong, knows the harmful statements-conduct they are currently engaged in is false, and defamatory per se, *but they really don't care, and are showing extreme willful-purposeful animus (almost to brag about what they can get away with).*

Per US Supreme Court's *Gertz v. Welch* quoted by Georgia's Supreme Court in *Retail Credit v. Russell* **1.**the potential damage to Mr Austin is clear when *"facing a commercial*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*Goliath with the power to destroy"*, and **2.** KMPR's liability, per CA's defamation statutes, is apparent whereas: *"We cannot agree to this weighing of the scales against the individual who stands alone facing a commercial Goliath with the power to destroy — not necessarily through malice but perhaps merely from carelessness — his credit rating, commercial advantages, insurance protection and employment, all through the publication of erroneous reports concerning his affairs .... An individual living in a world more and more dominated by large commercial entities is less able to bear the burden of the consequences of a false credit or character report than the agency in the business of selling these reports.* <u>*Gertz v. Welch*</u>, *... recognized "the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation..."* This is especially true as KMPR by definition of its Insurance license is supposed to be in the helping business, to ensure that when people go through a number of difficult, challenging, hurtful, injurious, scary and oppressive circumstances (for which Insurance protects against, mitigates those risks), one should not have to worry that the Goliath that is financially, and statutorily designed to help becomes the racial, disabled, injurious, and now defamatory abuser.

KMPR's falsely impugning criminality to Mr. Austin *"is an invasion of the interest in reputation..."* per <u>Smith v. Maldonado</u>. Per *Civ. Code § 46* and US Supreme Court's <u>*Carey v. Piphus*</u>, the disputed merchant is defaming Mr. Austin by directly falsely accusing him of being a criminal whereas defamation is *"a false and unprivileged publication ... which ... [t]ends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification ... or by imputing something ... that has a natural tendency to lessen its profits[.]"* … and includes.. *"false statements imputing to a person a criminal offense, a ... matter affecting adversely a person's fitness for trade, business, or profession ..."* See also e.g. <u>Weinberg v. Feisel</u>; Per *Civ. Code § 45* Falsely calling-insinuating a person is criminal, (*"<u>Black Criminal</u>"*) as the disputed merchant is doing to Mr. Austin repeatedly , is so illegal that

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

when spoken to at least one other person, or written (published), it is *per se illegal* and

Actionable on its face (*defamation per se*).  The reason it is actionable on its face is because that

statement *"is defamatory of the plaintiff without the necessity of explanatory matter"* per *Tonini*

*v. Cevasco* , and *Babcock v. McClatchy Newspapers.*

KMPR's **1.** false statements combined with **2.** conduct toward Mr. Austin based on those

false statements (despite it violating Unruh, and other laws) Combined with **3.** conduct

impugning Mr. Austin with racist derogatory epithets-slurs-stereotypes *"N*gg*r"*-*"Black*

*Criminal"*-*"Brute or Buck"*  *simultaneously violates a host of defamation per se precedent*

per  a. *Christian Research Institute v. Alnor*  b. *Maher v. Devlin*, c. *Stevens v. Snow*, d. *Edwards*

*v. San Jose Printing & Publishing Soc.*, e. *Boyich v. Howell*, f. *Dethlefsen v. Stull*, g. *Bates v.*

*Campbell*,  h. *Albertini v Schaefer*,  i. *Megarry v. Norton* j. *Maidman v. Jewish Publications* k.

*Williams v. Daily Review*, l. *Patton v. Royal Industries*, m. *Clay v. Lagiss*, n. *Cunningham v.*

*Simpson*

KMPR's escalated its conduct with Defamation per se conduct as it not only verbally

made statements to at least 25 persons, but wrote down in KMPR's system, Communication to

CA State agents to attempt to deflect from their criminal, per se illegal conduct which Mr. Austin

was reporting, and sent out for who knows how many others within their internal system.

KMPR's messaging Mr. Austin is a "Black criminal or inferior" and on that basis is **1.** depriving

his right to public accommodation contract despite it being owed generally via Unruh, and in a

precise manger via California's Insurance Code-Regs, **2.** Blacklisting him from claimants

settlement contracts that they themselves said they owe Mr. Austin is not only per se illegal, but

defamatory and violates. *Sommer v. Gabor* whereas *"[T]he jury was instructed that if it found*

*that defendant published matter that was defamatory on its face and it found by clear and*

*convincing evidence that defendant knew the statement was false or published it in reckless*

*disregard of whether it was false, then the jury 'also may award plaintiff presumed general*

*damages.' Presumed damages 'are those damages that necessarily result from the publication of defamatory matter and are presumed to exist. They include reasonable compensation for loss of reputation, shame, mortification, and hurt feeling[s]....."*

Mr. Austin has no way of knowing the full extent of the damages (or how many people in total) KMPR made these verbal, or written, set of derogatory statements, but knows it was BOTH a. Malicious (as they knew it was wrongful information) and b. far more than one (1) other person as the law requires per <u>Smith v. Maldonado</u> *"Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the 'public' at large; communication to a single individual is sufficient."* Mr. Austin provided repeated, and fair warning for KMPR to cease and desist this false, racist, per se illegal conduct and actively failed independently owed duties to Mr. Austin.

KMPR **1.** made statements-conduct was explicitly understood by their own agents, repeated to Mr. Austin, as *"statement[s] of fact rather than opinion"* **2.** knew slurs-epithets *"N\*gg\*r"*-*"Black Criminal"*-*"Brute or Buck"* for Mr. Austin were false, and thus were absolutely malicious showing an extreme reckless disregard for truth-malice (just to be racist per <u>Jackson v. Paramount Pictures Corp.</u> *"Actual malice... [requires].... refrain[ing] from .... acting in reckless disregard of the truth.")* ; <u>St. Amant v. Thompson</u>, *"...Publishing [orally or written] with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.."* It is of note KMPR never asked Mr. Austin to clarify any questions, provide any additional information after providing all the required information (including medical authorization) and took none of the hundreds of opportunities to self-correct from Mr. Austin's inquiries, internal complaints, phone calls, emails, etc. showing an extreme *"failure to investigate .... anger and hostility toward the plaintiff.."* also indicating <u>Actual Malice</u> per <u>Sanders v.Walsh</u>, or <u>Young v. CBS Broadcasting, Inc.</u> quoting *Reader's Digest Assn.* Per the

EXHIBIT A
Page 175

1   US Supreme Court's _Heckler v. Mathews,_ the KMPR's usage of  "_N\*gg\*r_" - "_Black Brutes_ or

2   _Bucks_"- "_Black Criminal_" derogatory slurs is defamation per se, AND simultaneously creates:

3   "_Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and_

4   _therefore as less worthy"._"

5

6   **E.      Conversion of Mr. Austin's owed settlement contract.**

7          Per _CACI 2100 Jury Instructions_ KMPR is liable for Conversion of Mr. Austin's owed

8   Settlement contract.  KMPR and its claims agents admit directly to Mr. Austin that they owe Mr.

9   Austin a settlement-contract-offer _including bodily injury damages, expenses, missed wages, loss_

10  _of quality of life, etc. compensation (Exhibits A-Z)._  Mr. Austin has done his part, and more,

11  many times over, but KMPR fails to make the legally required settlement offer, _at all, let alone_

12  _at a fair price and in a fair manner (Exhibits A-Z)._  KMPR's behavior toward Mr. Austin is

13  similar to Allstate's conduct toward Carlos Madrigal in _Madrigal v. Allstate Ins. Co._ whereas the

14  Ninth Circuit upheld a $14 million judgment against Allstate for failures of duty to settle citing

15  _Samson v. Transamerica Ins. Co._" '_the reasonableness of a rejected settlement offer is often an_

16  _issue of fact to be determined by the jury.' "_  Moreover, per  _Critz v. Farmers Ins. Group,_

17  a"_failure to settle may occur late or early in the game. Sometimes negotiations are held open_

18  _almost to the time the jury returns with its verdict"_  and per Moradi–Shalal "_prejudgment_

19  _interest may be awarded where ..insurer ..attempted to avoid a prompt, fair settlement.§ 3291.)._"

20

21         Here, KMPR wrongfully, discriminatorily, and per se illegally, is exercising control of

22  Mr. Austin's owed settlement contract which is his personal property and per Shopoff & Cavallo

23  LLP v. Hyon "_it is only necessary to show an assumption of control ... over the property, or that_

24  _the alleged converter has applied the property to his own use." . . . '_ "1302 and per Welco

25  Electronics, Inc. v. Mora "_Generally, conversion has been held to apply to the taking of_

26  _intangible property rights when 'represented by documents, such as bonds, notes, bills of_

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*exchange, stock certificates, ... warehouse receipts.'.... insurance policies, and other evidentiary documents...."* While KMPR illegally assumes control of his settlement contract owed Mr. Austin, KMPR not only deprives him causing additional-prolonged injuries, but enriches themselves through profiting-investing (with his property), from his pain.

Mr. Austin has a statutory, CA Executive, CA Legislature, and CA Supreme Court defined right to possess his settlement contract, in a specifically defined timeframe, and manner, for which KMPR is woefully late despite Mr. Austin's continued 180+ diligent requests-demands-inquiries from 3.1.25- 6.23.25. KMPR is perjuring itself to state officials to embezzle these funds owed Mr. Austin to take possession-delay production of these owed funds, and preventing Mr. Austin's access to his funds, care, services etc. as part of the settlement offer. Mr. Austin never consented to KMPR delaying his settlement offer, and did everything he could to expedite the offer. He is being harmed by KMPR's conduct-delays as the direct cause of the deprivation-harm per *Hensley v. San Diego Gas & Electric Co.* *"[D]amages for emotional distress growing out of a defendant's conversion of personal property are recoverable"* and per *Voris v. Lampert* *"[C]onversion is a strict liability tort. It does not require bad faith, knowledge, or even negligence; it requires only that the defendant have intentionally done the act depriving the plaintiff."*

**F.    Negligence (Negligence Per Se & Gross Negligence).**

KMPR as a public accommodation business has a set of particular duties owed to the public including the *General Duty to Exercise Due Care*. See Civil Code section 1714(a). KMPR's usage of *"N\*gg\*r"*-*"Black Inferior or Criminal"*-*"Brute or Buck"* to deprive Mr. Austin in public accommodation, Insurer services-contracts violates *sec. 1714,* as well as KMPR's roles, responsibilities, and duties for business operating in the public trust. See e.g. BELL v. MARYLAND: *"...When we deal with [13th-15th] Amendments touching the liberation*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*of [Black] people from slavery.... we deal with Amendments whose dominant purpose was to guarantee the freedom of the slave race & establish a regime where national citizenship has only one class....The manner .... <u>the right to be served in places of public accommodations</u>*…"

Provided the history and harms of these particular racist epithets-slurs, and their usage to deprive Black Men's, and Black People's, Citizenship, Constitutional, and other fundamental rights, it is clear KMPR violates its duties of care via KMPR's usage, especially as an Insurer for a bodily injury settlement contract per *Brown v. U.S. Taekwondo,* 11 Cal.5th 204, 209 (Cal. 2021) *"a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances."* KMPR's duties to Mr. Austin, and the public, is heightened per <u>BELL v. MARYLAND</u> and once KMPR created additional harms for Mr. Austin through usage of *"<u>N*gg*r</u>"- "<u>Black Inferior or Criminal</u>"-"<u>Brute</u> or <u>Buck</u>"* KMPR incurs an additional failed duty to correct-render aid for harms KMPR causes directly. This is especially true for KMPR operating as a California public accommodation Insurer with a long standing, well documented, set of publicly documented duties to serve claimants in a non-discriminatory way particularly as KMPR's explicit purpose is to make settlement contracts per precisely defined 'minimum standards' when people-claimants are at their most vulnerable, *per CA laws, Constitution, Unruh Act, Civil Rights Act of 1964* and a variety of Statutes including *1981* especially in light of 1988 California Supreme Court's <u>*Moradi–Shalal,*</u> , instructions that "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code. We urge the Insurance Commissioner and the courts to continue to enforce the laws <u>forbidding</u> such practices to the full extent consistent with our opinion,*"

Per <u>*Bell v. Maryland,*</u> because of the critical juncture KMPR operates for injured Black Californian claimants, *"We cannot blind ourselves to the consequences of a constitutional interpretation which would permit citizens to be turned away by all the restaurants, or by the only restaurant, in town. The denial of the constitutional right of Negroes to access to places of*

*public accommodation would **perpetuate a caste system in the United States**. The Thirteenth,*
*Fourteenth and Fifteenth Amendments do not permit Negroes to be considered as second-class*
*citizens in any aspect of our public life. Under our Constitution distinctions sanctioned by law*
*between citizens because of race, ancestry, color or religion "are by their very nature odious to a*
*free people whose institutions are founded upon the doctrine of equality."*   <u>*Bell v. Maryland*</u>

continues and makes clear that any public accommodation business, not just restaurants, fall

under this gambit. KMPR's function as a CA Insurer has an even higher level of responsibility

per <u>*Bell v. Maryland*</u>,: "*Here it is a restaurant refusing service to a Negro. …. But so far as*

*principle and law are concerned it might just as well be a hospital refusing …  admission to a*

*sick or injured Negro …, ….or a drugstore refusing antibiotics to a Negro …… or a bus denying*

*transportation to a Negro …… or a telephone company refusing to install a telephone in a*

*Negro's home…..*"

    As a CA Insurer KMPR duties owed Mr. Austin include **1.** a written KMPR settlement

contract offer within 40 or so days of him submitting his signed medical authorization-forms  **2.**

a still owed settlement contract offer, provided his claim has never been denied (in writing or

otherwise) **3.** KMPR effectuating *"a prompt, fair settlement. (…§ 3291.)"* per <u>Moradi–Shalal</u>  **4.**

KMPR abiding by Unruh per <u>*State Farm Mut. Auto. Ins. Co. v. Garamendi*</u> per "Insurance Code

section <u>*1861.03"*</u> or per  **§ 52***:*" *is <u>liable for each and every offense</u> …"* **5.** KMPR not treating

Mr. Austin in an inferior manner as compared to similar White bodily injury claimants (typically

settlement offers in 30 days or less) per <u>Koire v. Metro Car Wash</u>, and  <u>*Hutson v. Owl Drug*</u>

<u>*Company's*</u>  **6.** KMPR making settlement offer to Mr. Austin **a.** In a Fair & timely way-manner

(i.e. 40 days or less per *10 CCR § 2695.7*) **b.** At a fair price **c.** According to precise standards of

care defined by regs-statutes, regardless of race, sex, nor disability,  **7.** safeguarding *"the public*

*interest,… insurance claims adjusters, when preparing and completing documents which affect*

*the legal rights of third party claimants and when advising third parties to sign such documents,*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*must comply with the standard of care of a practicing attorney" by informing claimants [of] ....*

*legal consequences... disclosing the insurer's potential conflict of interest."* <u>Madrigal v. Allstate</u>

<u>Ins. Co.</u> **8.** KMPR not having an *"exclusionary policy"... "on the basis of the person's*

*membership in a protected category" per* <u>White v. Square</u>, **8.** KMPR quickly completing the

claims process after they discovered Mr. Austin's race (non-discrimination) **9.** KMPR providing

necessary paperwork to claimants. *(Exhibits A-Z).*

Further, KMPR duties owed Mr. Austin include **10.** Written communication of each step

of the claims-settlement process **11.** Written notice of additional time needed to effectuate

settlement **12.** Written responses to claimant demand for payment, or other needs **13.** effectuating

a settlement contract in a non-adversarial, cooperative, way **14.** not using derogatory per se

illegal slurs-stereotypes-epithets like *"<u>N\*gg\*r</u>"-"<u>Black Inferior</u> "-"<u>Brute</u> or <u>Buck</u>"* **15.**

Proactively fulfilling its duties to the claimant per <u>Moradi-Shalal</u> *"section 790.03 imposes on*

*the insurer a duty to ... the third party claimant"* and <u>Gibbs v.State Farm Mutual Insurance Co</u>.

*"insurer may be found to have "neglect[ed] its ... dut[ies] when it fails to take ... action in*

*settling claim."* **16.** Not discriminating per <u>10 CCR § 2695.7:</u> **17.** Providing *"written notice ...*

*<u>every</u> thirty (30) calendar days...."* if additional time beyond 40 days is needed to effectuate

settlement contract with Mr. Austin **18.** not doing any of the *<u>CACI No. 2337. Factors</u>* **19.** Not

Misrepresenting *"to [Mr. Austin] relevant facts ... "* per <u>*CACI No. 2337*</u> **20.** Acknowledging

and Acting *"reasonably promptly after receiving communications about [Mr. Austin]'s claim"*

per <u>*CACI No. 2337*</u> **21.** Adopting and implementing *"reasonable standards for the prompt*

*investigation and processing of claims"* per <u>*CACI No. 2337*</u> **22.** Accepting or Denying

*"coverage of claims within a reasonable time" (i.e. 40 days or less)* per <u>*CACI No. 2337*</u> **23.** Not

requiring *"lawsuit to recover amounts due..."* per <u>*CACI No. 2337*</u> **24.** Not delaying

*"investigation or payment of the claim"* per <u>*CACI No. 2337*</u> **25** promptly providing *"a*

**FIRST AMENDED COMPLAINT - San Francisco County Superior Court**

1    *reasonable explanation of its reasons for denying the claim or offering a compromise settlement*

2    *based on ... applicable law"...'*  per *CACI No. 2337* (*Exhibits A-Z*).

3            The proper conduct of a reasonable person in a particular situation may become settled by

4    judicial decision or may be established by statute or administrative regulation. *Ramirez v.*

5    *Plough, Inc.*, 863 P.2d 167 (1993); See also CACI Nos. 418 to 421 on negligence per se. Here,

6    KMPR fails each of the above stated duties in the *extreme* with *willful* breach of duty, and a

7    *wanton* want or lack of care.  KMPR's negligence can be found in KMPR's **1.** failure to do what

8    it is required to do, as well as **2.** doing what KMPR is prohibited by law from doing as

9
     *"Negligence can be found in the doing of an act, as well as in the failure to do an act."* (Rest.2d
10
     Torts, § 284.)  KMPR's Negligence per se violations of statutory duties include *CA Civ Code §*
11
     *1710, CACI No. 2337* ; *§ 2695.6.* ; *§ 2695.1.* ; *§ 2695.5.* ; *§ 2695.3.* ; *§ 2695.7.* *Ins. Code  § 790*
12
     *et seq, Ins. Code sec. 1861.03 , Civ. Code § 45- 46, BPC Sec. 17200 (UCL); Civ. Code, § 1770*
13
     *(CLRA), 13th-14th Amendments, Unruh Act, Civil Rights Act of 1964, 42 USC 1981* (as
14
     described above) as well as criminal per se violations of statute including *Perjury per Cal. Pen.*
15
     *Code § 131, § 129, § 127, § 126, § 125, § 123, § 119, &  § 118a; Embezzlement per Pen.Code §*
16
     *503.*  In process of attempting to make KMPR public accommodation bodily injury settlement
17
     contracts Mr. Austin perceives at least Eight (8) distinct types of animus toward Mr. Austin each
18
     violative of Unruh.  KMPR **1.** Subjects Mr. Austin to a different-inferior process, policy-
19
     procedure as compared to similarly situated Whites  **2.** Excluding, denigrating, and segregating,
20
     by per se violations of code-regs, in the extreme, failing 99.9% of duties owed (including
21
     *Insurance Code section 1861.03*) (*Exhibits A-Z*).
22
             KMPR's embezzlement, and use of felony perjury to do so, is through fraudulent
23
     appropriation of property, Mr. Austin's owed settlement as admitted by KMPR and their claims
24
     agents, by KMPR who is empowered with the public trust through CA Insurer license.  KMPR is
25
     entitled to collect premiums as a licensed CA Insurer, but with the entitlement comes the duties
26

27

28

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

to investigate, and timely pay settlement claims, like Mr. Austin's bodily injury claim.    KMPR's

negligence per se violations of Penal Code Section 503 statues (and conversion), are due to

KMPR's *Insurance Fraud* conduct which the most common form of embezzling in a multi-

Billion dollar a year racket per the 1. *FBI*; www.fbi.gov/stats-services/publications/insurance-

fraud ("*...The total cost of insurance fraud... is estimated to be more than $40 billion per year...*

*.[Insurer] Premium diversion is the embezzlement of insurance premiums .. is the most common*

*type of insurance fraud....collecting premiums and then not paying claims....*"), 2. CDI

Insurance Fraud is a Felony and costs Californians *"over $15 billion each year"* and 3. The

rising tide of insurance fraud: an estimated $308B problem - Insurance News |

InsuranceNewsNet *"Premium diversion occurs when insurance premiums are embezzled,*

*usually by agents ....instead keep it for themselves. It is regarded as the most prevalent kind of*

*insurance fraud."*  As described above in Conversion, KMPR is using Mr. Austin's owed

property for their own benefit in a way that was not authorized by Mr. Austin, and in direct

violation of 99.9% CA legal duties owed to Mr. Austin. (*Exhibits A-Z*).

     KMPR's Gross Negligence can be shown in the extreme nature of their *ongoing*

violations showing malice, a complete want or scant want of due care by failing 99.9% of duties

owed Mr. Austin in a flagrant, callous, and malicious way while at the same time annually taking

an oath under penalty of perjury to fulfill the very duties to Mr. Austin, and other claimants,

regardless of race, gender, disability, etc.  Hypocrisy, and Irony, don't begin to encapsulate the

level of diabolical duty violations KMPR engages in without remorse, or repentance. KMPR

goes out of their way to cause harm even while knowing Mr. Austin did everything he was

supposed to do, including correctly submitting his medical authorization forms, other

information, and attempted 180+ times to make settlement contract from 3.1.25-6.23.25.  Like

the US Supreme Court's *St. L. Iron Mtn. Ry. v. McWhirter* says *"the language of the provision*

*[i.e. Insurance codes-regs].... is* **mandatory and .. the duty it imposes is a definite, absolute**

-176-

*duty"* with violations this extreme to be nothing less than willful, malicious, extreme and with want of even scant care (as well as criminal perjury and embezzlement).  (*Exhibits A-Z).*

### G.    Intentional Infliction of Emotional Distress

Per *CACI 1600 Jury Instructions* KMPR is liable for *Intentional Infliction of Emotional Distress.*  CA Insurers, like KMPR, have precise defined boundaries of reasonable conduct toward claimants, which must be annually certified under oath - penalty of perjury - to keep their license, and ability to conduct business in California. California's statutory framework, Executive, Legislature, and CA Supreme Court are all in agreement that the *'metes and bounds'* of the Insurance Code and Regs provide the reasonable expected Insurer behavior toward CA claimants per *Moradi-Shalal* the *minimum standards* of Insurer conduct are defined by the Insurance Code and forbids KMPR's conduct toward Mr. Austin whereas "*We caution, ...our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by.. Ins. Code. We urge .... courts to continue to enforce the laws forbidding such practices....*"

Per Moradi–Shalal  *"prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. (See id., § 3291.)"* and per 10 CCR § 2695.7: *"No insurer shall discriminate in its claims settlement practices based upon the claimant's age, race, gender, income, ... or physical disability..... (b) Upon receiving proof of claim, every insurer.... shall ... in no event more than forty (40) ... days ... accept or deny the claim... (c)(1) If more time is required than ... [forty (40) calendar days]... every insurer shall provide the claimant,.... with written notice of the need for additional time .... every thirty (30) calendar days...."* and per *CACI No. 2337. Factors to Consider in Evaluating Insurer's Conduct :: California Civil Jury Instructions (CACI) (2025)* (*Exhibit F),* the baseline standards for reasonable Insurer conduct toward *any* Californian-claimant is precisely spelled out in those factors listed. (*Exhibits A-Z).*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

KMPR's normal operating procedure also helps establish what is reasonably expected conduct. KMPR's typical policy for White similarly situated claimants includes a. providing necessary paperwork to claimants once notice of accident is made to KMPR b. written confirmation of receipt by KMPR (*once authorization form is submitted to KMPR*) c. written 1.settlement offer to claimant in 40 days or less, or 2. notice of additional information needs d. if additional steps needed, then specific detailed written instructions provided by KMPR within 40 days e. If investigation needed to substantiate claim components, KMPR must notify needs in writing (in 40 days) f. If additional time is needed, KMPR must provide written notice every 30 days until information provided & settlement contract offer made. (*Exhibits A-Z).* Mr. Austin followed KMPR's & CA's, policies.

KMPR concedes, despite 180+ attempts between 3.1.25-6.23.25 (updated 8.18.25), KMPR still fails its basic duties owed to make written settlement offer, or explanation, to Mr. Austin (claimant) in 40 days or less. KMPR abuses its position, licence, and fails 99.9% of duties owed including making a settlement contract offer per <u>Molko v. Holy Spirit Ass'n</u>  " *'Behavior may be considered outrageous if a defendant (1) abuses a relation or position that gives him power to damage the plaintiff's interests; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. . . .  Relationships that have been recognized as significantly contributing to the conclusion that particular conduct was outrageous include:  .... Insurer-insured [or claimant] (Fletcher v. Western National Life InsuranceCo. (1970) 10 Cal.App.3d 376, 403-404 [89 Cal.Rptr. 78])' "*  This is extreme Insurer behavior in itself beyond all bounds of decency in a civilized world (especially with annual oath under penalty of perjury swearing to abide by those very duties) per <u>Hughes v. Pair</u>  *"conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' And ... defendant's conduct ... 'intended to inflict injury or engaged in with the*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*realization that injury will result.' "* Here, KMPR not only knew its conduct would most assuredly cause Mr. Austin injury, but had to repeatedly, egregiously, and conspicuously, violate all (99.9%) of duties annually sworn to to do so.

KMPR is especially callous, and purposefully harmful to Mr. Austin when considering that KMPR began this type of per se illegal conduct *after* receiving documented proof (via medical authorization forms, documented disability forms, proof of inability to work at all) of Mr. Austin's severe *ongoing* injury knowing that time is of the essence for his full health, quality of life, and economic injuries, and *after* discovering Mr. Austin is a Black man.  KMPR's overt 8 forms of animus is already disgusting and offensive, but combined with KMPR's intentional prolonging-worsening of Mr. Austin's injury by violating every principle, 99.9% of Insurer duties owed (including settlement contract offer in 40 days or less) per precise statutory framework is the height of 1. Malice 2. Extreme Conduct and 3. Intentional Infliction of Physical harm, and Emotional Distress per <u>Little v. Stuyvesant Life Insurance Co.</u>  *"The requirement of reckless conduct is satisfied by a showing that the defendant acted in reckless disregard of the probability that the plaintiff would suffer emotional distress."*

KMPR's conduct would already be outside the bounds of what any reasonable CA claimant should be expected to endure, but KMPR goes further.  KMPR's Perjury, Embezzlement, and simultaneous violations of *CA Civ Code § 1710,* <u>*CACI No. 2337*</u> ; <u>*§ 2695.6.*</u> ; <u>*§ 2695.1.*</u> ; <u>*§ 2695.5.*</u> ; <u>*§ 2695.3.*</u> ; <u>*§ 2695.7.*</u> *Ins. Code  § 790 et seq, Ins. Code sec. 1861.03 , Civ. Code § 45- 46, BPC Sec. 17200 (UCL); Civ. Code, § 1770 (CLRA), 13th-14th Amendments, Unruh Act, Civil Rights Act of 1964, 42 USC 1981* (as described above) as well as criminal per se violations of statute including *Perjury per Cal. Pen. Code § 131, § 129, § 127, § 126, § 125, § 123, § 119, &  § 118a; Embezzlement per Pen.Code § 503* truly take the proverbial Cake and constitutes what <u>*Fletcher v. Western Life Insurance Co.*</u>  defines as *"Severe emotional distress ...*

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**

*of such substantial quantity or enduring quality that no reasonable man in a civilized society*

*should be expected to endure it."*

Provided KMPR's direct knowledge of both 1. The expected standards of civilized conduct for Insurers to CA claimants 2. Mr. Austin's serious injuries from KMPR covered car accident, and their respective duties toward him, it is clear that KMPR's subsequent *ongoing* conduct was not only per se illegal, and willful, but a. Outrageous b. intended to cause emotional [and physical as well as other] distress c. malicious and recklessly disregarded the knowing various harms it was causing Mr. Austin while knowing he would suffer emotional, physical, economic, and other distress as a direct result of their conduct and d. Knew Mr. Austin is in fact suffering severe emotional, economic, physical and other distress because of KMPR's per se illegal, felony, conduct.   While suffering so much physical pain and anguish from KMPR covered car accident injuries that basic daily tasks like going to sleep (taking hours to find a position where pain is not excruciating in back or neck) or going to the bathroom, Mr. Austin also had to contend with fright, horror, nervousness, grief, worry, and shock, that KMPR would behave this illegal beyond all bounds of legality or decency, and the humiliation, and shame of KMPR's overtly racist use of derogatory racial stereotypes to embezzle property-contract owed him. (*Exhibits A-Z*).

### CONCLUSION: Minimum demand $5.5 - $10.5 million

Mr. Austin's *minimum demand* is in the range of $5.5 - $10.5 million depending on the overall structure, and timing, of KMPR's settlement offer including for KMPR's **180+** Unruh, and other legal violations between **3.1.25 - 6.23.25** *(updated 8.18.25)*.  Also, Mr. Austin seeks Injunctive relief for KMPR to immediately correct its illegal conduct.  If KMPR chooses to proceed to Trial, instead of ADR, Mr. Austin shall seek compensatory, punitive, and injunctive relief and remains open to non-litigious resolution options at stated price range.

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the California (& the US), that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin        6.23.25 (updated 8.18.25)**

**FIRST AMENDED COMPLAINT  -  San Francisco County Superior Court**



## Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Information Package



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

**WHY CHOOSE ADR?**

It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*<u>Electing to participate in an ADR process does not stop the time period to respond to a complaint or cross-complaint</u>\*\***

**WHAT ARE THE ADR OPTIONS?**

The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

**1) MANDATORY SETTLEMENT CONFERENCES**

Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

**2) MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF):** The ADR DEPARTMENT OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF), in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. BASF's panel of experienced, professional and impartial mediators work with parties to help them arrive at mutually agreeable solutions. Parties can select their mediator from the website www.sfbar.org/mediation or BASF can assist with mediator selection. BASF pre-screens all mediators based upon strict educational and experience requirements and handles administrative matters, including conflict checks and case management. BASF charges an initial fee of $295 per party, which covers (1) BASF's administration costs, (2) the first hour of preparation time, and (3) the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate, which varies depending on the mediator selected. Waivers of BASF's fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco  Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional  malpractice, insurance coverage,  toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court will coordinate assignment of cases for the program.  There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

**3) ARBITRATION**

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION**

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.1 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION**

Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

**HOW DO I PARTICIPATE IN ADR?**

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
adrcoordinator@sftc.org
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*) | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER: _____ |
|---|---|
| | **DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days ☐ 90-120 days ☐ Other (please specify)

_____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____
3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____          _____
Name of Party Stipulating                              Name of Party Stipulating

_____          _____
Name of Party or Attorney Executing Stipulation        Name of Party or Attorney Executing Stipulation

_____          _____
Signature of Party or Attorney                        Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant         ☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____                      Dated: _____

☐ *Additional signature(s) attached*

ADR-2  04/24                    **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

**BAR ASSOCIATION OF SAN FRANCISCO**

**CIVILITY TASK FORCE**

GUIDELINES OF CIVILITY AND PROFESSIONALISM

*Task Force Note: These guidelines are based on the California Attorney Guidelines of Civility and Professionalism, adopted July 20, 2007, and credit for the statewide guidelines should remain with their original authors. Likewise, where the inspiration for a section is from a guideline adopted previously by another bar association of this state, citation to the original is included.*

*In proposing these updated guidelines for the Bar Association of San Francisco, the Civility Task Force attempts to revisit the statewide guidelines with consideration for the progress we have made as a profession since the statewide rules were last updated. These guidelines remind lawyers of the importance of fostering the highest standards of civility, integrity and professionalism and of exhibiting courtesy to all participants in the practice of law and the judicial process. Although these guidelines are not a basis for discipline, sanctions, or ancillary litigation, they reflect expected standards of conduct for lawyers who practice in San Francisco Superior Court. These guidelines are in addition to mandatory requirements for lawyer conduct such as those set forth in the California Rules of Professional Conduct. Lawyers are expected to be familiar with and must observe all such rules of law. Lawyers are also expected to adhere to both the letter and spirit of Rules of Professional Conduct that prohibit discrimination, harassment, or retaliation in the practice of law.*

**SECTION 1**
**RESPONSIBILITIES TO THE JUSTICE SYSTEM**

The dignity, decorum and courtesy that have traditionally and aspirationally characterized the courts and legal profession of civilized nations are not empty formalities. They are essential to an atmosphere that promotes justice and to an attorney's responsibility for the fair and impartial administration of justice.

**SECTION 2**
**RESPONSIBILITIES TO THE PUBLIC AND THE PROFESSION**

An attorney should be mindful that, as individual circumstances permit, the goals of the profession include improving the administration of justice and contributing time to persons and organizations that cannot afford legal assistance.

An attorney should encourage new members of the bar to adopt these guidelines of civility and professionalism and mentor them in applying the guidelines.

41257\14956885.2
EXHIBIT A
Page 192

## SECTION 3
## RESPONSIBILITIES TO THE CLIENT AND CLIENT REPRESENTATION

An attorney should treat clients with courtesy and respect, and represent them in a civil and professional manner. An attorney should advise current and potential clients that it is not acceptable for an attorney to engage in abusive behavior or other conduct unbecoming a member of the bar and an officer of the court.

As an officer of the court, an attorney should not allow clients to prevail upon the attorney to engage in uncivil behavior.

An attorney should not compromise the guidelines of civility and professionalism to achieve an advantage.

## SECTION 4
## COMMUNICATIONS ABOUT THE LEGAL SYSTEM

An attorney's communications about the legal system should at all times reflect civility, professional integrity, personal dignity, and respect for the legal system. An attorney should not engage in conduct that is unbecoming a member of the Bar and an officer of the court.

This guideline should not prevent the member from expressing dissent or disagreement with a particular policy, law, or outcome, as our legal system often evolves and improves over time.

For example, in communications about the legal system and with adversaries:

a.      An attorney's conduct should be consistent with high respect and esteem for the civil and criminal justice systems.

b.      This guideline does not prohibit an attorney's good faith expression of dissent or criticism made in public or private discussions for the purpose of improving the legal system or profession.

## SECTION 5
## DUTIES TO OTHER COUNSEL

An attorney's communications with other attorneys, including opposing counsel, should at all times be respectful, civil, and courteous.  An attorney should also act in good faith with other counsel whom the attorney has dealings within the course of his or her practice.

For example:

a.      An attorney will not employ abusive, demeaning, or humiliating language in written or oral communications with other attorneys.

2

b.    An attorney will adhere to all express promises and to agreements with other counsel, whether oral or in writing, and will adhere in good faith to all agreements implied by the circumstances or local customs.

c.    When attorneys reach an oral understanding on a proposed agreement or a stipulation and decide to commit it to writing, the drafter will endeavor in good faith to state the oral understanding accurately and completely. The drafter will provide the other counsel with the opportunity to review the writing.

d.    An attorney will not write letters for the purpose of ascribing to opposing counsel a position he or she has not taken, or to create "a record" of events that have not occurred. Letters intended only to make a record should be used sparingly and only when thought to be necessary under all of the circumstances. Unless specifically permitted or invited by the court, letters between counsel should not be sent to judges.

## SECTION 6
## PUNCTUALITY

An attorney should be punctual in appearing at trials, hearings, meetings, depositions and other scheduled appearances.

For example:

a.    An attorney should arrive sufficiently in advance to resolve preliminary matters.

b.    An attorney should timely notify participants when the attorney will be late or is aware that a participant will be late.

## SECTION 7
## SCHEDULING, CONTINUANCES AND EXTENSIONS OF TIME

An attorney should advise clients that civility and courtesy in scheduling meetings, hearings and discovery are expected as professional conduct.

For example:

a.    An attorney should consider the scheduling interests of the court, other counsel or party, and other participants, should schedule by agreement whenever possible, and should send formal notice after agreement is reached.

b.    An attorney should not arbitrarily or unreasonably withhold consent to a request for scheduling accommodations or engage in delay tactics.

3

     c.    An attorney should promptly notify the court and other counsel of problems with key participants' availability.

     d.    An attorney should promptly notify other counsel and, if appropriate, the court, when scheduled meetings, hearings or depositions must be canceled or rescheduled, and provide alternate dates when possible.

In considering requests for an extension of time, an attorney should consider the client's interests and need to promptly resolve matters, the schedules and willingness of others to grant reciprocal extensions, the time needed for a task, and other relevant factors.

Consistent with existing law and court orders, an attorney should agree to reasonable requests for extensions of time that are not adverse to a client's interests.

For example:

     a.    Unless time is of the essence, an attorney should agree to an extension without requiring motions or other formalities, regardless of whether the requesting counsel previously refused to grant an extension.

     b.    An attorney should agree to an appropriate continuance when new counsel substitutes in.

     c.    An attorney should advise clients that failing to agree with reasonable requests for time extensions is inappropriate.

     d.    An attorney should not use extensions or continuances for harassment or to extend litigation.

     e.    An attorney should place conditions on an agreement to an extension only if they are fair and essential or if the attorney is entitled to impose them, for instance to preserve rights or seek reciprocal scheduling concessions.

     f.    If an attorney intends that a request for or agreement to an extension shall cut off a party's substantive rights or procedural options, the attorney should disclose that intent at the time of the request or agreement.

## SECTION 8
## SERVICE OF PAPERS

The timing and manner of service of papers should not be used to the disadvantage of the party receiving the papers.

4

For example:

      a.    An attorney should serve papers on the attorney who is responsible for the matter at his or her principal place of work.

      b.    If possible, papers should be served upon counsel at a time agreed upon in advance.

      c.    When serving papers, an attorney should allow sufficient time for opposing counsel to prepare for a court appearance or to respond to the papers.

      d.    An attorney should not serve papers to take advantage of an opponent's absence or to inconvenience the opponent, for instance by serving papers late on Friday afternoon or the day preceding a holiday.

      e.    When it is likely that service by mail will prejudice an opposing party, an attorney should serve the papers by other permissible means.

      f.    When possible, electronic service should be completed during normal business hours of 9:00 a.m. to 5:00 p.m.  Attorneys should avoid serving opposing counsel late at night, during the weekend, or on holidays.

      g.    An attorney should ask a party or third party's counsel, where the attorney is aware of such counsel, whether the counsel is authorized to accept service of papers if there is any question about such authorization. An attorney should not serve the party or third party directly before making such an inquiry.

**SECTION 9**
**WRITINGS SUBMITTED TO THE COURT, COUNSEL OR**
**OTHER PARTIES**

Written materials directed to counsel, third parties or a court should be factual and concise and focused on the issue to be decided.

For example:

      a.    An attorney should not make ad hominem attacks on opposing counsel.

      b.    Unless at issue or relevant in a particular proceeding, an attorney should avoid degrading the intelligence, ethics, morals, integrity, or personal behavior of others.

41257\14956885.2
EXHIBIT A
Page 196

   c.    An attorney should clearly identify all revisions in a document previously submitted to the court or other counsel.

## SECTION 10
## DISCOVERY

Attorneys are encouraged to meet and confer early in order to explore voluntary disclosure, which includes identification of issues, identification of persons with knowledge of such issues, and exchange of documents.

Attorneys are encouraged to propound and respond to formal discovery in a manner designed to fully implement the purposes of the Civil Discovery Act.

An attorney should not use discovery to harass an opposing counsel, parties, or witnesses. An attorney should not use discovery to delay the resolution of a dispute.

For example:

   a.    As to Depositions:

      1.    When another party notices a deposition for the near future, absent unusual circumstances, an attorney should not schedule another deposition in the same case for an earlier date without opposing counsel's agreement.

      2.    An attorney should delay a scheduled deposition only when necessary to address scheduling problems and not in bad faith.

      3.    An attorney should treat other counsel and participants with courtesy and civility, and should not engage in conduct that would be inappropriate in the presence of a judicial officer.

      4.    An attorney should remember that vigorous advocacy can be consistent with professional courtesy, and that arguments or conflicts with other counsel should not be personal.

      5.    An attorney questioning a deponent should provide other counsel present with a copy of any documents shown to the deponent before or contemporaneously with showing the document to the deponent.

      6.    An attorney questioning a deponent should not engage in bullying of the deponent or seek to intimidate the deponent.

41257\14956885.2
EXHIBIT A
Page 197

7.    Once a question is asked, an attorney should not interrupt a deposition or make an objection for the purpose of coaching a deponent or suggesting answers.

8.    An attorney should not direct a deponent to refuse to answer a question or end the deposition without a legal basis for doing so.

9.    An attorney should refrain from self-serving speeches and speaking objections.

b.    As to Document Demands:

1.    Document requests should be used only to seek those documents that are reasonably needed to prosecute or defend an action.

2.    An attorney should not make demands to harass or embarrass a party or witness or to impose an inordinate burden or expense in responding.

3.    If an attorney inadvertently receives a privileged document, the attorney should promptly notify the producing party that the document has been received.

4.    In responding to a document demand, an attorney should not intentionally misconstrue a request in such a way as to avoid disclosure or withhold a document on the grounds of privilege.

5.    An attorney should not produce disorganized or unintelligible documents, or produce documents in a way that hides or obscures the existence of particular documents.

6.    An attorney should not delay in producing a document in order to prevent opposing counsel from inspecting the document prior to or during a scheduled deposition or for some other tactical reason.

c.    As to Interrogatories and Requests for Admission:

1.    An attorney should narrowly tailor special interrogatories and requests for admission and not use them to harass or impose an undue burden or expense on an opposing party.

2.    An attorney should not intentionally misconstrue or respond to interrogatories or requests for admission in a manner that is not truly responsive.

3.  When an attorney lacks a good faith belief in the merit of an objection, the attorney should not object to an interrogatory or request for admission. If an interrogatory or request for admission is objectionable in part, an attorney should answer the unobjectionable part.

## SECTION 11
## MOTION PRACTICE

An attorney should consider whether, before filing or pursuing a motion, to contact opposing counsel to attempt to informally resolve or limit the dispute.

For example:

a.  Before filing demurrers, motions to strike, motions to transfer venue, and motions for judgment on the pleadings, an attorney should engage in more than a pro forma effort to resolve the issue. An attorney should ensure he/she begins the meet and confer process early enough to ensure the meet and confer process can be completed before the deadline to file the motion.

b.  In complying with any meet and confer requirement in the California Code of Civil Procedure, an attorney should speak personally with opposing counsel and engage in a good faith effort to resolve or informally limit an issue.

c.  An attorney should not engage in conduct that forces an opposing counsel to file a motion and then not oppose the motion.

d.  An attorney who has no reasonable objection to a proposed motion should promptly make this position known to opposing counsel, who then may file an unopposed motion or avoid filing a motion.

e.  After opposing a motion, if an attorney recognizes that the movant's position is correct, the attorney should promptly advise the movant and the court of this change in position.

f.  Because requests for monetary sanctions, even if statutorily authorized, can lead to the destruction of a productive relationship between counsel or parties, monetary sanctions should not be sought unless fully justified by the circumstances and necessary to protect a client's legitimate interests and then only after a good faith effort to resolve the issue informally among counsel.

## SECTION 12
## DEALING WITH NONPARTY WITNESSES

It is important to promote high regard for the profession and the legal system among those who are neither attorneys nor litigants. An attorney's conduct in dealings with nonparty witnesses should exhibit the highest standards of civility.

For example:

      a.    An attorney should be courteous and respectful in communications with nonparty witnesses.

      b.    Upon request, an attorney should extend professional courtesies and grant reasonable accommodations, unless to do so would materially prejudice the client's lawful objectives.

      c.    An attorney should take special care to protect a witness from undue harassment or embarrassment and to state questions in a form that is appropriate to the witness's age and development.

      d.    An attorney should not issue a subpoena to a nonparty witness for inappropriate tactical or strategic purposes, such as to intimidate or harass the nonparty.

      e.    As soon as an attorney knows that a previously scheduled deposition will or will not go forward as scheduled, the attorney should notify all counsel.

      f.    An attorney who obtains a document pursuant to a deposition subpoena should, upon request, make copies of the document available to all other counsel at their expense.

## SECTION 13
## EX PARTE COMMUNICATION WITH THE COURT

In a social setting or otherwise, an attorney should not communicate ex parte with a judicial officer on the substance of a case pending before the court, unless permitted by law.

## SECTION 14
## SETTLEMENT AND ALTERNATIVE DISPUTE RESOLUTION

An attorney should raise and explore with the client and, if the client consents, with opposing counsel, the possibility of settlement and alternative dispute resolution in every matter as soon as possible and, when appropriate, during the course of litigation.

41257\14956885.2
EXHIBIT A
Page 200

For example:

      a.    An attorney should advise a client at the outset of the relationship of the availability of informal or alternative dispute resolution.

      b.    An attorney should attempt to evaluate a matter objectively and to de-escalate any controversy or dispute in an effort to resolve or limit the controversy or dispute.

      c.    An attorney should consider whether alternative dispute resolution would adequately serve a client's interest and dispose of the controversy expeditiously and economically.

      d.    An attorney should honor a client's desire to settle the dispute quickly and in a cost- effective manner.

      e.    An attorney should use an alternative dispute resolution process for purposes of settlement and not for delay or other improper purposes, such as discovery.

      f.    An attorney should participate in good faith, and assist the alternative dispute officer by providing pertinent and accurate facts, law, theories, opinions and arguments in an attempt to resolve a dispute.

      g.    An attorney should not falsely hold out the possibility of settlement as a means for terminating discovery or delaying trial.

      h.    An attorney should provide briefing to the settlement officer before any deadlines provided to ensure the settlement officer has time to prepare for the settlement conference.

## SECTION 15
## CONDUCT IN COURT

To promote a positive image of the profession, an attorney should always act respectfully and with dignity in court and assist the court in proper handling of a case.

For example:

      a.    An attorney should be punctual and prepared.

      b.    An attorney's conduct should avoid disorder or disruption and preserve the right to a fair trial.

      c.    An attorney should maintain respect for and confidence in a judicial office by displaying courtesy, dignity and respect toward the court and courtroom personnel.

d.    An attorney should refrain from conduct that inappropriately demeans another person.

e.    Before appearing in court, an attorney should advise a client of the kind of behavior expected of the client and endeavor to prevent the client from creating disorder or disruption in the courtroom.

f.    An attorney should make objections for legitimate and good faith reasons, and not for the purpose of harassment or delay.

g.    An attorney should honor an opposing counsel's requests that do not materially prejudice the rights of the attorney's client or sacrifice tactical advantage.

h.    While appearing before the court, an attorney should address all arguments, objections and requests to the court, rather than directly to opposing counsel.

i.    While appearing in court, an attorney should demonstrate sensitivity to any party, witness or attorney who has requested, or may need, accommodation as a person with physical or mental impairment, so as to foster full and fair access of all persons to the court.

## SECTION 16
## DEFAULT

An attorney should not take the default of an opposing party known to be represented by counsel without giving the party advance warning.

For example, an attorney should not race opposing counsel to the courthouse to knowingly enter a default before a responsive pleading can be filed. This guideline is intended to apply only to taking a default when there is a failure to timely respond to complaints, cross- complaints, and amended pleadings.

## SECTION 17
## SOCIAL RELATIONSHIPS WITH JUDICIAL OFFICERS, NEUTRALS AND COURT APPOINTED EXPERTS

An attorney should avoid even the appearance of bias by notifying opposing counsel or an unrepresented opposing party of any close, personal relationships between the attorney and a judicial officer, arbitrator, mediator or court-appointed expert and allowing a reasonable opportunity to object.

## SECTION 18
## PRIVACY

An attorney should respect the privacy rights of parties and nonparties.

41257\14956885.2
EXHIBIT A
Page 202

For example:

> a.    An attorney should not inquire into, attempt or threaten to use, private facts concerning any party or other individuals for the purpose of gaining an advantage in a case. This guideline does not preclude inquiry into sensitive matters relevant to an issue, as long as the inquiry is pursued as narrowly as possible.

> b.    If an attorney must inquire into an individual's private affairs, the attorney should cooperate in arranging for protective measures, including stipulating to an appropriate protective order, designed to assure that the information revealed is disclosed only for purposes relevant to the pending litigation.

> c.    Nothing herein shall be construed as authorizing the withholding of information in violation of applicable law.

## SECTION 19
## NEGOTIATION OF WRITTEN AGREEMENTS

An attorney should negotiate and conclude written agreements in a cooperative manner and with informed authority of the client.

For example:

> a.    An attorney should use boilerplate provisions only if they apply to the subject of the agreement.

> b.    If an attorney modifies a document, the attorney should clearly identify the change and bring it to the attention of other counsel.

> c.    An attorney should avoid negotiating tactics that are abusive; that are not made in good faith; that threaten inappropriate legal action; that are not true; that set arbitrary deadlines; that are intended solely to gain an unfair advantage or take unfair advantage of a superior bargaining position; or that do not accurately reflect the client's wishes or previous oral agreements.

> d.    An attorney should not participate in an action or the preparation of a document that is intended to circumvent or violate applicable laws or rules.

In addition to other applicable Sections of these Guidelines, attorneys engaged in a transactional practice have unique responsibilities because much of the practice is conducted without judicial supervision.

For example:

12

a.    Attorneys should be mindful that their primary goals are to negotiate in a manner that accurately represents their client and the purpose for which they were retained.

b.    Attorneys should successfully and timely conclude a transaction in a manner that accurately represents the parties' intentions and has the least likely potential for litigation.

c.    With client approval, attorneys should consider giving each party permission to contact the employees of the other party for the purpose of promptly and efficiently obtaining necessary information and documents.

## SECTION 20
## ADDITIONAL PROVISION FOR FAMILY LAW PRACTITIONERS

In addition to other applicable Sections of these Guidelines, in family law proceedings an attorney should seek to reduce emotional tension and trauma and encourage the parties and attorneys to interact in a cooperative atmosphere, and keep the best interest of the children in mind.

For example:

a.    An attorney should discourage and should not abet vindictive conduct.

b.    An attorney should treat all participants with courtesy and respect in order to minimize the emotional intensity of a family dispute.

c.    An attorney representing a parent should consider the welfare of a minor child and seek to minimize the adverse impact of the family law proceeding on the child.

## SECTION 21
## ADDITIONAL PROVISION FOR CRIMINAL LAW PRACTITIONERS

In addition to other applicable Sections of these Guidelines, criminal law practitioners have unique responsibilities. Prosecutors are charged with seeking justice, while defenders must zealously represent their clients even in the face of seemingly overwhelming evidence of guilt. In practicing criminal law, an attorney should appreciate these roles.

For example:

a.    A prosecutor should not question the propriety of defending a person accused of a crime.

41257\14956885.2
EXHIBIT A
Page 204

b.    Appellate counsel and trial counsel should communicate openly, civilly and without rancor, endeavoring to keep the proceedings on a professional level.

## SECTION 22
## COURT PROCEEDINGS

Judges are encouraged to become familiar with these Guidelines and to support and promote them where appropriate in court proceedings.

## SECTION 23
## DIVERSITY AND ELIMINATION OF BIAS

Our society is diverse. We must commit ourselves to promote and encourage respect for diverse cultures, opinions and views, and expand opportunities to those who have traditionally been excluded.

(*Source: Ventura Co. Bar Assoc. Guidelines on Professional Conduct and Civility § 14.*)

Our profession includes individuals of various ages, races, national origins, ethnicity, political views, cultural and economic backgrounds, religions, disabilities, gender identities, and sexual orientation. It also includes a wide variety of specialties, affiliations and professional relationships. Professional courtesy and civility requires lawyers to respect diversity and to uniformly honor these rules of civility without discrimination and with equal dignity. (*Id.*)

Lawyers shall always act impartially with respect to all persons including opposing counsel, clients, witnesses, and the public. Lawyers shall not engage in any act of bias based on age, race, national origin, ethnicity, political views, cultural or economic background, religion, disability, gender identity, or sexual orientation while engaging in the practice of law, and should work toward the elimination of bias in all aspects of the justice system.

Examples - Lawyers shall:

a.    Treat opposing counsel with respect and courtesy regardless of age, race, national origin, ethnicity, political views, cultural or economic background, religion, disability, gender identity, or sexual orientation.

b.    Not attempt to take advantage of or intimidate another lawyer on account of age, race, national origin, ethnicity, political views, cultural or economic background, religion, disability, gender identity, or sexual orientation.

14

c.    Not tolerate bias or prejudice by another attorney or by the court and should take appropriate steps to prevent an occurrence of such behavior in the future.

d.    Refrain from making any statement or comment, whether publicly or privately, which serves to denigrate any other lawyer, judicial officer or member of the public on the basis of age, race, national origin, ethnicity, political views, cultural or economic background, religion, disability, gender identity, or sexual orientation.

(*Source: Sacramento Co. Bar Association Standards of Professional Conduct § 3G.*)

## SECTION 24
## REMOTE PROCEEDINGS

Advances in technology combined with the COVID-19 pandemic accelerated a shift in our profession towards remote depositions, mediations, and court appearances becoming a generally accepted norm.  Remote proceedings are a cost-effective and time-saving means of conducting certain matters, yet in-person proceedings may be preferred in many instances.

In order to facilitate the continued integration of remote proceedings into our profession, lawyers should:

a.    Familiarize themselves with the commonly used technology for conducting remote proceedings, and upgrade their existing hardware, software, and internet connection to meet the expected quality necessary to hold such proceedings without causing a disruption due to poor video or audio quality.

b.    Accommodate reasonable requests to hold remote appearances for the convenience of counsel or the witness. Conversely, where an attorney believes that an in-person appearance is essential, a request for an in-person proceeding should be accommodated absent extenuating circumstances which render proceeding in-person unsafe or unnecessarily expensive (*i.e.* long distance travel).

c.    Ensure that they and the persons they represent at the proceeding are appearing from a computer with a sufficiently strong internet connection, and from a location free from excessive background noise or distractions.

d.    Not communicate with a remote deposition witness while on the record via technological or other means which are not also made part of the record and disclosed to the other attendees.

15

e.    Treat remote proceedings with the same level of decorum and respect as if the matter was taking place in person.

## SECTION 25
## MENTORSHIP

The training of young lawyers through hands-on experience is essential both to their development and the future of our legal community.  Where possible, experienced attorneys should take the opportunity to:

a.    Mentor young attorneys and provide constructive feedback without undue harsh criticism.

b.    Allow less-experienced attorneys to attend and present oral arguments at hearings.

c.    Allow less-experienced attorneys to take and defend depositions.

d.    Allow less-experienced attorneys to make meaningful contributions at trial.

16

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **DEC 10, 2025** |
| **TIME:** | **10:30 am** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

> CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order  **without an appearance**  at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

> **IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
>
> (SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



**Superior Court of California, County of San Francisco**
**Information Sheet**
**Voluntary Expedited Jury Trial Summary**

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases.  EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way.  Voluntary EJTs are authorized by statute.  CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.)  EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

•  Parties encouraged to submit a joint jury questionnaire;

•  8 jurors (6 must agree);

•  3 peremptory challenges per side;

•  5-hour time limit per side <u>unless agreed otherwise and approved;</u>

•  One to two court days completion <u>unless agreed otherwise and approved;</u>

•  Option to present evidence by stipulation and objection;

•  High/low arrangement option;

•  Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><b>FOR COURT USE ONLY</b><br><i>(SOLO PARA USO DE LA CORTE)</i></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
 KEMPER CORPORATION ('KMPR') 2167877; per California Secretary of State 55898375 &
60164789;per Illinois Sec.of State. Publicly traded as "KMPR"  www.kemper.com/

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
 GEORGE JARVIS AUSTIN

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es:)*    San Francisco Superior Courthouse

 400 McAllister St, San Francisco, CA 94102

CASE NUMBER:
*(Número del Caso:)*

**CGC-25-627172**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
 George Jarvis Austin, 2107 Montauban Court, Stockton, CA, 95210, 209.915.6304

DATE:
*(Fecha)*  **07/21/2025**

Clerk, by
*(Secretario)* _____  **WILMA CORRALES**  , Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL] 

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

EXHIBIT A
Page 210

**For your protection and privacy, please press the Clear This Form button after you have printed the form.** | Print this form | Save this form | Clear this form